# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Case No.: 14-34232 |
| | ) |
| CONCEPTS AMERICA, INC. | ) Honorable Pamela S. Hollis |
| | ) |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| BRIAN AUDETTE, NOT INDIVIDUALLY BUT AS CHAPTER 7 TRUSTEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Pro. Case No.: |
| | ) |
| TED KASEMIR, LISA KASEMIR, ROGER GREENFIELD, JENNIFER GREENFIELD, RESTAURANTS-AMERICA CONSULTING GROUP,  INC., D/B/A RESTAURANTS AMERICA, RESTAURANTS-AMERICA TRADEMARK, INC., RODD GOLDMAN, RACHEL DENNIS, R CONSULTING COMPANY, TAPSMITH MANAGEMENT, INC., HOPWORKS MANAGEMENT, INC., DRAFT TOWN MANAGEMENT, LLC, ROSEMONT RESTAURANT, LLC, 1645 W. JACKSON, INC., PRIME BAR AMERICA, LLC, PRIME BAR CHICAGO, LLC, PRIME BAR TAMPA, LLC, ONE NORTH, INC, 1840 PICKWICK, LLC, CONCEPTS RESTAURANT HOLDING, LLC, , JOHN DOES 1 THROUGH 20, REPUBLIC BANK OF CHICAGO, AND CONCEPTS  RESTAURANT MANAGEMENT, LLC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## ADVERSARY COMPLAINT

Now comes Plaintiff BRIAN AUDETTE, NOT INDIVIDUALLY BUT AS CHAPTER 7 TRUSTEE (the "*Trustee*") for the bankruptcy estate of CONCEPTS AMERICA, INC. ("*Concepts*" or the "*Debtor*"), by his counsel, Goldstein & McClintock LLLP, and for his Adversary Complaint against defendants TED KASEMIR ("*Ted*"); LISA KASEMIR ("*Lisa*"); ROGER GREENFIELD ("*Roger*"); JENNIFER GREENFIELD ("*Jennifer*"; and together with Ted, Lisa, and Roger, the "*Insider Defendants*"); RESTAURANTS-AMERICA CONSULTING GROUP, INC., D/B/A RESTAURANTS AMERICA ("*RA Consulting*"), RESTAURANTS-AMERICA TRADEMARK, INC. ("*RA Trademark*"; and together with RA Consulting, the "*Restaurants America Entities*"); RODD GOLDMAN ("*Rodd*"); RACHEL DENNIS ("*Dennis*"), R CONSULTING COMPANY ("*Consulting*"), TAPSMITH MANAGEMENT, INC. ("*Tapsmith*"), HOPWORKS MANAGEMENT, INC. ("*Hopworks*"), DRAFT TOWN MANAGEMENT, LLC ("*Draft Town*") ROSEMONT RESTAURANT, LLC ("*Park Tavern Rosemont*"); 1645 W. JACKSON, INC. ("*Park Tavern Chicago*"); PRIME BAR AMERICA, LLC ("*Prime Bar America*"); PRIME BAR CHICAGO, LLC ("*Prime Bar Chicago*"); PRIME BAR TAMPA, LLC ("*Prime Bar Tampa*"), ONE NORTH, INC. ("*One North*"), 1840 PICKWICK, LLC ("*1840 Pickwick*"), Concepts Restaurant Holding, LLC ("*Holding*"), , John Does 1-20, REPUBLIC BANK OF CHICAGO ("*Republic Bank*"); and CONCEPTS RESTAURANT MANAGEMENT, LLC ("*Concepts RM*"; and together with the Insider Defendants, the Restaurants America Entities, Rodd, Dennis, Consulting, Tapsmith, Hopworks, Draft Town, Park Tavern Rosemont, Park Tavern Chicago, Prime Bar America, Prime Bar Chicago, Prime Bar Tampa, One North, 1840 Pickwick, Holding, John Does 1-20, and Republic Bank, the "*Defendants*"), respectfully states as follows:

## INTRODUCTION

1.      Roger and Ted, with the assistance of counsel, have orchestrated a scheme that resulted in creditors – mostly landlords around the country who were led to believe they were leasing and advancing credit to a healthy and solvent entity – incurring millions of dollars in damages.

2.      In broad strokes, for years, Concepts served as a holding company (for some entities) and management company for a restaurant group owned (directly or indirectly), controlled, and operated by Roger and Ted (defined below as the "*Restaurant Group*").  Each restaurant within the Restaurant Group was historically owned by its own holding company (each a "*HoldCo*"), with the HoldCos either owned by Concepts (the "*Concepts-Owned HoldCos*") or by Ted and/or Roger individually (the "*Insider-Owned HoldCos*").

3.      Notwithstanding the foregoing corporate structure, the entire Restaurant Group operated as a single economic unit.  Funds were extensively and regularly comingled between and among Concepts, Concepts-Owned HoldCos, and Insider-Owned HoldCos.  Concepts employees provided management services (without management agreements or compensation), developed new restaurants (negotiating leases, dealing with contractors, etc.), and used funds from the Comingled Concepts Accounts (defined below) for the development and operation of restaurants regardless of legal ownership.  Roger and Ted routinely borrowed money and/or incurred debts that jointly obligated Concepts, Concepts-Owned HoldCos, and/or Insider-Owned HoldCos, regardless of which entities or individuals may have received the borrowed funds.  In sum, the entire Restaurant Group operated as a single company without any regard for corporate separateness.

4.     Moreover, the disregard for corporate separateness extended directly to Ted and Roger and their wives.  Beyond their regular salaries, when Concepts had cash, it would often distribute it to Ted and Roger (directly or via management entities owned by them) and their wives, and when it needed cash (for development of a new restaurant for example), funds would flow back in from them.  Roger and Ted frequently paid contractors personally, and then were reimbursed by Concepts, often for projects not owned by Concepts or its subsidiaries, but instead owned by Insider-Owned HoldCos.  Roger and Ted treated Concepts and the entire Restaurant Group as one company that they owned 50-50 (again notwithstanding actual legal ownership of the entities), and they then treated this consolidated company as a giant "piggy bank."  For the vast majority of transfers, the only documentation was the corresponding check, money order, or bank record (*e.g*., for electronic transfers).  Although there were literally hundreds of intercompany transfers of funds, there were no notes or other formal evidence of indebtedness between the companies nor was there any effort made to pay back the funds "borrowed" by one company from another.

5.     New restaurants were typically developed in large part using tenant allowance funds ("*TI Funds*") – *i.e*., up-front funds from landlords that often covered a significant portion of restaurant buildout costs.  Landlords would naturally be concerned about being asked to provide hundreds of thousands of dollars in TI Funds to brand new HoldCos with no assets or operating histories.  In order to reassure landlords and thereby maximize TI Funds and obtain leases, Roger and Ted would offer to have Concepts act as guarantor, and would provide Consolidated Financials (defined below) deceptively showing Concepts owning substantial assets that were producing tens of millions of dollars more in annual revenue than was reflected

in Concepts' tax returns (which were conveniently filed years late). Either these revenue figures were fabricated, or they included revenue from Insider-Owned HoldCos that Concepts did not own and whose assets and revenues would thus not be available to satisfy claims on guarantees against Concepts in the event of HoldCo defaults.

6.     When new restaurants were not profitable, Roger and Ted would quickly close them. This would leave landlords – who had typically advanced substantial TI Funds largely in reliance on the Concepts guaranty – out hundreds of thousands or millions of dollars in TI Funds and back and future rent.

7.     By 2012, Concepts was insolvent and unable to pay its bills as they came due. Well over 100 checks were returned for non-sufficient funds, multiple restaurants closed or breached leases that Concepts had guaranteed, and Concepts employees were aware that other locations were not viable and were likely to close soon. Even more locations closed in 2013, and Concepts remained insolvent and unable to pay its bills through its bankruptcy filing in September, 2014.

8.     As landlords began to pursue Concepts on account of the defaults, what they did not know is that they were chasing an entity – Concepts – that legally had far fewer assets and substantially less revenue than had been represented to them in the Consolidated Financials.

9.     Moreover, rather than trying to maximize value for creditors in light of Concepts' insolvency, Roger and Ted instead took numerous actions to hinder and delay creditor collections. For example, and as discussed in greater detail below:

> (A)     **Creation of Insider "Loan" Obligations.** On December 12, 2012, with Concepts insolvent, Roger had all eleven of the HoldCos then in existence issue a $1.8 million promissory note (the "*Greenfield Note*") in his favor. The Greenfield Note appears to have been an attempt to turn random and

undocumented equity advances made over a series of years into a "loan" that would jointly obligate all of the HoldCos.

(B) **Financial De-Coupling, and Diversion of Revenues from the HoldCos.** As noted above, Concepts and the rest of the Restaurant Group had historically operated in a manner that disregarded legal ownership and corporate formalities. One manifestation of this was extensive comingling, with millions of dollars in monthly revenues from a variety of HoldCos flowing into the Comingled Concepts Accounts (described in detail below).

In mid-2013, with Concepts falling ever deeper into insolvency as more restaurants closed, checks bounced, and guaranty obligations mounted, Concepts employees opened separate bank accounts for all or virtually all of the individual HoldCos. The credit card processor used by the Restaurant Group was asked to begin directing revenues to these separate accounts (as opposed to into comingled accounts as before).

The de-linking of these accounts, and the corresponding re-direction of millions of dollars in revenues from restaurants that had always operated as part of Concepts, had been created and managed by Concepts employees (often with Concepts funds), and that had been held out to creditors as being part of Concepts (including via the Consolidated Financials), shall be referred to herein as the "*De-Coupling*".

The impact of the De-Coupling and resultant diversion of revenue was that deposits into Concepts accounts – which had averaged more than $2,500,000 per month from January, 2012 through May, 2013, dropped in June, 2013 to less than $1,000,000, dropped in July 2013 to less than $300,000, and to less than $50,000 by September 2013. *See* chart in paragraph 215, and detail in associated exhibit. In sum, with Concepts insolvent and facing ever-increasing legal pressure from landlords, *Roger and Ted caused all revenues to be diverted away from Concepts.*

(C) **Transfer of the Concepts-Owned HoldCos and Associated Restaurants.** As of the beginning of March, 2013, Concepts directly owned five HoldCos (defined below as the Transferred Subsidiaries), each of which owned one restaurant. On March 4, 2013, as part of a plan devised by Concepts' counsel (individually, the "Law Firm Partner" and the "Law Firm" and collectively, "counsel"), Concepts transferred its entire ownership interest in each of the Transferred Subsidiaries to Holding for no consideration (the foregoing, the "*Transfer of the Owned Subsidiaries*").

Although Concepts was given ownership of Holding, as described below, counsel structured the transaction so as to make it much more difficult for a trustee or receiver appointed for Concepts to obtain control of the Transferred Subsidiaries – thus entrenching Roger and Ted in control. Moreover, it turned into Concepts an empty shell at a time when landlords were commencing or pursuing litigation to obtain judgments.

After the transfer described above, Roger and Ted closed and wound up two of the Transferred Subsidiaries, and they purported to have one of them – One North, Inc., the owner of the "One North" restaurant on Wacker Drive in Chicago, IL – transfer 100% of its own capital stock (the "*One North Stock*") to Rodd Goldman, Concepts' CFO. As discussed below, the Trustee believes that (a) this was an ineffective transfer and (b) to the extent it was effective, it was fraudulent and should be avoided.

(D)     **Borrowing Against and Encumbering the Concepts-Owned HoldCos for the Benefit of Insiders.** In March, 2013, with Concepts insolvent, Concepts closed on a $650,000 revolving line of credit (the "*Concepts-Edgebrook Loan*") with Edgebrook Bank ("*Edgebrook*"). As collateral, Edgebrook was granted a lien on all business assets of not only Concepts, but also the two most valuable remaining Concepts-Owned HoldCos (previously unencumbered) and one Insider-Owned HoldCo. At the same time, 1840 Pickwick, one of the entities that the Trustee believes is the alter-ego of Concepts, obtained a $1 million loan from Edgebrook (the "*Pickwick-Edgebrook Loan*"; and together with the Concepts-Edgebrook Loan, the "*Edgebrook Loans*").

As discussed below, given Concepts' financial condition – insolvent and having not filed tax returns since its 2008 return – the only way the Edgebrook Loans issued was that Edgebrook itself was in serious financial trouble and desperate for capital. Concepts was effectively required to invest $200,000 of the proceeds into Edgebrook-related entities. As discussed below, Roger initially made this investment (the "*Edgebrook Investment*") personally, but he was then promptly reimbursed by Concepts when the Edgebrook Loans closed a few weeks after the Edgebrook Investment was made.

Upon information and belief, Roger and Ted were willing to do this – have Concepts "invest" $200,000 in a failing (and now failed) bank to obtain $650,000 in credit – because it could not otherwise obtain a loan, and they knew that either all or a substantial portion of the proceeds of the Edgebrook Loans would be used for their own benefit. In other words, with creditor judgments on the horizon, and Concepts insolvent, Roger and Ted caused Concepts to pay $200,000 to borrow money that they then

benefited from – further "judgment proofing" Concepts by encumbering it and its best subsidiaries and using most of the loan proceeds for their personal benefit (the foregoing actions shall be described herein as the "*Encumbering of the Concepts Assets*").

Notably, although Concepts ultimately paid for the Edgebrook Investment, the stock certificates were placed in a separate LLC owned personally by Roger.

(E)    **Opening New Restaurants Not Under Concepts.**    Finally, upon information and belief, beginning in at least 2012, Roger stopped using Concepts and the Restaurant Group to form and open new restaurants, and instead began to open new restaurants with Dennis – Concepts' General Counsel.    For at least some of these locations, ownership is vested in Jennifer – Roger's wife – as opposed to in Roger.    These new entities are defined below as the *New Greenfield-Dennis Restaurant Ventures*.

10.    The result of the foregoing is that when landlords began to obtain judgments against Concepts, post-judgment discovery revealed a far different picture than the one that had been painted by the Consolidated Financials just months before (showing Concepts with tens of millions of dollars in revenue and substantial assets).    In stark contrast, *Concepts now had no direct assets (its subsidiaries were now indirectly owned making it harder for a trustee or receiver to gain control), no revenues (and its actual revenues had never been as depicted in the Consolidated Financials), and both it and its indirect subsidiaries were now encumbered.*    When this became apparent, creditors worked together and filed the involuntary bankruptcy petition on September 19, 2014.

11.    The trustee now brings this action to seek redress for creditors – almost all landlords – who have been intentionally harmed by the conduct of the defendants herein.

## PARTIES

12.     Concepts is the debtor in the above-captioned bankruptcy and is an Illinois Corporation with its principal office and place of business at 1840 Pickwick in Glenview, Illinois.  Ted and Roger each own 50% of the equity in Concepts.

13.     Defendant Roger Greenfield is an individual residing in Northbrook, Illinois.  He is Jennifer's husband.

14.     Defendant Jennifer Greenfield is an individual residing in Northbrook, Illinois.  She is Roger's wife.

15.     Defendant Ted Kasemir is an individual residing in Highland Park, Illinois.  He is Lisa's husband.

16.     Defendant Lisa Kasemir is an individual residing in Highland Park, Illinois.  She is Ted's wife.

17.     Defendant Rodd Goldman is an individual residing in Skokie, Illinois.  He was the Chief Financial Officer ("*CFO*") for Concepts and the other entities within the Restaurant Group until mid-2013, and claims to be the owner of One North.

18.     Defendant Dennis is an individual residing in Illinois.  She was the general counsel for Concepts and all of the individual HoldCos as well as RA Consulting, RA Trademark and 1840 Pickwick.

19.     R Consulting is an Illinois corporation owned by Dennis with its principal place of business in Oak Park, Illinois.

20.     Tapsmith is an Illinois corporation owned by Roger with its principal place of business in Northbrook, Illinois.  Roger uses Tapsmith to collect what he asserts are management fees from various HoldCos.

21.     Hopworks is an Illinois corporation owned by Roger with its principal place of business in Northbrook, Illinois.   Roger uses Hopworks to collect what he asserts are management fees from various HoldCos.

22.     Draft Town is an Illinois limited liability company owned by Ted with its principal place of business at 1840 Pickwick in Glenview, Illinois.  Ted uses Draft Town to collect what he asserts are management fees from various HoldCos.

23.     Defendant Park Tavern Rosemont is an Illinois limited liability company ("*LLC*") with its principal office at 1840 Pickwick in Glenview, Illinois, and its principal place of business in Rosemont, Illinois.  Park Tavern Rosemont is owned by some combination of Roger and Ted, as discussed below.  Ted is Park Tavern Rosemont's registered agent.  Park Tavern Rosemont's primary asset is a "Park Tavern" restaurant located at 5433 Park Place in Rosemont, Illinois.

24.     Defendant Prime Bar America is an Illinois LLC with its principal office at 1840 Pickwick in Glenview, Illinois, and its principal place of business in Chicago, Illinois.  Prime Bar America is owned by some combination of Roger and Ted, as discussed below.  Prime Bar America did not own a specific restaurant, but maintained a bank account where revenue from other HoldCo's was deposited and comingled, and from which it transferred funds to and from Concepts and other HoldCos and made payment to some or all of the Insider Defendants.

25.     Defendant Park Tavern Chicago is an Illinois corporation which has its principal office at 1840 Pickwick in Glenview, Illinois, and its principal place of business in Chicago, Illinois.  Park Tavern Chicago is owned by some combination of Roger and Ted, as discussed below.  Park Tavern Chicago's primary asset is a "Park Tavern" restaurant located at 1645 W. Jackson Boulevard in Chicago, Illinois.

26.     Defendant Prime Bar Chicago is an Illinois LLC with its principal office at 1840 Pickwick in Glenview, Illinois, and its principal place of business in Chicago, Illinois.  Ted and Roger are the only members of Prime Bar Chicago, each owning 50% of the company.  Prime Bar Chicago's primary asset is a "Prime Bar" restaurant located at 155 N. Wacker Drive in Chicago, Illinois.

27.     Defendant Prime Bar Tampa is an Illinois LLC with its principal office at 1840 Pickwick in Glenview, Illinois, and its principal place of business in Wesley Chapel, Florida. Prime Bar Tampa is owned by some combination of Roger and Ted, as discussed below.  Ted is Prime Bar Tampa's registered agent.  Prime Bar Tampa's main asset is a "Prime Bar" restaurant located at 2001 Piazza Avenue in Wesley Chapel, Florida.

28.     Defendant One North is an Illinois corporation with its principal place of business in Chicago, Illinois.  One North's primary asset is a "One North Kitchen & Bar" restaurant located at 1 North Wacker Drive in Chicago, Illinois.

29.     Defendant RA Trademark is an Illinois corporation with its principal office and place of business at 1840 Pickwick in Glenview, Illinois.  RA Trademark is owned and managed by Roger and Ted.

30.     Defendant RA Consulting is an Illinois corporation with its principal place of business at 1840 Pickwick in Glenview, Illinois.  RA consulting is owned and managed by Roger and Ted.

31.     Defendant 1840 Pickwick is an Illinois corporation with its principal office and place of business in Glenview, Illinois.  1840 Pickwick is owned and managed by Roger and Ted.  1840 Pickwick's main asset is real property that served as the corporate headquarters of Concepts, RA Consulting, RA Trademark and each of the HoldCos.

32.     Holding is an Illinois limited liability company formed by Roger and Ted at the direction of counsel to facilitate the transfer of the Concepts-Owned HoldCos and frustrate the collection efforts of Concepts' creditors.  Holding is owned by Concepts and has its principal place of business at 1840 Pickwick in Glenview, Illinois.

33.     Defendant Concepts RM is an Illinois limited liability company formed by Roger and Ted at the direction of counsel in connection with the transfer of the Concepts-Owned HoldCos to Holding in order to frustrate the collection efforts of Concepts' creditors.  Concepts RM is owned by Concepts and has its principal place of business at 1840 Pickwick in Glenview, Illinois.

34.     John Does 1 through 20 are unknown individuals believed to reside in Illinois that assisted or participated with Roger and Ted on the various acts described in this Complaint.

35.     Defendant Republic Bank is an Illinois banking corporation headquartered in Oak Brook, Illinois.  Upon information and belief Republic Bank is the successor in interest to the Federal Deposit Insurance Corporation (the "*FDIC*") in its capacity as receiver for Edgebrook

Bank, and is the current holder of the Concepts-Edgebrook Loan and the Pickwick-Edgebrook Loan.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§1408 and 1409.

37.     This matter is a core proceeding pursuant to, without limitation, 28 U.S.C. §§157(b)(2)(A), (B), (C), (H), (K), and (O).

38.     This Court has personal jurisdiction over Roger because Roger resides in Illinois.

39.     This Court has personal jurisdiction over Jennifer because Jennifer resides in Illinois.

40.     This Court has personal jurisdiction over Ted because Ted resides in Illinois.

41.     This Court has personal jurisdiction over Lisa because Lisa resides in Illinois.

42.     This Court has personal jurisdiction over Rodd because Rodd resides in Illinois.

43.     This Court has personal jurisdiction over Dennis because Dennis resides in Illinois.

44.     This Court has personal jurisdiction over Park Tavern Rosemont because: Park Tavern Rosemont is an Illinois LLC; Park Tavern Rosemont has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

45.     This Court has personal jurisdiction over Park Tavern Chicago because: Park Tavern Chicago is an Illinois LLC; Park Tavern Chicago has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

46.     This Court has personal jurisdiction over Prime Bar America because: Prime Bar America is an Illinois LLC; Prime Bar America has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

47.     This Court has personal jurisdiction over Prime Bar Chicago because: Prime Bar Chicago is an Illinois LLC; Prime Bar Chicago has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

48.     This Court has personal jurisdiction over Prime Bar Tampa because: Prime Bar Tampa is an Illinois LLC; Prime Bar Tampa has transacted business in Illinois, including maintaining its corporate offices in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

49.     This Court has personal jurisdiction over One North because: One North is an Illinois corporation; One North has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

50.     This Court has personal jurisdiction over RA Trademark because: RA Trademark is an Illinois corporation; RA Trademark has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

51.     This Court has personal jurisdiction over Consulting because: Consulting is an Illinois corporation; Consulting has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois

52.     This Court has personal jurisdiction over Tapsmith because: Tapsmith is an Illinois corporation; Tapsmith has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

53.     This Court has personal jurisdiction over Hopworks because: Hopworks is an Illinois corporation; Hopworks has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

54.     This Court has personal jurisdiction over RA Consulting because: RA Consulting is an Illinois corporation; RA Consulting has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

55.     This Court has personal jurisdiction over 1840 Pickwick because: 1840 Pickwick is an Illinois LLC; 1840 Pickwick has transacted business in Illinois; 1840 Pickwick owns real property located in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

56.     This Court has personal jurisdiction over Draft Town because: Draft Town is an Illinois LLC; Draft Town has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

57.     This Court has personal jurisdiction over Holding because: Holding is an Illinois LLC; Holding has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

58.     This Court has personal jurisdiction over John Does 1 through 20 because, on information and belief: John Does 1 through 20 reside in Illinois; John Does 1 through 20 have transacted business in Illinois; John Does 1 through 20 have committed tortious acts in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

59.     This Court has personal jurisdiction over Republic Bank because: Republic Bank is an Illinois banking corporation; Republic Bank has transacted business in Illinois; Republic

Bank has committed tortious acts in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

60.     This Court has personal jurisdiction over Concepts RM because: Concepts RM is an Illinois LLC; Concepts RM has transacted business in Illinois; and/or a substantial amount of the acts giving rise to this action occurred in Illinois.

## BACKGROUND

### I.     The Restaurant Group – Ownership Structure

### (A)     Legal Ownership of the HoldCos Within the Restaurant Group

61.     Each restaurant within the Restaurant Group has historically been owned by an associated HoldCo.

62.     As noted above, Concepts historically owned some of the HoldCos – *i.e.*, the "Concepts-Owned HoldCos" – directly.   The following chart contains a non-exclusive list of Concepts-Owned HoldCos:

| Restaurant | HoldCo | HoldCo Formation Date | Original Owner of HoldCo | Current Owner of HoldCo | Current Status |
|---|---|---|---|---|---|
| *Grill Room* – Chicago, IL | 33 Restaurant, Inc. | 10.15.1999 | Concepts 100% | Concepts Restaurant Holding, Inc. | Open |
| *One North Kitchen & Bar* – Chicago, IL | One North, Inc. | 3.14.2001 | Concepts 100% | Concepts Restaurant Holding, Inc.[1] | Open |
| *Bluepoint Ocean Grill* – Hollywood, FL | Bluepoint Hollywood, Inc. | 5.19.2003 | Concepts 100% | Concepts Restaurant Holding, Inc. | Closed |
| *Townhouse* -- Chicago, IL | 111 Wacker Restaurant | 5.10.2005 | Concepts 100% | Concepts Restaurant | Open |

---

[1]      Rodd Goldman, the former CFO of Concepts and all entities owned by Roger and Ted, purports to have purchased the stock of One North and currently is in possession of, and is operating, One North as discussed herein. As he never purchased the stock from the entity owning the stock, his ownership claim is disputed.

| | Corp. | | | Holding, Inc. | |
|---|---|---|---|---|---|
| *Midtown Kitchen & Bar* – Chicago, IL | Midtown Kitchen & Bar, Inc. | 3.30.2006 | Concepts 100% | Concepts Restaurant Holding, Inc. | Closed |

63.    Ownership of the Insider-Owned HoldCos, on the other hand, was vested in

Roger and/or Ted.  The following chart contains a non-exclusive list of Insider-Owned HoldCos:

| Restaurant | SP Entity | Legal HoldCo Ownership | Roger's Testimony Re: HoldCo Ownership | Ted's Testimony Re: HoldCo Ownership | Date HoldCo Formed | Status (Open or Closed) |
|---|---|---|---|---|---|---|
| *Prime Bar* – Tampa, FL | Prime Bar Tampa, LLC | Unknown | Either Roger 100%, or Roger and Ted | Roger 50%; Ted 50% | 11.18.08 | Open |
| *Prime Bar* – Chicago, IL | Prime Bar Chicago, LLC | Roger 50%; Ted 50% | Roger 50%, Ted 50% | Roger 50%; Ted 50% | 5.5.09 | Open |
| *Prime Bar* – Dallas, TX | Prime Bar Greenway LLC | Unknown | Roger 100% | Roger 50%; Ted 50% | 1.11.11 | Closed |
| *Park Tavern* – Dallas, TX | Park Grill LLC | Unknown | Either Roger 100%, or Roger and Ted | Roger 50%; Ted 50% | 4.6.11 | Closed |
| *Townhouse* – Dallas, TX | Townhouse DG, LLC | Roger 100% | Either Roger 100%, or Roger and Ted | Roger 50%; Ted 50% | 4.29.11 | Closed |
| *Townhouse* – Baltimore, MD | Townhouse Baltimore, LLC | Unknown | Roger 100% | Roger 50%; Ted 50% | 7.23.11 | Closed |
| *Boca Chica* – Dallas, TX | Boca Chica, LLC | Unknown | Either Roger 100%, or Roger and Ted | Roger 50%; Ted 50% | 12/13/11 | Closed |

| *Prime Bar* – Minneapolis, MN | Prime Bar Minneapolis LLC | Roger 100% | Either Roger 100%, or Roger and Ted | Roger 50%; Ted 50% | 2.6.12 | Closed |
|---|---|---|---|---|---|---|
| *Long Bar* – Denver, CO | Long Bar Denver, LLC | Unknown | Either Roger 100%, or Roger and Ted | Roger 50%; Ted 50% | 4.9.12 | Closed |
| *Mockingbird Tavern* – Dallas, TX | Wild Cat Mockingbird, LLC | Roger 100% | Either Roger 100%, or Roger and Ted | Roger 50%; Ted 50% | 4.13.12 | Closed |
| *Park Tavern* – Rosemont, IL | Rosemont Restaurant, LLC | Roger 100% | Roger 100% | Roger 50%; Ted 50% | 4.19.12 | Open |
| *Central Standard* – Dallas, TX | Hi Line Restaurant, LLC | Unknown | Could not recall. | Roger 50%; Ted 50% | 5.4.12 | Closed |
| *Park Tavern* – Chicago, IL | 1645 W. Jackson, Inc. | Unknown | Either Roger 100%, or Roger and Ted | Roger 50%; Ted 50% | 8.27.12[2] | Open |
| *Central Standard* – Chicago, IL | Wells Street Restaurant, LLC | Unknown | Either Roger 100%, or Roger and Ted | Roger 50%; Ted 50% | 12.11.12 | Closed |
| *Chica Loca* – Chicago, IL | Chica Loca LLC | Unknown | N/A | Roger 50%; Ted 50% | 12.21.12 | Closed |

64.    Concepts, all of the HoldCos in the foregoing two charts, all other HoldCos owned by Roger and Ted and/or Concepts for which Concepts provided Common Concepts

---

[2]    Park Tavern Chicago was actually incorporated on March 10, 1994 by a third party.  However, it was originally acquired and re-purposed to develop a Park Tavern in Chicago on or about August 27, 2012 (the date Roger Greenfield became its registered agent – the Park Tavern Chicago restaurant opened a few months thereafter in December, 2012).

Services (as defined below), and the Restaurants America Entities, shall be collectively referred to as "*Restaurant Group*" for purposes of this Complaint.

65.     All of the HoldCos within the Restaurant Group had commonality of ownership, with Roger and/or Ted owning them either indirectly (*i.e.*, the Concepts-Owned HoldCos that they owned indirectly through their ownership of Concepts) or directly (*i.e.*, the Insider-Owned HoldCos).

66.     Roger is an "insider" of Concepts as such term is defined in section 101(31) of the Bankruptcy Code, and is also an insider of each of the HoldCos.

67.     Ted is an "insider" of Concepts as such term is defined in section 101(31) of the Bankruptcy Code, and is also an insider of each of the HoldCos.

> **(B)     Wholesale Disregard for the Legal Ownership of the HoldCos Within the Restaurant Group**

68.     Actual legal ownership of HoldCos was unimportant to Roger and Ted and was wholly disregarded in practice.

69.     Roger, Roger and Ted did not determine who as between Concepts, Roger, and Ted would own a new HoldCo.

70.     Instead, Julie Foran, the paralegal and Concepts Employee who formed the HoldCos would assign ownership in her discretion.

71.     Legal ownership was not relevant because in practice Roger and Ted have always treated the entire Restaurant Group as being owned 50-50 – *i.e.*, they completely disregarded actual legal ownership.  So although Ted may not be listed as the legal owner of any stock or membership interest in any particular HoldCo, he considered himself to own 50% of each such entity and he and Roger acted as such.

## II.   Concepts – Background and Role Within the Restaurant Group

### (A)   Concepts -- Formation

72.   Restaurant Development, Inc. ("*RDI*"), an Illinois corporation owned 50% by Roger and 50% by Ted, was formed on June 20, 2003.

73.   On September 16, 2003, RDI's name was formally changed to "Concepts America, Inc." via Articles of Amendment filed with the office of the Illinois Secretary of State.

### (B)   Concepts – Ownership and Management

74.   Roger and Ted have at all times each owned 50% of the issued shares in Concepts.

75.   Although pursuant to its bylaws Concepts is supposed to be governed by a board of directors, Roger Greenfield testified that Concepts does not have, and has never had, a board of directors.

76.   To the extent Concepts did have a board of directors – and Mr. Greenfield was unaware of its existence – Roger and Ted have always been listed as the sole members of the board of directors of Concepts.

77.   At all times relevant to this Complaint, Roger and Ted were the sole officers of Concepts as President and Secretary/Treasurer respectively.

### (C)   Concepts – Role and Activities

78.   From September, 2003 through approximately July, 2013 (the "*Concepts Period*"), Concepts played a number of critical roles within the Restaurant Group.  These roles included:

(a)   Acting as a holding company for the Concepts-Owned HoldCos.

(b)      Helping to develop and form, through Roger and Ted and Concepts employees (collectively, the "*Concepts Employees*"), new restaurants and associated HoldCos. To give just a few examples, Concepts Employees would form HoldCo entities, obtain licenses, help track buildout costs, assist with lease preparation, and perform other critical development services (the foregoing, and other similar development services provided by Concepts Employees to the HoldCos, the "*Development Services*").[3]

(c)      Providing management services to the HoldCos comprising the Restaurant Group via the Concepts Employees. For example, Concepts Employees: (a) provided in-house general counsel (Dennis) and paralegal (Julie Foran) services to the Restaurant Group (everything from analyzing and responding to litigation claims to forming entities and keeping corporate registrations up to date); (b) served as chief financial officer (Rodd Goldman) and, together with supporting Concepts Employees, kept the books and records for the HoldCos that were part of the Restaurant Group; (c) served as Director of Operations (Marc Wuenschel) and provided supporting managerial services (Tim Heavey); and (c) prepared and ran the payroll for the HoldCos within the Restaurant Group (the foregoing, and other similar management services provided by Concepts Employees to the HoldCos, the "*Management Services*").[4]

(d)      Providing rent-free office space to all of the HoldCos and other defendants at the 1840 Pickwick address in Glenview, Illinois, which space Concepts leased from, and for which it paid rent to, defendant 1840 Pickwick (the "*Office Space Services*").

(e)      Providing cash management services to various HoldCos in the Restaurant Group through use of the Comingled Concepts Accounts and by having Concepts employees monitor the cash needs of the various HoldCos and either paying their bills from the Comingled Concepts Accounts or by moving money between multiple accounts to obtain the cash needed to pay bills and payroll obligations (the "*Cash Management Services*"; and

---

[3]    *See*, *e.g.*, Greenfield 9.13.16 Transcript at 106:9-17 (Roger testifying that Sean Murray opened a number of restaurants); *Id* at 133:8-12 (Roger testifying that Julie Foran would be in charge of obtaining the necessary business licenses for newly formed HoldCos).

[4]    *See*, *e.g.*, Greenfield 9.13.16 Transcript at 106:9-17 (Roger testifying that Rodd Goldman was "CFO of everything" and then confirming that this included all of the entities on Trustee Exhibit 1 (*i.e.*, the entities comprising the Restaurant Group)); *Id* at 109:6-12 (Roger testifying that Dennis was "corporate counsel for the entities at 1840 Pickwick" and then confirming that this included all of the entities on Trustee Exhibit 1); *Id* at 113:14-9 (Roger testifying that Tim Heavey, a manager under Marc Wuenschel provided services to all of the Restaurant Group entities in existence at the time of his employment).

together with the *Development Services*, the *Management Services*, and the *Office Space Services* the "*Common Concepts Services*").

(f)    Acting as a guarantor of leases for both Concepts-Owned HoldCos and Insider-Owned HoldCos.

79.    No management agreement existed between Concepts and any HoldCos, and Concepts was not paid or reimbursed for the Common Concepts Services, or for the risk it undertook in acting as a guarantor of HoldCo leases.

### III.    Concepts, the Concepts-Owned HoldCos, the Insider-Owned HoldCos, and the Restaurants America Entities were Treated, Operated, and Held Themselves Out as a Single Company or Economic Unit

80.    Not only did Roger and Ted wholly disregard legal ownership and treat the entire Restaurant Group as a single jointly-owned company, they also operated the entire Restaurant Group as a single company or economic unit, and held it out as such to creditors.  For example:

### (A)    Financing of New Restaurants – Undercapitalization and Disregard for Corporate Separateness

81.    New HoldCos would typically be minimally capitalized, if at all.

82.    New HoldCos would often not even open bank accounts until post-development, and sometimes long after because as discussed below, revenues were, at least until mid-2013, being comingled into and expenses paid from comingled accounts.

83.    Restaurant development would typically be funded from one or more of four general "pockets":  (a) TI Funds; (b) cash from Concepts; (c) cash advanced to the Restaurant Group by one of the Insider Defendants; and/or (d) cash from one of the other HoldCos or Restaurant Group entities, and as discussed below, funds from all these sources were regularly and extensively comingled to cover expenses without proper documentation.

84.    Often cash from one or more of the foregoing sources would be comingled into the Comingled Concepts Accounts to allow Concepts to pay development expenses for new restaurants.

**(B)    Inducing Landlords – the Consolidated Financials and the Illusion that Concepts was a Healthy Guarantor**

85.    Landlords, in the ordinary course of business, requested financial statements from Concepts prior to entering into leases and agreeing to provide TI Funds.

86.    When new leases were negotiated on behalf of new HoldCos, Concepts would thus provide prospective landlords with consolidated financials – almost always a balance sheet and statement of income – purporting to show Concepts' financial position (the "*Consolidated Financials*").

87.    The Consolidated Financials were often accompanied by a cover letter on the letterhead of "Goldman Associates," with the letterhead suggesting that Goldman Associates was an "Accounting, Tax and Financial Management" firm. *See*, *e,g*., January 30, 2010 letter from Goldman Associates attaching the 2009 Consolidated Financials, attached hereto as <u>Exhibit A</u>.

88.    The formal "Goldman Associates" letterhead gave recipients the appearance that the Consolidated Financials had been reviewed and/or prepared by an outside firm, when in reality the "Goldman" was Rodd Goldman – Concepts' in-house chief financial officer – "Goldman Associates" was the name of a sole proprietorship he claims to have used prior to his employment with Concepts.

89.    More troubling, the Consolidated Financials showed revenues that exceeded, by tens of millions of dollars, the revenues that Concepts reported to the IRS.

90.    For example, for 2009, 2010, 2011, and 2013, the years for which the Trustee has complete Consolidated Financials that are known to have been provided to landlords and/or lenders to induce them to enter into leases with and/or lend money to Concepts, revenues in the Consolidated Financials compare to what Concepts reported to the IRS as follows:

| Year | Assets Per Consolidated Financials | Gross Income Per Consolidated Financials | Gross Income Per Concepts Tax Return | Extent to Which Income Was Over-Reported |
|------|-----------|-----------|-----------|-----------|
| 2009 | $4,584,046[5] | $56,083,778[6] | $24,473,075 | *$31,610,703* |
| 2010 | $6,625,966[7] | $36,605,162[8] | $20,521,263 | *$16,083,899* |
| 2011 | $6,963,540[9] | $39,270,475[10] | $14,199,155 | *$25,071,320* |
| 2013 | N/A | 23,857,934[11] | $8,897,889 | *$14,960,045* |

91.    Moreover, Concepts did not file its tax returns for tax years 2009 – 2012 until 2014.

---

[5]    As of December 31, 2009, as reflected in Consolidated Financials Concepts sent to Galleria Mall Investors LP ("*Galleria*"), a landlord of a property in Dallas, TX where Concepts was seeking to open a Townhouse through a HoldCo called Townhouse DG, LLC (collectively, the "*Galleria Financial Representations*").

[6]    Through December 31, 2009, as reflected in the Combined Statement of Income provided by Concepts to Galleria as part of the Galleria Financial Representations.

[7]    As of December 25, 2010, as reflected in Consolidated Financials Concepts sent to Edgebrook in connection with Concept's 2013 application for the Concepts-Edgebrook Loan (collectively, the "*Edgebrook Financial Representations*").

[8]    As of December 25, 2010, as reflected in the Edgebrook Financial Representations.

[9]    As of December 25, 2010, as reflected in the Edgebrook Financial Representations. Similarly, a "Goldman Associates" cover letter and partial year Consolidated Financials (through October 23, 2011) Concepts sent to ROF Calhoun Square, LLC, a landlord of a property in Minneapolis, MN where Concepts was seeking to open a Prime Bar through a HoldCo called Prime Bar Minneapolis, LLC, showed Concepts with total assets of $6,540,093 as of October 23, 2011 (collectively, the "*ROF Calhoun Square Financial Representations*").

[10]    As of December 25, 2010, as reflected in Edgebrook Financial Representations. In addition, Concepts also sent partial year Consolidated Financials (through October 23, 2011) to ROF Calhoun Square as part of the ROF Calhoun Square Financial Representations that reflected partial year gross revenue of $31,416,380.

[11]    Through December 29, 2013 per consolidated income statement signed by Roger.

92.     As a result of the late filing of tax returns, between 2009 and 2012 – critical years when as discussed herein, Concepts guaranteed numerous new leases entered into by Restaurant Group HoldCos around the country – the *only* thing Concepts could show landlords and lenders was the Consolidated Financials (*i.e.*, there was no way to corroborate the numbers since the tax returns had not yet been filed).

93.     There are two plausible explanations for the hugely overstated revenue numbers in the Consolidated Financials:

(a)     The higher revenue numbers in the Consolidated Financials are fabricated.

(b)     The Consolidated Financials include income from the Concepts-Owned HoldCos and the Insider-Owned HoldCos, whereas the Concepts tax returns properly only reflect income from the Concepts-Owned HoldCos.

Either way, the Consolidated Financials are misleading, because they suggest that Concepts owned assets that were producing tens of millions of dollars more in revenues than was actually the case.

94.     In reality, the Insider-Owned HoldCos were legally owned by Roger and/or Ted, so those assets would at least facially appear to be unavailable to a creditor seeking to collect on a guaranty by Concepts.

95.     Roger, Ted, and Rodd (who prepared the Consolidated Financials as Concepts' CFO on behalf of Roger and Ted) each testified that they do not know or recall what the Consolidated Financials include, or why they differ by tens of millions of dollars from the actual revenue numbers reflected in the tax returns.

### (C)     Comingling of Funds and Lack of Financial Independence

96.     Although the Consolidated Financials are misleading in the sense that Concepts did not, at least on paper, own many of the HoldCos whose revenues and assets were included, at a practical level, Concepts and the entire Restaurant Group was acting as a single entity as all of the Restaurant Group entities were actively and extensively comingling funds between and among themselves.

97.     Rodd Goldman, the former CFO for Concepts and all of the HoldCos, confirmed this at his deposition:

> **Question:**  Were the restaurants owned by Ted and Roger, did they maintain financial independence or were they operated as a group?
>
> **Answer:**  As a group.
>
> **Question:**  Was that true throughout your entire time as the CFO for these entities?
>
> **Answer:**  Yes

*See* transcript of Rodd Goldman's 10.13.16 deposition (the "*Goldman 10.13.16 Transcript*") at 51:21 – 52:3.

98.     The evidence of extensive comingling and total lack of financial independence is overwhelming.  For example:

### (i)     Comingling of Restaurant Credit Card Receipts into the Comingled Credit Card Revenue Accounts

99.     For example, on the revenue front, the vast majority of revenue received by restaurants within the Restaurant Group is received via credit card.

100.     On or about September 14, 2010, Ted signed a Customer Processing Agreement (the "*Concepts Credit Card Processing Account*" "*CCCPA*") with WorldPay ("*WorldPay*") on

behalf of Concepts, with the CCCPA defining Concepts as the "Customer."  Schedule A to the

CCCPA established Transaction Pricing for Concepts and, in so doing, set forth certain

Processing assumptions, including an annual credit card volume of $38,000,000 that was

anticipated to be generated from 19 active locations (which at that time would have included all

of the HoldCos – not just those owned by Concepts).  WorldPay signed the CCCPA on or about

February 17, 2011.

101.    On or about January 24, 2011, Roger signed the First Amendment to the CCCPA

on behalf of Concepts.  The First Amendment changed the definition of Customer to include

Concepts and the entities specified on Exhibit 1 to the First Amendment.  More specifically, the

First Amendment stated that:

> "Concepts America, Inc., and the entities specified on <u>Exhibit 1</u>
> (each a "<u>Customer</u>" and collectively, the "<u>Customers</u>").  Each
> Customer acknowledges that the entities listed on <u>Exhibit 1</u> are
> affiliates by virtue of the fact that they control, are controlled by,
> or are under common control with the other entities included on
> such list. . . . [E]ach Customer agrees that it will be jointly and
> severally liable for the performance of all obligations of all other
> Customers under this Agreement."

Exhibit 1 to the First Amendment listed 23 restaurants as Customers, including Grillroom, One

North, Townhouse, Prime Bar Tampa, and Prime Bar Chicago.

102.    WorldPay signed the CCPA on or about February 17, 2011 and began processing

credit card revenue for the entities within Restaurant Group in March, 2011.

103.    On or about July 3, 2012, Rodd Goldman, as Concepts' CFO, signed the Fifth

Amendment to the CCCPA on behalf of Concepts America, Inc.  The Fifth Amendment stated

that each of four new entities, including Park Tavern Rosemont, "desires to become a

"Customer" as such term is used and defined in the Agreement . . ." It then Amended Exhibit 1 to add Park Tavern Rosemont and the other entities.

104.    On or about November 26, 2012, Rodd Goldman, as Concept's CFO, signed the Sixth Amendment to the CCCPA on behalf of Concepts. The Sixth Amendment stated that each of three new entities, including 1645 W. Jackson, Inc., "desires to become a "Customer" as such term is used and defined in the Agreement . . ." It then Amended Exhibit 1 to add 1645 W. Jackson, Inc. d/b/a Park Tavern Chicago and the other entities.

105.    For each HoldCo that was added to the CCPA, Roger, Ted, or Rodd would direct WorldPay to deposit the credit card receipts into a designated account.

106.    From March, 2011 through mid-2013 (the "*World Pay Comingling Period*"), WorldPay often deposited credit card receipts from the HoldCos within the Restaurant Group into one of two comingled bank accounts:  (a) an account maintained by Concepts at Banco Popular (n/k/a First Midwest Bank ("*First Midwest*")) and ending in 1439 (the "*Concepts-FM 1439 Account*"); or (b)  an account maintained by Prime Bar America at First Midwest and ending in 7163 (the "*Prime Bar-FM 7163 Account*"; and together with the Concepts-FM 1439 Account, the "*Comingled Credit Card Revenue Accounts*").

107.    Once again, HoldCo ownership, and even restaurant type, appears to have been disregarded for purposes of determining where HoldCo revenue would be deposited.  For example, although Grill Room and Townhouse, both owned by Concepts-Owned HoldCos, deposited their credit card receipts into the *Concepts-FM 1439 Account,* so did Park Tavern Rosemont, an Insider-Owned HoldCo.  Meanwhile Park Tavern Chicago, also a "Park Tavern"

and an Insider-Owned Holdco, deposited its credit card revenues into the Prime Bar-FM 7163 Account.

108.    As a result, revenue from entities that Concepts allegedly did not own flowed into the Concepts-FM 1439 Account, with money frequently moving between other comingled accounts Concepts maintained, notably including an account maintained by Concepts at JP Morgan Chase ending in 8165 (the "*Concepts-JPM 8165 Account*") and an account maintained by Concepts at First Midwest ending in 5562 (the "*Concepts-FM 5562 Account*"; and together with the Concepts-FM 1439 Account, the Concepts-JPM 8165 Account, and the other accounts maintained by Concepts (since all were comingled), the "*Comingled Concepts Accounts*").

109.    To give a sense of the degree to which HoldCo credit card receipts were comingled during the World Pay Comingling Period, over the 18 month period between January 1, 2012 and May 30, 2013 (after which point the De-Coupling quickly reduced and eliminated Concepts' revenues over several months, as discussed below), aggregate additions into the two main Comingled Concepts Accounts (the Concepts-JPM 8165 Account and the Concepts-FM 1439 Account) averaged more than $2,500,000 per month[12] and Concepts received credit card deposits from at least eleven (11) different HoldCos, including six (6) Concepts-Owned HoldCos (111 Wacker Restaurant Corp., 33 Restaurant, Inc., Bluepoint Hollywood, Inc., One North, Inc., Townhouse Sherman Oaks, and Midtown Kitchen & Bar, Inc.) and five (5) Insider-Owned HoldCos (Townhouse DG, LLC, Townhouse Baltimore, LLC, Red Star Deerfield, Park Lane, LLC, and Park Tavern Rosemont).

---

[12]    This aggregate monthly average was calculated based on information from the summary pages of the applicable monthly bank statements.  The vast majority of the additions would be deposits – *i.e.*, credit card receipts, checks, or incoming electronic transfers.  It should be noted, however, that a smaller amount of the additions may reflect non-cash "additions" due to NSF checks not clearing.

(ii)    **Comingling of Funds Between and Among the Comingled Credit Card Revenue Accounts**

110.    Not only were credit card receipts from many of most of the HoldCos deposited into one or more of the Comingled Credit Card Revenue Accounts during the World Pay Comingling Period, *funds were also being regularly and extensively comingled between and among between and among the holders of the Comingled Credit Card Revenue Accounts* (*i.e.*, Prime Bar America and Concepts).

111.    For example, just between January 2012 and July 2013 (by which time Concepts' revenue was almost entirely eliminated due to the De-Coupling), the Trustee is aware of 82 transfers between the Concepts-FM 1439 Account and the Prime Bar-FM 7163 Account, with an aggregate dollar value of $1,828,590.    *See* <u>Exhibit B</u> (providing a breakdown of all of the transfers of which the Trustee is currently aware).

112.    When asked to explain the extensive transfers between the Comingled Credit Card Revenue Accounts, Rodd Goldman, the CFO for most of all of the WorldPay Comingling Period, admitted that he would just make transfers as needed to pay bills:

> **Question:** So if the entities had bills coming due and the other entity had cash, you'd move it from the entity with cash to the entity with bills due?
>
> **Answer:** Correct.
>
> **Question:** Did that continue into 2013?
>
> **Answer:** Yes.

Goldman 10.13.16 Transcript at 73:15-20.

### (iii) Comingling of TI Funds

113. Similarly, when TI Funds were received from landlords, they would often be deposited into comingled accounts in total disregard for legal ownership.

114. Among the many examples, when the Village of Rosemont (Park Tavern Rosemont's landlord) issued checks for TI Funds to Park Tavern in the amount of $1,088,850 for the buildout of the Park Tavern Rosemont – a HoldCo that on paper is 100% owned by Roger – the funds were deposited into the one of the Comingled Concepts Accounts.

115. Similarly, when West Side Realty Corporation (Park Tavern Chicago's landlord) issued three checks for TI Funds for the buildout of Park Tavern Chicago totaling $128,974.94, the checks were made payable to Concepts and deposited in the Concepts-JPM 8165 Account. Although the ownership of Park Tavern Chicago is unclear, it is an Insider-Owned HoldCo and its credit card revenues were initially directed into the Prime Bar-FM 7163 Account.

116. Again, not only were funds being comingled, legal ownership was being wholly ignored.

### (iv) Payment of HoldCo Expenses from Comingled Concepts Accounts

117. Not only was revenue being comingled in the Comingled Credit Card Revenue Accounts as described, and then further comingled between and among Concepts and Prime Bar America (the holders of the Comingled Credit Card Revenue Accounts), Concepts was using this comingled revenue to pay millions of dollars in expenses for both Concepts-Owned and Insider-Owned HoldCos during the WorldPay Comingling Period.

118. The HoldCo expenses that Concepts was paying during this period included the entire spectrum of restaurant operating costs – everything from payroll to food supplier invoices.

119.    In addition, Concepts was using comingled revenue from the Comingled Concepts Accounts to fund the development of Insider-Owned HoldCos and associated restaurants without any expectation that it would be repaid.

120.    In fact, Concepts was paying development expenses of Insider-Owned HoldCos whose credit card receipts would, once the associated restaurant opened, then be comingled into the Prime Bar America-FM 7163 Account – a further example of the extent to which cash was being commingled within the Restaurant Group.

121.    For example, Concepts paid hundreds of thousands of dollars in expenses relating to the buildout of a Park Tavern restaurant owned by Park Tavern Chicago, yet upon completion, the associated credit card revenues were deposited into the Prime Bar America-FM 7163 Account.

122.    In sum, during the WorldPay Comingling Period, funds were comingled so pervasively and at so many levels, that the entire Restaurant Group was in essence one large bank account.  It hardly mattered from a cash-flow perspective where a deposit was made, or what entity paid a bill, since funds could be and were moved around the Restaurant Group as needed.

### (v)    Post-De-Coupling – Continued Comingling on a Vast Scale

123.    As discussed in much greater detail below, the World Pay Comingling Period ended in mid-2013 when Roger and Ted caused Concepts, which was then insolvent and facing mounting landlord claims, to engage in the De-Coupling.  All of the HoldCos that had not previously done so opened their own bank accounts, and credit card revenues began to be directed to those accounts, eliminating all of Concepts' revenues.

124.   Importantly, however, even after the De-Coupling occurred, and credit card receipts began to be directed to individual HoldCo accounts, Concepts and all of the HoldCos continued to comingle funds on a vast scale, disregarding corporate separateness, and generally continuing to act as a single economic unit.

125.   Because credit card receipts were no longer being directly comingled in the Comingled Credit Card Revenue Accounts, post De-Coupling the HoldCos resorted to daily electronic transfers (the "*Post- De-Coupling Transfers*") to move money around as needed to cover expenses.

126.   There was no real pattern to the Post- De-Coupling Transfers, with money flowing back and forth between the various HoldCos as needed to cover collective expenses.

127.   As was the case before the De-Coupling, the Post- De-Coupling Transfers were not documented other than via the electronic bank entries showing the transfers and allegedly via the purported "to-from" spreadsheet that was not produced to the Trustee.

128.   No interest was charged on the Post- De-Coupling Transfers, no notes were issued, and no formal repayment schedule was established or implemented.

129.   To give a sense of the regularity and scale of the Post- De-Coupling Transfers, just between March, 2014 and March, 2015 – a sample one-year period after the De-Coupling occurred – the Trustee is currently aware of Concepts and other HoldCos engaging in over three thousand (3,000) separate transfers of cash to and from seventeen (17) accounts held by either Concepts or other HoldCos, with an aggregate value of over fourteen million dollars ($14,000,000).  *See* detailed breakdown of currently known intercompany transfers in and out of Restaurant Group accounts attached hereto as Exhibit C.

130.     In sum, while direct comingling of credit card revenues into the Comingled Credit Card Revenue Accounts ceased with the De-Coupling, as a practical matter Roger and Ted continued to operate the Restaurant Group as a single comingled pot, via a myriad of daily cash management transfers between HoldCos instead of using Concepts.

**(vi)     None of this Comingling Was Documented, and the Restaurant Group Failed to Maintain Sufficient Financial Records**

131.     None of the foregoing inter-company activity – whether comingling of revenue or TI Funds, bill payments, inter-company transfers, or other activity – was documented other than via the electronic bank entries showing the transfers and allegedly in a "to-from" Microsoft Excel spreadsheet that Concepts Accounting staff allegedly maintained.

132.     Notably, to the best of the Trustee's knowledge, the alleged "to-from" spreadsheet was not produced in discovery by Concepts or any of the HoldCos, despite being directly responsive to the Trustee's Bankruptcy Rule 2004 subpoenas to those entities.

133.     No notes were ever issued to reflect or formalize inter-company balances owed between and among Concepts and the HoldCos until the Greenfield Note was issued after Concepts became insolvent (as discussed below).

134.     No inter-company balances were listed as payables or receivables on the balance sheets that were part of the Concepts Consolidated Financials.

135.     No interest was ever charged on inter-company balances within the Restaurant Group.

136.     No inter-company balances were re-paid, unless by the happenstance of a future inter-company transfer happening to go from a "debtor" entity to a "creditor" entity.

137.   Concepts' bankruptcy schedules, a verification for which was signed by Ted under penalty of perjury (discussed below), do not reflect any debts owed to other HoldCos or associated entities within the Restaurant Group, or balances owed by such entities to Concepts.

138.   Roger testified that no records exist showing all amounts that he and Ted put into the Restaurant Group, and all amounts that they took out, making it nearly impossible to compile a full list of insider transactions absent a forensic review of all checks, cash withdrawals, and cashiers' checks for years of activity for dozens of Restaurant Group entities.

139.   Ted has indicated that the Restaurant Group's computer server suffered a catastrophic failure and was destroyed, so cannot be turned over.  Counsel to the Trustee has reached out to counsel for Roger and Ted and asked for confirmation that the server, together with pre-petition electronic emails and the Restaurant Group's electronic accounting filed, are destroyed.  No response has been received as of the date of filing, and the server, the electronic accounting records, and the electronic mail server, have not been turned over or produced.

140.   All of the foregoing facts relating to the failure of Concepts to document inter-company and insider financial transactions, or to maintain and preserve such documentation, together with all other facts herein supporting such a conclusion, shall be referred to as the "*Failure to Maintain Records and Document Inter-Company and Insider Transactions Facts*" for purposes of this Complaint.

> **(D)   Concepts Employees Provided the Common Concepts Services to Both Concepts-Owned HoldCos and Insider-Owned HoldCos**

141.   As noted above, Concepts and the Concepts Employees provided the Cash Management Services, the Development Services, the Management Services and the Office

Space Services (*i.e.* the Common Concepts Services) to both Concepts-Owned HoldCos and Insider-Owned HoldCos despite the fact that no management agreements existed and Concepts was not paid or reimbursed for the costs associated with providing the Common Concepts Services.

142.   The alleged "to-from" spreadsheet that was purportedly maintained to track inter-company balances would not, if it existed, have broken out the costs associated with the Common Concepts Services or allocated them by entity.

### (E)   "Restaurants-America" Restaurant Group

143.   All of the restaurants within the Restaurant Group were, at all times relevant hereto, advertised as being part of the "Restaurants-America" restaurant group.

144.   "Restaurants-America" is not an entity, but is an assumed name for Restaurants-America Consulting Group, Inc. ("*Restaurants-America Consulting*"), and a was registered as a Federal "Service Mark" by Restaurants-America Trademark, Inc. ("*Restaurants America Trademark*"; and together with Restaurants America and Restaurants America Consulting, the "*Restaurants America Entities*").

145.   The existence of an "umbrella" group tied Concepts and the various HoldCos together.  For example, even beyond the common branding, customers could buy "Restaurants America" gift cards (the "*Gift Cards*") which could then be used at any of the "Restaurants America" restaurants – *i.e.*, both the Concepts-Owned HoldCos and the Insider-Owned HoldCos.

146.   As a practical matter, however, the Restaurants America Entities were indistinguishable from Concepts.

147.    For example, at least within the last decade, none of the Restaurants America

Entities had any employees.  Thus, by definition, any promotion that "Restaurants America" ran,

or even maintaining the corporate existence of the Restaurants America Entities, were services

performed by Concepts Employees, without payment or reimbursement.

148.    Many of these Concepts Employees, despite not being employed Restaurants

America, had business cards showing they worked for Restaurants America, they used

Restaurants America letterhead for their correspondence, they had @restaurants-america.com

email addresses, and when they sent emails, they used Restaurants America signature blocks.

Not surprisingly, many entities that dealt with individual HoldCos that held themselves out as

being Restaurants America Entities thought that they were dealing with a consolidated holding

company named Restaurants America.

149.    For example, at least two contractors performing services for Park Tavern

Rosemont issued lien waivers that identified the entity that employed them as Restaurants

America.  Additionally, vendors would regularly issue checks to "Restaurants America" and,

because none of the Restaurants America Entities had a bank account during at least the last ten

years, these checks would generally be deposited into the Comingled Concepts Accounts.  *See*,

*e.g.*, Exhibit D (copies of lien waivers and a few examples where vendors wrote checks to

"Restaurants America" and the checks were then deposited into the Concepts-FM 1439

Account).

150.    Once again, ownership lines were blurred, and property was comingled.  For

example, when Concepts and certain of the HoldCos were behind on payment of the Law Firm

legal invoices, Roger and Ted issued tens of thousands of dollars in "Restaurants America" Gift

Cards to the Law Firm (the "*Law Firm Gift Cards*").

151.    As the Law Firm Gift Cards, like any of the Gift Cards, could be used at any

"Restaurants America" restaurant (including restaurants owned by Concepts-Owned HoldCos

and Insider-Owned HoldCos), this certainly resulted in particular HoldCos paying, via free meals

and drinks, for services the Law Firm had provided to other HoldCos and/or Concepts.

**(F)    Concepts, the Concepts-Owned HoldCos, and the Insider-Owned HoldCos all Shared a Common Address, Yet Only Concepts Was Obligated To Pay Rent**

152.    Concepts, the Restaurants America Entities, and all of the Concepts-Owned

HoldCos and the Insider-Owned HoldCos list their principal office as being 1840 Pickwick,

Glenview, Illinois (the "*Pickwick Property*").

153.    The Pickwick Property is owned by 1840 Pickwick, which is in turn owned by

Roger and Ted.

154.    On February 1, 2004, Concepts and 1840 Pickwick executed a lease – with Roger

appearing to sign on behalf of both 1840 Pickwick and Concepts – whereby Concepts agreed to

lease the Pickwick Property from 1840 Pickwick for $10,000 per month for an indefinite period

(the "*Pickwick Lease*").   The Pickwick Lease allowed Concepts to pay the 1840 Pickwick

mortgage directly and deduct such payments from the $10,000 rent.

155.     Roger testified that: (a) he had never seen the Pickwick Lease; (b) he did not sign

the Pickwick Lease, but his signature was stamped on the document; and (c) he did not authorize

anyone to prepare or affix his stamp to the Pickwick Lease.

156.    While this raises questions about the validity of the Pickwick Lease, and raises substantial questions about the extent to which corporate formalities were being observed (discussed below), over time Concepts, and Concepts-Owned HoldCos, have made hundreds of thousands of dollars in monthly lease payments on the Pickwick Lease, with the real beneficiary of these payments being Roger and Ted.

157.    Rent payments Concepts made on behalf of all of the other Restaurant Group entities were not tracked or allocated them among the various HoldCos and other entities that operated out of the Pickwick Property.

158.    Moreover, although Concepts made most of the monthly rent payments, further evidencing the comingled and jumbled nature of the Restaurant Group's finances, other HoldCos within the Restaurant Group, including, upon information and belief, 33 Restaurant, Inc., the owner of a Grillroom restaurant in Chicago ("*Grillroom*") and 111 Wacker Restaurant Corp., the owner of a Townhouse restaurant in Chicago ("*Townhouse*"), sometimes made the monthly lease payments to 1840 Pickwick (or to Republic Bank on behalf of 1840 Pickwick) instead of Concepts.

159.    All of the Concepts Employees worked from the Pickwick Property unless they were traveling or working from home.

**(G)    Concepts, the HoldCos, and the Restaurants America Entities all Shared Common Owners, Directors, and Officers**

160.    Concepts, the HoldCos, and the Restaurant America Entities had the same owners (Roger and/or Ted, directly or indirectly), directors (Roger and/or Ted, to the extent boards of directors existed or were active), managers (Roger and/or Ted), and officers (Roger and/or Ted).

161.     Roger and Ted dominated and controlled the entire Restaurant Group, and every entity within it.

162.     Moreover, as noted above, Concepts Employees such as Rodd Goldman (CFO), Dennis (General Counsel), Marc Wuenschel (Director of Operations), Julie Foran (Paralegal), and many others, served in those positions for all of the entities within the Restaurant Group – not just for Concepts.

**(H)     Concepts and the HoldCos Failed to Observe Corporate Formalities and Maintain Corporate Records**

163.     As discussed in detail above, Roger and Ted totally disregarded legal ownership, allowing Julie Foran to randomly attribute ownership, and then ignoring such "legal" ownership and treating the entire Restaurant Group as being owned 50-50 notwithstanding organizational documents to the contrary.

164.     For each of the entities within the Restaurant Group, Ted could make critical decisions without consulting Roger, notwithstanding that Roger was often the sole owner or sole manager of an entity.  Again, legal ownership, and formalities generally, were disregarded.

165.     The extensive comingling described separately herein, including extensive and regular comingling between Restaurant Group entities with legally different ownership, also evidences a wholesale disregard for the corporate form and legal ownership.

166.     The fact that Concepts was providing the Common Concepts Services without management agreements, and without compensation or reimbursement, and was providing such services to Restaurant Group entities with legally different ownership also evidences a wholesale disregard for the corporate form and legal ownership.

167.     Moreover, it appears that board of directors or shareholder meetings did not occur for any of the Restaurant Group entities in any meaningful way.

168.     When asked whether he had to attend a variety of annual shareholders meetings each year given all the entities in the Restaurant Group, Roger stated:

> First of all, this [presumably using "this" to refer to the entire Restaurant Group] is a privately-owned company.   Two people. There's no meetings at a big desk, so…   I walk into Ted's office, we talk, done.

*See* transcript from Roger Greenfield's 9.13.16 deposition Transcript (the "*Greenfield 9.13.16 Transcript*") at 159:12-18.

169.     Roger then confirmed that after the foregoing process occurred – allegedly a single informal meeting for the Restaurant Group as a whole – someone would prepare minutes and he would sign them.  Greenfield 9.13.16 Transcript at 159:19-23.

170.     Roger testified that the same process applied to directors meetings.  Greenfield 9.13.16 Transcript at 159:19-23.

171.     Roger's testimony about a single, consolidated, and informal board/shareholders meeting occurring on an annual basis conflicts, however, with his other testimony.  Roger denied that Concepts had a board of directors, and when asked whether Restaurants America Consulting had a board of directors, testified that none of the Restaurant Group entities ever had boards of directors:

> **Question:**  At any time did it have a board of directors?
>
> **Answer:**  None of these have board or directors, so you don't have to ask that question.  Okay.  I never – we never – We [*sic*] never had board of directors.

> **Question:**  Okay.  And would that be true for every entity we identify on Trustee Exhibit 1?
>
> **Answer:**  Correct.

Greenfield 9.13.16 Transcript at 20:10-18

172.    Moreover, Ted, who per Roger's testimony attended the informal annual meeting

Roger described, testified that he never attended a board of directors or shareholders meeting for

Concepts, and that none actually occurred:

> **Question:**  Did you ever attend any Board of Directors meetings for Concepts America?
>
> **Answer:**  No.
>
> **Question:**  Were there Board of Directors meetings for Concepts America?
>
> **Answer:**  I think it was just on paper.
>
> **Question:**  The attorneys prepared a document saying there was a meeting and you would sign it?
>
> **Answer:**  That is how I think it worked.
>
> **Question:**  Would the same be true for shareholders meetings for Concepts America?
>
> **Answer:**  Yes.

*See* transcript from Ted Kasemir's 10.18.16 deposition (the "*Kasemir 10.18.16 Transcript*") at

137:22 – 138:9.


173.    Kasemir then testified that he never attended a board of directors, shareholder, or

LLC member meeting for any Restaurant Group entity, did not know if he was a director for any

entity, and if he signed any corporate documents certifying that he attended any such meeting, it

was just something an attorney handed him. *Id* at 161:21 – 162:20.

174.    Similarly, Rodd Goldman could not remember a board or shareholder meeting for

any of Concepts or the HoldCos taking place during his tenure.

175.    The limited corporate documents that were maintained, for example often a

generic annual resolution for each entity approving everything done in the prior year, were just

computer printouts printed by a Concepts Employee, typically with Roger's electronic (typed)

signature.  Roger and Ted did not review these corporate documents.

176.    Key documents such as the Pickwick Lease were, according to Roger, prepared

without his authorization or knowledge, and using a stamp of his signature.

177.    Corporate (or LLC) resolutions were not issued for key decisions, such as when

each HoldCo was made to sign the Greenfield Note.

178.    All of the foregoing facts relating to the failure of Concepts and the other entities

within the Restaurant Group to observe corporate formalities and maintain records, together with

all other facts herein supporting such a conclusion, shall be referred to as the "*Failure to Observe*

*Corporate Formality Facts*" for purposes of this Complaint.

### (I)    Concepts and the HoldCos Were Liable on Common Debts, Including Insider Debts Forced on them by Dominant Shareholders

179.    Given the extensive comingling described above, and the failure to observe

corporate formalities and separate corporate ownership, *almost all obligations of entities within*

*the Restaurant Group were effectively treated as common debts as described above.*

180.    When developing restaurants, Concepts would often be obligated on agreements and debts for entities it did not legally own.  For example, Fox General, the general contractor for the buildout of Park Tavern Rosemont (among other locations), listed Concepts, not Park Tavern Rosemont, as the customer in lien waiver forms, and Concepts made substantial payments to Fox General for buildout services.  Concepts also paid hundreds of thousands of dollars in Fox General invoices related to the buildout.

181.    In addition to the foregoing, a few other examples of common debts include:

### (i)    Common Lease Debt

182.    As noted above, Concepts regularly acted as a guarantor of leases for both Concepts-Owned HoldCos and Insider-Owned HoldCos.  Hence Concepts was, and in many cases still is, liable on substantial guaranty obligations to landlords for entities with which it purportedly had no legal ownership.

### (ii)    The Greenfield Note

183.    On December 12, 2012, Roger had all eleven of the HoldCos then in existence – both Concepts-Owned HoldCos and Insider-Owned HoldCos – issue the Greenfield Note in his favor for $1,800,000.

184.    At the time the time the Greenfield Note was executed, Concepts was insolvent, and had been since at least the beginning of 2012.  *See* insolvency discussion, *infra*.

185.    Roger testified that no individual restaurant or HoldCo had borrowed $1,800,000. Rather, Roger claims he made numerous undocumented advances to individual HoldCos, Concepts, and contractors over the years, and had taken money out in a similar fashion, leaving

an unpaid balance of $1,800,000, which the Greenfield Note purports to obligate all of the HoldCos, jointly and severally, to pay.  *See*, discussion of insider comingling, *infra*.

186.    In other words, by causing the HoldCos to execute the Greenfield Note, Roger caused them to become jointly and severally liable for debts they did not individually owe, and for which they may have received no benefit, once again in wholesale derogation of corporate formalities and legal ownership.  Not surprisingly, there are no resolutions from any of the HoldCos approving the Greenfield Note.

187.    The timing of the Greenfield Note – to which Concepts, which was in financial trouble at the time, is notably not party – is highly suspicious in that not only was Concepts in serious financial distress, as described below, but also because in the months that followed it divested all of its assets and revenues, leaving Concepts as an empty shell.

188.    On information and belief, the Greenfield Note was not disclosed to Edgebrook Bank when Concepts approached it for the Edgebrook Loan in February 2013.

### (iii)     The Edgebrook Loans

189.    In March, 2013, Concepts caused Concepts, Pickwick, and numerous HoldCos (as guarantors) to become obligated on the Edgebrook Loans, all as discussed in greater detail below.

### IV.     Financial Trouble – Concepts and the Restaurant Group Become Insolvent

190.    By the beginning of 2012, the Concepts, and by extension the entire Restaurant Group (due to the comingling described above), had begun to experience serious financial difficulties.  Roger and Ted had signed a host of new leases in 2011 and 2012, and between

buildout expenses and the fact that many of these locations were not profitable, Concepts and the Restaurant Group were struggling.

191.    By January, 2012, Concepts was having checks, including at least one rent check issued from the Concepts-FM 1439 Account – the main comingled operating account for the Restaurant Group – returned for "non-sufficient funds" ("*NSF*").

192.    The NSF check problem only got worse as the year went on.  Over the course of 2012, well over one hundred (100) checks were similarly returned as NSF from just the Concepts-FM 1439 Account alone.

193.    Despite all of the NSF checks, the Insider Defendants continued to take out hundreds of thousands of dollars from Concepts and other Restaurant Group entities.

194.    Mr. Goldman, as CFO, admitted when examined that he was concerned that so many checks were being returned as NSF.

195.    Lease defaults by HoldCos were also beginning to mount in 2012, meaning that landlords were increasingly looking to Concepts to satisfy its guaranty obligations.  And Roger, Ted, and Rodd knew that additional locations were unprofitable and likely to default in 2013.

196.    For example, on May 4, 2012, the landlord for Townhouse Paramus, LLC, an Insider-Owned HoldCo whose lease was guaranteed by Concepts, sent a formal notice that Townhouse Paramus was in default and owed $71,317 in rent.

197.    In September, 2012, Prime Bar Minneapolis, LLC, another Insider-Owned HoldCo, defaulted on its lease (owing well over $100,000 at the time), a default that was never cured and that ultimately resulted in a judgment for over $5 million being entered against Concepts on account of its guaranty of the lease.

198.   Wild Cat Mockingbird, LLC ("*WMC*") defaulted on its lease in February, 2013, and Ted testified that he knew in 2012 that WMC was unprofitable and would be closing. Concepts was a guarantor of the WMC lease, so it was apparent in 2012 that the lease default obligations would become a current Concepts obligation.

199.   On February 28, 2013, the landlord for Long Bar Denver, LLC, another Insider-Owned HoldCo whose lease was guaranteed by Concepts, issued a default notice to Concepts relating to its failure to pay subcontractors on the Long Bar buildout.

200.   Ted testified that he knew in 2012 that Long Bar Denver, LLC was unprofitable and would be closing.

201.   Not surprisingly, Rodd Goldman, the CFO for all of the Restaurant Group entities, also knew Concepts was in trouble in 2012.   When asked at his deposition whether it was "safe to say that during 2012 Concepts was having problems paying its bills when they came due," Mr. Goldman answered "yes."   *See* Goldman 10.13.16 Transcript at 90:8-11.

202.   Mr. Goldman also testified that he had concerns about his job security in 2012 as a result of Concepts' financial problems.   *Id*. at 90:12-21.

203.   Mr. Goldman further testified that when he referred to Concepts having trouble paying its bills or being in financial difficulty, he really meant the entire Restaurant Group, given the extent to which the entities were comingling funds.

204.   Ted similarly testified that Concepts was unable to pay its bills as they came due in 2012.

205.   Ted also testified that Concepts' financial condition continued to get worse in 2013.

206.    Concepts was insolvent from at least the beginning of 2012, and has remained insolvent through the date of filing of this Complaint.

### V.    Roger and Ted's Response to Concepts' Insolvency and Financial Difficulties

207.    Rather than trying to maximize value for creditors in light of Concepts' insolvency (due to its limited assets and extensive guaranty obligations), Roger and Ted instead took a number of actions that hindered and delayed creditor collections.  For example:

### (A)    Creation of Insider "Loan" Obligations

208.    On December 12, 2012, with Concepts clearly insolvent and facing another wave of restaurant closings and increasing guaranty obligations, Roger caused all eleven of the HoldCos then in existence to issue the $1,800,000 Greenfield Note to him.

209.    Roger had made dozens of random undocumented advances to individual HoldCos, Concepts, contractors, and others over the years, and had taken money out in a similar fashion (including, as reflected in a chart below, amounts ending in random amounts of cents), so it is not clear how the $1,800,000 figure was calculated.

210.    What is clear is that no individual entity owed $1,800,000 to Roger, and by making all of the HoldCos jointly and severally liable, Roger was again treating them and Concepts, the entity that had received most of the advances, as one company.

211.    Concepts, despite being the recipient of most or all of the transfers allegedly underlying the Greenfield Note (and having made numerous transfers to Roger), is not included as an obligor on the Greenfield Note.

212.    Concepts was insolvent when the Greenfield Note was issued and in worsening financial distress (including facing mounting guaranty claims from landlords).  That same month

the first of the New Greenfield-Dennis Restaurant Ventures (as defined below) appears to have been formed (discussed below), and over the following few months Concepts would have its assets encumbered and transferred and its revenues diverted by Roger and Ted engaging in the Encumbering of Concepts Assets, the transfer of the Transferred Subsidiaries to Holding, and the De-Coupling, leaving it an empty shell.

**(B)      The De-Coupling – Diversion of the Revenue of the Insider-Owned HoldCos**

213.    As discussed, Concepts had always operated the HoldCos as though they were directly owned, providing the Common Concepts Services, comingling revenues, paying expenses from a common fund, etc.

214.    Suddenly, in mid-2013, Roger and Ted had Concepts employees open separate bank accounts for the HoldCos, and WorldPay, the credit card processor, was asked to begin directing revenues to these separate accounts (as opposed to into the Comingled Credit Card Revenue Accounts where they had always been deposited previously, as discussed above).

215.    This De-Coupling deprived Concepts of millions of dollars in revenues from restaurants that had always operated as part of Concepts, and that were created by Concepts employees and often with Concepts funds.  The following chart graphically depicts how quickly revenue dropped to almost nothing as a result of the De-Coupling:



216.    More specifically, the De-Coupling resulted in aggregate deposits into the two

main Comingled Concepts Accounts – which had averaged more than $2,500,000 per month

from January, 2012 through May, 2013,  dropping to less than $1,000,000 in June 2013,

dropping to less than $300,000 in July 2013, and dropping to less than $50,000 by September

2013.  *See* chart attached hereto as Exhibit E showing aggregate deposits by month.[13]  In other

words, in the course of two months, *Roger and Ted caused essentially all revenues to be diverted*

*away from Concepts.*

217.    Given the timing, it is apparent that this was an obvious, and belated, attempt to

(a) make the Insider-Owned HoldCos appear independent and (b) move revenue out of Concepts

so that when creditors obtained judgments, there would be nothing to attach.

---

[13]    This aggregate monthly addition numbers contained in the exhibit have been calculated based on information from the summary pages of the applicable monthly bank statements.  The vast majority of the additions would be deposits – *i.e.*, credit card receipts, checks, or incoming electronic transfers.  It should be noted, however, that a smaller amount of the additions may reflect non-cash "additions" due to NSF checks not clearing.

### (C)     Transfer of the Owned Subsidiaries

218.     As of March 3, 2013, Concepts owned 100% of the stock of the following five (5) Concepts-Owned HoldCos, each a qualified sub-s corporation, and each the owner of one restaurant: (a) 111 Wacker Restaurant Corp.; (b) Bluepoint Hollywood, Inc.; (c) 33 Restaurant, Inc.; (d) Midtown Kitchen & Bar, Inc.; and (e) One North Inc. (the "*Transferred Subsidiaries*").

219.     On February 21, 2013, at the Law Firm Partner's direction, Roger and Ted caused two new LLCs to be formed with the Illinois Secretary of State: (a) Holding and (b) Concepts RM.

220.     Concepts is the 100% member of Holdings, and Roger and Ted together own 100% of the membership interests in Concepts RM (each owns a 50% membership interest).

221.     Concepts RM is the manager of Holdings, and Concepts RM is managed by Roger.

222.     The articles of organization for both Holding and Concepts RM list Roger as the incorporator, but upon information and belief, they were incorporated by counsel or employees of Concepts.

223.     In 2013, Roger and Ted were each directors (to the extent a board existed), officers, owners, employees, and fiduciaries of Concepts.

224.     In 2013, the Law Firm Partner and the Law Firm were counsel to Concepts, had represented Concepts since January 19, 2009, and would continue to represent Concepts until at least January 21, 2016.

225.    The Law Firm Partner, or others at the Law Firm working under the Law Firm Partner's direction, prepared the operating agreements for Holding and Concepts RM (the "*Holding Operating Agreement*" and the "*Concepts RM Operating Agreement*" respectively).

226.    Despite having represented Concepts since 2009, prior to preparing the operating agreements for Holding and Concepts RM, the Law Firm Partner and the Law Firm had not prepared any corporate documents, including operating agreements, for the dozens of entities that had been formed as part of the Restaurant Group.

227.    The Holding and Concepts RM Operating Agreements each contain a provision providing that: (a) the "Involuntary Withdrawal" of a member shall cause a "dissociation" of that Member within the meaning of the Illinois Limited Liability Company Act (the "*Act*") and (b) that if a dissociation occurs, the Manager of the entity (in the case of Holdings, Concepts RM) gets the right to purchase a 1% interest.   *See* Holding and Concepts RM Operating Agreements at § 6.3.

228.    The term "Involuntary Withdrawal" is separately defined in section 1.2 of the Holding Operating Agreement as "any of the events specified in Section 35-45(2), (3), (4), (5), (6), (7), (8), (9), (10), or (11) of the Act."   Section 35-45 provides, in relevant part, that:

> A member is dissociated from a limited liability company upon the occurrence of any of the following events: ... (7) the member's: (A) becoming a debtor in bankruptcy; (B) executing an assignment for the benefit of creditors; (C) seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of the member or substantially all of the member's property...

805 ILCS 180/35-45(7)(A).

229.    The Act further provides that if a member is dissociated from a limited liability company, the member retains its economic rights (*e.g.*, the right to receive distributions), but

loses its non-economic rights (such as participating in management or conducting the company's business). *See* 805 ILCS 180/35–45(7)(A); 805 ILCS 180/35–55(b)(1).

230.   On or around March 4, 2013, approximately seven days after the Law Firm and Concepts Employees formed Holdings and Concepts RM and prepared their corporate documents, Concepts transferred 100% of its ownership interest in the Transferred Subsidiaries to Holding for no consideration (the "*Subsidiary Transfer*").

231.   All of the Transferred Subsidiaries are corporations, so prior to the Subsidiary Transfer, the dissociation provisions of the Act did not apply to them, and if Concepts had become a debtor in bankruptcy or had a trustee, liquidator, or receiver appointed, the appointed fiduciary would have been able to control and/or change the management of the Transferred Corporations (thus immediately benefiting from the income and assets of such Transferred Subsidiaries).

232.   After and as a direct result of the Subsidiary Transfer, any trustee or receiver would be taking over a company – Concepts – that was allegedly dissociated from Holdings, with Concepts RM, assuming it exercised its option, now a 1% member *and the sole manager* of Holdings.   As Roger and Ted control Concepts RM, the practical effect of the Subsidiary Transfer was to ensure that they would remain in control of the Transferred Subsidiaries in the event a trustee or receiver was appointed.

233.   The Subsidiary Transfer was made at a time when Concepts was insolvent, facing additional restaurant closures (and associated guaranty obligations coming due), and thus faced with the prospect of creditors seeking appointment of a trustee or receiver or forcing Concepts into bankruptcy.

234.    On or about March 29, 2013, almost a month *after* the Subsidiary Transfer occurred, the Law Firm Partner authored a legal memo outlining the purported rationale for the Transfer (the "*Post-Transfer Memo*").  In the Post-Transfer Memo, the Law Firm Partner claims that the transfer was made in order to "package" the Transferred Entities in order to create a "healthy" entity that Roger and Ted could seek to sell or re-capitalize.

235.    Omissions from, and inconsistencies within, the Post-Transfer Memo, the structure of the Subsidiary Transfer (described above), subsequent statements and admissions by the Law Firm Partner, and actions taken by Roger, Ted, and the Law Firm Partner post-bankruptcy, suggest, however, that the true motive behind the Subsidiary Transfer was not as set forth in the Post-Transfer Memo.  For example, and without limitation:

(a)    As discussed, the Subsidiary Transfer was structured in a manner that would give Roger and Ted a means of staying in control of the Transferred Subsidiaries if a trustee or receiver was appointed for Holdings, at a time when this was a real risk due to creditor claims and Concepts' insolvency.

(b)    Despite the foregoing, the Post-Transfer Memo does not anywhere address the impact on creditors – by then the main interest holders in Concepts due to its insolvency – of the dissociation provisions described above, or even discuss or mention dissociation (despite the fact that the Law Firm Partner and the Law Firm were clearly aware of the issue, since they structured the transaction to allow Concepts RM, and thus Roger and Ted, to obtain management control in the event of a dissociation).

(c)    The purported purpose of the Subsidiary Transfer, as explained by the Law Firm Partner in the Post-Transfer Memo, was to "segregate" (in Holding) "high performing restaurant operations from low performing or failing restaurant operations to enable the high quality holdings to be sold, financed or capitalized as a package…."  In reality, however, *all of Concepts remaining subsidiaries* were transferred, including One North (which was transferred to Rodd for basically no consideration as discussed below approximately three months later), Midtown Kitchen & Bar, Inc. (a restaurant Roger referred to as a "failing restaurant" at his deposition, and upon information and belief, closed on or about September 16, 2013, or approximately five months after the Subsidiary Transfer), and Bluepoint

Hollywood, Inc. (which upon information and belief also closed quickly after the Subsidiary Transfer). Only Grill Room and Townhouse remain operational today. In sum, the actual actions Roger, Ted, and the Law Firm Partner caused Concepts to engage in – *transferring all of its subsidiaries, good and bad, beyond the reach of its creditors* – does not appear to correspond with the purpose described in the Post-Transfer Memo.

(d)     The Post-Transfer Memo does not anywhere advise that the Law Firm believed the Subsidiary Transfer could be viewed as fraudulent and avoided, though it is clear the Law Firm Partner and the Law Firm were aware of this at the time. As discussed below, the Law Firm Partner later admits to having "discussed" with Roger that the Subsidiary Transfer being subsequently unwound as a fraudulent transfer "has always been a risk."

(e)     The Post-Transfer Memo was drafted almost a month after the Subsidiary Transfer occurred.

236.    The Subsidiary Transfer and its aftermath had the foreseeable effect of directly impeding creditor recoveries, allowing Roger and Ted to remain in control of the Transferred Restaurants far longer than they otherwise would have, and allowing them to dissipate assets for their personal benefit, and for the benefit of the Law Firm.

237.    Specifically, as described above, after landlords obtained judgments and discovered that Concepts had been made into an empty shell (as described herein), the involuntary bankruptcy was filed on September 19, 2014, with the order for relief entered on November 18, 2014.

238.    After the involuntary bankruptcy had been filed, Roger and Ted executed a document entitled "Exercise of Right to Become a Member of Concepts Restaurant Holding, LLC" (the "*Exercise of Rights Document*"), with an effective date of November 18, 2014 – *the date the order for relief was entered in the bankruptcy* – pursuant to which Concepts RM

purported to exercise its right to become a 1% owner of Holdings (the foregoing, the "*Post-Petition Transfer*").

239.    Although the Exercise of Rights Document has an effective date of November 18, 2014, it was actually on March 26, 2015 that Roger and Ted caused Concepts RM to transfer $15,000, what Roger and Ted calculated the option price to be – into Holding.  On information and belief, this is also the date they signed the Exercise of Rights Document.

240.    Upon information and belief, the Law Firm Partner and/or others at the Law Firm acting at his direction drafted the Exercise of Rights Document.

241.    The Post-Petition Transfer purported to vest Concepts RM, and thus Roger and Ted, with the sole right to continue to manage the operations of Townhouse and Grillroom (by this time the only remaining Transferred Subsidiaries).

242.    Although Concepts retained its economic interest in Holdings, Concepts RM, via Roger and Ted, had control of Townhouse and Grillroom and managed them in such a way as to ensure that no profits were generated or flowed up to Holdings and then to Concepts.  For example, between the effective date of the Exercise of Rights Document and the date the Trustee obtained a court order gaining control of Townhouse and Grillroom (the "*Roger and Ted Post-Petition Management Period*"), without limitation, the following payments were made that benefitted Roger and Ted (and/or entities owned or controlled by them) but not Concepts or Townhouse or Grillroom:

(a)    Grillroom paid the Law Firm at least $214,917, and Townhouse paid the Law Firm a total of $61,500.   Upon information and belief, these payments were not for services that the Law Firm had rendered to either of Townhouse or Grillroom, and in fact were likely for services that directly harmed Concepts and its creditors (such as relating to the Holdings transaction and the Exercise of Rights document).   Obviously if the

Transfer had not happened and a trustee or receiver had quickly gained control of the Transferred Corporations, none of these payments would have been made.

(b)   Townhouse issued monthly checks in the amount of $9,957.39 to 1840 Pickwick, the entity owned by Roger and Ted that in turn owns the building from which the entire Restaurant Group operated.  These purport to be "rent" payments, but there is no reason that a rational manager would allow a single restaurant to pay almost $10,000 per month for a separate office over 20 miles from where the restaurant is located.  No lease existed between Townhouse and 1840 Pickwick, and it appears that in essence Roger and Ted were causing Townhouse to pay 1840 Pickwick's mortgage for their personal benefit.  There was no corporate purpose for these payments and they cost Townhouse at least $99,914.52 in 2015 alone.  This is money that should have flowed up to the Debtor.

(c)   Grillroom issued three checks, totaling $4,765.73 to Sean Murray.  Townhouse issued another three checks, totaling $4,019.59, to Mr. Murray during that same time period.  Mr. Murray is the Vice President of Operations for Restaurants America and Roger testified that he has never been an employee of either Townhouse of Grill Room.

(d)   Townhouse issued at least fifteen checks, payable to Cash, totaling more than $29,000.  During this same time period, Grillroom issued at least twelve checks payable to Cash totaling more than $24,000.  This is in excess of $53,000 in cash, much or all of which likely should have flowed up to the Debtor but was dissipated by current management.

(e)   Grillroom issued monthly checks to Republic Bank, each in the amount of $11,696.88, for a total of at least $105,271.92.  Upon information and belief, these payments were not made on account of a legal obligation of Grillroom.

(f)   Grillroom issued a $425 check to the Wolf & Henderson law firm in Dallas, TX.  Once again, there is no indication that this firm did any work for Grillroom.

(g)   Townhouse issued at least ten checks, each in the amount of $5,555.00 (for a total of at least $55,550), to Phoenix Builders.  Upon information and belief, Phoenix Builders did not perform any work for Townhouse.

(h)   Grillroom made at least $27,500 in payments to Advanced Construction Services.  Upon information and belief, Advanced Construction Services did not perform any work for Grillroom.

(i)      Grillroom made at least $17,500 in payments and Townhouse at least $5,000 in payments to Fred Morganstern, a neighbor of Ted's who, upon information and belief, may have loaned money to Ted and/or another HoldCo.  Upon information and belief, Grillroom is not an obligor of Mr. Morganstern.

(j)      Grillroom made at least one distribution to Roger in the amount of $10,000 on March 9, 2015.  Any distribution should have flowed up to Holding, and then to the estate.

Although the Trustee will need additional post-filing discovery, the foregoing payments total $659,363.76.  All of the foregoing transfers, together with all others that the Trustee establishes at trial to have been made for the benefit of persons or entities other than Concepts, Holding, Townhouse, or Grillroom during the Roger and Ted Post-Petition Management Period shall be referred to herein as the "*Post-Petition Corporate Waste Transfers*."

243.    Roger and Ted's conduct during the Roger and Ted Post-Petition Management Period, including allowing or causing the Post-Petition Corporate Waste Transfers, further belies the explanation in the Post-Transfer Memo that the Transfer was done with the best interests of "stakeholders" (*i.e.*, creditors, given Concepts' insolvency) at heart.

244.    Moreover, shortly after the interim trustee was appointed, Roger wrote an email to the Law Firm Partner – again, the Law Firm attorney who orchestrated the Subsidiary Transfer – concerned that the trustee would "go after 111 and grillroom" ("111" referring to Townhouse). *See* email chain attached hereto as <u>Exhibit F</u>.  Again, Roger's concern in the email is obviously not maximizing value for creditors, but rather *preventing creditors from accessing the value of townhouse and Grillroom -- the remaining Transferred Subsidiaries*.

245.    The Law Firm Partner's response is also telling.  He admits that there was always a risk that the Subsidiary Transfer was going to be construed as a fraudulent transfer, claimed

that he had previously advised Roger of this fact, and interestingly refers to the Post-Transfer Memo as having been "prepared in early March while you [Roger] were trying to obtain financing." *Id*. Again, the Post-Transfer Memo was actually prepared at the end of March, almost a month *after* the Subsidiary Transfer.

246.     All of the foregoing facts relating to the Subsidiary Transfer, as well as to the subsequent execution of the Exercise of Rights Document, the Roger and Ted Post-Petition Management Period, the Corporate Waste Transfers, and the Law Firm Partner and the Law Firm's involvement in all of the foregoing, together with all other facts herein relating to the foregoing issues, shall be referred to as the "*Subsidiary Transfer Facts*" for purposes of this Complaint.

**(D)     Borrowing Against and Encumbering Concepts and the HoldCos**

247.     On or about March 18, 2013, Roger and Ted caused Concepts to become obligated on the Concepts-Edgebrook Loan, and 1840 Pickwick to become obligated on the 1840-Edgebrook Loan.  The Concepts-Edgebrook Loan was guaranteed by 33 Restaurant, 111 Wacker, and Prime Bar Chicago, in addition to Ted and Roger.  Edgebrook was granted liens (the "*Edgebrook Liens*") on the assets of all of the foregoing entities.

248.     As a "quid-pro-quo" for obtaining this loan, in February, 2013, Roger made the $200,000 Edgebrook Investment.   Although Roger was promptly reimbursed by Concepts after the Concepts-Edgebrook Loan closed (so effectively Concepts made the Edgebrook Investment), Roger kept ownership of the resultant stock interests in the name of a limited liability company of which he is the sole owner.

249.     Upon information and belief, the assets of all of the obligors or guarantors on the
Edgebrook Loans were unencumbered prior to the imposition of the Edgebrook Liens.

250.     $649,999.29 of the total $650,000 proceeds from the Concepts-Edgebrook Loan
(the "*Concepts-Edgebrook Loan Proceeds*") had been drawn down by March 19, 2013 – *i.e.*, one
day after the closing.

251.     Very little of, if any, of the Concepts-Edgebrook Loan Proceeds were used for the
benefit of Concepts or the Concepts-Owned HoldCos, and none was used to satisfy creditor
claims.  Rather, the Concepts-Edgebrook Loan Proceeds were disbursed as follows:

    a.     **$30,534.00** funded expenses associated with the closing (attorneys' fees,
           broker fee, etc.).

    b.     **$414,402.29** was wired to Houston, Texas based Amegy Bank of Texas
           for the benefit of Alliance Payroll Services, Inc., which Goldman testified
           was used to fund payroll for the employees of all of Roger and Ted's
           ventures, including all of the Insider-Owned HoldCos.

    c.     **$205,063.00** was deposited into an infrequently-used bank account that
           Concepts had just opened on March 1, 2013 at Edgebrook Bank ending in
           8612 (the "*Concepts Edgebrook 8612 Account*").  On March 20, 2013 –
           *one day after the funds were deposited in the Concepts-Edgebrook 8612
           Account* – Roger withdrew $202,000 of the funds via a check written to
           "cash."  Roger has testified that he took these funds to reimburse himself
           for the stock he had to purchase in Edgebrook to get the loan.

252.     In sum, with Concepts insolvent, Roger and Ted caused Concepts to borrow
$650,000, encumbered Concepts and its two strongest Concepts-Owned HoldCos (*i.e.*, its
primary assets) and Prime Bar Chicago (as discussed below, an *alter-ego* of Concepts), and then
used all or the vast majority of the Concepts-Edgebrook Loan Proceeds for their own direct or
indirect benefit.

253.    Similarly, while a portion of the 1840-Edgebrook Loan paid off a pre-existing mortgage, it generated $394,839.80 in free cash (the "*1840-Edgebrook Loan Proceeds*"; and together with the Concepts-Edgebrook Loan Proceeds, the "*Edgebrook Loan Proceeds*").   Upon information and belief, all or the vast majority of the 1840-Edgebrook Loan Proceeds were used for the benefit of Roger and Ted.

254.    As discussed below, 1840 Pickwick is also an *alter-ego* of Concepts, so as before, the impact of the foregoing was Roger and Ted encumbering an entity that should have been part of Concepts and using the loan proceeds for their own benefit.

255.    All of the foregoing actions – (a) the issuance of the Greenfield Note, (b) the De-Coupling and associated diversion of revenue, (c) the Transfer of the Owned Subsidiaries, and (d) the Encumbering of the Concepts Assets – occurred during the same period (December, 2012 through June, 2013) and was devastating for creditors.   When landlords began to obtain judgments against Concepts, post-judgment discovery revealed that in stark contrast to the Consolidated Financials that Concepts had provided to these same landlords just a matter of months before (showing tens of millions of dollars in revenue and substantial associated assets), *Concepts suddenly purported to have no assets and no revenues*.

256.    When Concepts' financial condition was discovered, creditors worked together and the involuntary bankruptcy petition was filed on September 19, 2014.

### (E)    Opening New Restaurants Not Through Concepts

257.    Finally, it appears that Roger, knowing that Concepts and the Restaurant Group were insolvent and facing landlord claims for all of the reasons set forth herein, began to pursue

new restaurant ventures outside of Concepts, often in partnership with Dennis (Concepts' General Counsel).

258.    For example, on December 11, 2012, a new entity called Smith & Wells, LLC ("*Smith & Wells*") was formed with the Illinois Secretary of State listing the Law Firm Partner – *i.e.*, counsel to Concepts – as its registered agent.  Smith & Wells was formed to develop and own, and currently does own, a "Randolph Tavern" restaurant at 188 W. Randolph Street in Chicago, Illinois ("*Randolph Tavern*").

259.    According to Roger, Smith & Wells is owned by Jennifer (Roger's wife) and Dennis.  But it is managed by Roger and Dennis through management companies that they formed (Tapsmith in the case of Roger, and Consulting for Dennis).

260.    Upon information and belief, Roger, Dennis, and Jennifer, including Roger and Dennis acting through Tapsmith and Consulting respectively, have similarly developed other Chicago-area restaurants since 2012 without routing those opportunities through Concepts, including, without limitation, Jackson Tavern located at 216 W. Jackson St. in Chicago, IL (owned by 216 Restaurant LLC), Lake Street Kitchen & Bar located at 410 Circle Ave. in Forest Park, IL (owned by Lake Restaurant & Bar LLC), and Madison Tavern located at 500 W. Madison St. in Chicago, IL  (the foregoing, together with Randolph Tavern, Jackson Tavern and Lake Street Kitchen & Bar, shall be referred to herein as the "*New Greenfield-Dennis Restaurant Ventures*").

261.    Upon information and belief, Tapsmith and Consulting are single purpose management entities formed by Roger and Dennis to route management fees and/or disguise

their involvement in the New Greenfield-Dennis Restaurant Ventures, and are the alter-egos of

Roger (in the case of Tapsmith) and Dennis (in the case of Consulting).

262.    Notably, the Law Firm Partner appears to be the registered agent for all of the

New Greenfield-Dennis Restaurant Ventures.

263.    All of the foregoing facts relating to the New Greenfield-Dennis Restaurant

Ventures, together with all other facts relating thereto, shall be referred to as the "*New

Greenfield-Dennis Restaurant Ventures Facts*" for purposes of this Complaint.

> **VI.    Roger, Ted, and Lisa Treated Concepts and the HoldCos as a Personal "Piggy Bank" – Putting in Money When Needed and Taking Money Out When Possible**

264.    Throughout Concepts' existence, including during all periods relevant to this

Complaint, Roger, Ted, and Lisa comingled their own funds with funds of Concepts and other

entities within the Restaurant Group, and in doing so wholly disregarded the legally separate

corporate existence of Concepts and the other entities.

### (a) Roger

265.    With respect to Roger, the addendum to his filed proof of claim (claim No. 9-1,

the "*Greenfield POC*") evidences that (a) Roger was comingling funds with Concepts and related

entities and (b) that Roger regards all of the HoldCos (whether Concepts-Owned or Insider-

Owned) as part and parcel of Concepts.

266.    Specifically, the addendum to the Greenfield POC, which is signed under penalty

of perjury, breaks down the $1,592,000 that Roger claims he is owed into the following

payments that Roger allegedly made to Concepts (and, presumably, were allegedly not re-paid):

| Date | Amount | Recipient | Note |
|------|--------|-----------|------|
| 8.6.2007 | $300,000 | TBD | The Trustee has not yet been able to identify this |

| | | | |
|---|---|---|---|
| | | | alleged payment, and it does not appear that any such payment was deposited into the comingled Concepts-FM 1439 Account (the main Concepts operating account) at or around this time. |
| 12.2.2010 | $100,000 | Concepts | Cashier's Check from Northbrook Bank & Trust Company ("*Northbrook Bank*") with Roger listed as the remitter is deposited into the comingled Concepts-FM 1439 Account. No loan agreement or other documentation ever issued. |
| 8.15.2011 | $50,000 | Gilmon Fox | Gilmon Fox is a contractor that built out restaurants for, without limitation, (a) Prime Bar Greenway, LLC (the owner of a Prime Bar in Dallas, TX) and (b) Townhouse DG, LLC (the owner of a Townhouse in Dallas, TX). *Both of these entities were Insider-Owned HoldCos (i.e., Roger is alleging that Concepts owes him money on account of funds he advanced to a contractor that did work for HoldCos that Roger claims Concepts did not own).* |
| 8.21.2011 | $10,000 | TBD | The Trustee has not yet been able to identify this alleged payment, and it does not appear that any such payment was deposited into the comingled Concepts-FM 1439 Account (the main Concepts operating account) at or around this time. |
| 8.25.2011 | $50,000 | Concepts | Cashier's Check from Northbrook Bank with Roger listed as the remitter is deposited into the Comingled Concepts 1439 Account. No loan agreement or other documentation ever issued. |
| 11.1.2011 | $50,000 | Concepts | Check No. 1483 from Roger and Jennifer's 0887 account at Northbrook Bank is deposited into the Concepts-FM 1439 Account. No loan agreement or other documentation ever issued. |
| 11.18.2011 | $100,000 | Tim Fox | Payment from Roger to the owner of Gilmon Fox – *see* note above for the 8.15.2011 payment (again, appears this payment was for construction related to Insider-Owned HoldCos). |
| 1.6.2012 | $25,000 | Concepts | Check No. 1226 from Roger and Jennifer's 0887 account at Northbrook Bank is deposited into the Concepts-FM 1439 Account. No loan agreement or other documentation ever issued. |
| 1.31.2012 | $100,000 | Gilmon Fox | *See* note above for the 8.15.2011 payment (again, appears this payment was for construction related to Insider-Owned HoldCos). |

| 2.10.2012 | $65,000 | Concepts | Check No. 1225 from Roger and Jennifer's 0887 account at Northbrook Bank is deposited into the Comingled Concepts 1439 Account.   No loan agreement or other documentation ever issued. |
| 2.23.2012 | $65,000 | Concepts | Check No. 1230 from Roger and Jennifer's 0887 account at Northbrook Bank is deposited into the Concepts-FM 1439 Account.  No loan agreement or other documentation ever issued. |
| 3.1.2012 | $50,000 | Concepts | Check No. 1232 from Roger and Jennifer's 0887 account at Northbrook Bank is deposited into the Concepts-FM 1439 Account.  No loan agreement or other documentation ever issued. |
| 3.9.2012 | $300,000 | Gilmon Fox | *See* note above for the 8.15.2011 payment (again, appears this payment was for construction related to Insider-Owned HoldCos). |
| 4.30.2012 | $65,000 | Concepts | Check No. 1232 from Roger and Jennifer's 6923 account at JPMorgan Chase Bank, N.A. ("*Chase*") is deposited into the Concepts-FM 1439 Account. No loan agreement or other documentation ever issued. |
| 5.18.2012 | $100,000 | Concepts | Check No. 1241 from Roger and Jennifer's 0887 account at Northbrook Bank is deposited into the Concepts-FM 1439 Account.  No loan agreement or other documentation ever issued. |
| 5.23.2012 | $100,000 | Concepts | Check No. 1246 from Roger and Jennifer's 0887 account at Northbrook Bank is deposited into the Concepts-FM 1439 Account.  No loan agreement or other documentation ever issued. |
| 7.19.2012 | $33,000 | Concepts | Cashier's Check from Chase with Roger listed as the remitter is deposited into the Concepts-FM 1439 Account.   No loan agreement or other documentation ever issued. |
| 7.23.2012 | $29,000 | TBD | The Trustee has not yet been able to identify this alleged payment, and it does not appear that any such payment was deposited into the comingled Concepts-FM 1439 Account (the main Concepts operating account) at or around this time. |
| 3.7.2013 | $80,000 | Concepts | Cashier's Check from Edgebrook with Roger listed as the remitter is deposited into the Concepts-FM 1439 Account.   No loan agreement or other documentation ever issued. |

267.    Summarizing the above, of the amounts Roger asserts Concepts owes him in the

Greenfield POC:

A.    $550,000 relates to payments that Roger appears to have made in connection with construction on Insider-Owned HoldCos that Roger has claimed Concepts had no legal ownership interest in (*i.e.*, the Gilmon Fox related payments). *So even in the Greenfield Proof of Claim, Roger is still disregarding separate ownership and treating the HoldCos – including Insider-Owned HoldCos, as one and the same with Concepts.*

B.    $390,000 of the amount claimed in the Greenfield POC relates to amounts that do not appear to have been deposited into the Concepts-FM 1439 Account.  The Trustee has not yet seen evidence that these amounts were deposited into any Concepts account, but continues to investigate.

C.    The remaining $652,000 was advanced by Roger and/or Jennifer Greenfield and deposited into the Comingled Concepts Accounts via twelve payments on random dates between 2007 and 2013.  None of these advances were documented as loans at the time, and the transactions were evidenced only by the check and corresponding deposit.

268.    Even with the $652,000 in checks that were actually deposited into a Concepts

account, due to the extensive comingling described above, and the fact that Concepts was paying

the expenses of the HoldCos and providing them with gratuitous services, it is impossible to

know whether the funds were used for the benefit of Concepts, Concepts-Owned HoldCos, or

Insider-Owned HoldCos.

269.    Moreover, at the same time Roger was putting money in to Concepts and/or the

HoldCos, he was also taking money *out*.  While the Trustee will need further discovery to

identify all payments to or for the benefit of Roger from Concepts and the  HoldCos, the Trustee

is already aware of Roger withdrawing the following amounts from Concepts and/or HoldCos:

| Known Payments to Roger Greenfield from Concepts and HoldCos | | | |
| --- | --- | --- | --- |
| **Date** | **Amount** | **Recipient** | **Paying Entity** |

| 4/26/2012 | $247,759.33 | Roger | 8165 |
|---|---|---|---|
| 10/31/2012 | $250,000.00 | Roger | 8165 |
| 11/30/2012 | $15,000.00 | Roger | 8165 |
| 2/20/2013 | $75,000.00 | Roger | 7163 |
| 2/22/2013 | $30,000.00 | Roger | 7163 |
| 3/4/2013 | $30,000.00 | Roger | 1439 |
| 3/14/2013 | $158,150.06 | Roger | 0838 |
| 3/6/2013 | $158,150.00 | Roger | 8604 |
| 3/14/2013 | $157,580.00 | Roger | 6099 |
| 6/3/2013 | $55,000.00 | Roger | 0515 |
| 6/3/2013 | $55,000.00 | Roger | 0515 |
| 6/3/2013 | $55,000.00 | Roger | 0515 |
| 10/1/2013 | $7,149.00 | Roger | 9902 |
| 9/15/2014 | $5,000.00 | Roger | 0515 |
| 10/20/2014 | $10,000.00 | Roger | 0515 |
| 10/24/2014 | $15,000.00 | Roger | 0515 |
| 10/27/2014 | $30,000.00 | Roger | 0515 |
| 12/9/2014 | $10,000.00 | Roger | 0515 |
| 1/5/2015 | $25,000.00 | Roger | 0515 |
| 1/13/2015 | $3,415.51 | Roger | 1664 |
| 1/20/2015 | $7,500.00 | Roger | 0515 |
| 1/27/2015 | $3,415.50 | Roger | 1664 |
| 2/17/2015 | $10,000.00 | Roger | 0515 |
| 4/7/2015 | $3,487.62 | Roger | 1664 |
| 1/25/2016 | $20,000.00 | Roger | 5659 |
| 3/9/2016 | $10,000.00 | Roger | 6420 |
| **TOTAL** | **$1,446,607.02** | | |

| **Payments to Roger Greenfield from Concepts and HoldCos via Hopworks** | | | |
|---|---|---|---|
| **Date** | **Amount** | **Recipient** | **Paying Entity** |
| 6/8/2015 | $10,000.00 | Hopworks | 1631 |
| 6/15/2015 | $10,000.00 | Hopworks | 1631 |
| 6/15/2015 | $10,000.00 | Hopworks | 1631 |
| 6/22/2015 | $10,000.00 | Hopworks | 1631 |
| 6/22/2015 | $10,000.00 | Hopworks | 1631 |
| 6/30/2015 | $10,000.00 | Hopworks | 1631 |
| 7/13/2015 | $10,000.00 | Hopworks | 1631 |
| 7/20/2015 | $10,000.00 | Hopworks | 1631 |
| 7/27/2015 | $10,000.00 | Hopworks | 1631 |
| 8/5/2015 | $10,000.00 | Hopworks | 1631 |

| | | | |
|---|---|---|---|
| 8/10/2015 | $10,000.00 | Hopworks | 1631 |
| 8/24/2015 | $10,000.00 | Hopworks | 1631 |
| 12/8/2015 | $10,000.00 | Hopworks | 1599 |
| 12/15/2015 | $10,000.00 | Hopworks | 1599 |
| 1/19/2016 | $10,000.00 | Hopworks | 1599 |
| 1/25/2016 | $10,000.00 | Hopworks | 1599 |
| 1/26/2016 | $10,000.00 | Hopworks | 1599 |
| 1/26/2016 | $10,000.00 | Hopworks | 1599 |
| 2/29/2016 | $10,000.00 | Hopworks | 1599 |
| 3/7/2016 | $10,000.00 | Hopworks | 1599 |
| 3/14/2016 | $10,000.00 | Hopworks | 1599 |
| 3/21/2016 | $10,000.00 | Hopworks | 1599 |
| **TOTAL** | **$220.000.00** | | |

All payments that Roger received from Consolidated Concepts (defined below) while Concepts and the Restaurant Group were insolvent, whether received directly or indirectly, and including payments he received via Hopworks (or were paid to and remain in Hopworks), which upon information and belief is a single purpose management entity 100% owned by Roger and Roger's *alter-ego*, shall be referred to herein as the "*Greenfield Post-Insolvency Payments*").

270.    Roger also at times withdrew money from Concepts in the form of salary.

271.    Concepts employees also provided personal services for Roger and his wife Jennifer.  For example, Rodd Goldman, Concepts' CFO, prepared Roger and Jennifer's personal tax returns on an annual basis.  Roger did not pay Rodd separately for this work or reimburse Concepts.

### (b) Ted and Lisa

272.    Just like Roger, Ted and Lisa routinely comingled funds with Concepts and the HoldCos, regularly contributing and taking out money.

273.    Like Roger, both Ted and Lisa routinely put money into entities within the Restaurant Group, likewise calling every infusion a "loan" even though it was in fact equity.

274.     Moreover, at the same time Ted and Lisa were putting money in to Concepts

and/or the HoldCos, they were also taking money *out*.  While the Trustee will need further

discovery to identify all payments to or for the benefit of Ted and Lisa from Concepts and the

HoldCos, the Trustee is already aware of them withdrawing the following amounts from

Concepts and/or HoldCos:

| Payments to Ted Kasemir from Concepts and HoldCos | | | |
|---|---|---|---|
| **Date** | **Amount** | **Recipient** | **Paying Entity** |
| 2/13/2012 | $35,000.00 | Ted | 1439 |
| 2/29/2012 | $58,000.00 | Ted | 1439 |
| 3/1/2012 | $38,000.00 | Ted | 1439 |
| 3/5/2012 | $38,000.00 | Ted | 1439 |
| 3/8/2012 | $51,000.00 | Ted | 1439 |
| 3/12/2012 | $34,000.00 | Ted | 1439 |
| 3/14/2012 | $25,500.00 | Ted | 1439 |
| 3/20/2012 | $10,000.00 | Ted | 1439 |
| 3/26/2012 | $62,000.00 | Ted | 1439 |
| 3/28/2012 | $49,000.00 | Ted | 1439 |
| 3/29/2012 | $60,000.00 | Ted | 1439 |
| 3/29/2012 | $60,000.00 | Ted | 1439 |
| 3/30/2012 | $37,000.00 | Ted | 1439 |
| 4/5/2012 | $60,000.00 | Ted | 1439 |
| 4/11/2012 | $40,000.00 | Ted | 1439 |
| 4/11/2012 | $37,000.00 | Ted | 7163 |
| 4/12/2012 | $12,000.00 | Ted | 1439 |
| 4/19/2012 | $41,000.00 | Ted | 1439 |
| 4/19/2012 | $41,000.00 | Ted | 7163 |
| 4/20/2012 | $18,000.00 | Ted | 1439 |
| 4/24/2012 | $35,000.00 | Ted | 1439 |
| 4/24/2012 | $30,000.00 | Ted | 7163 |
| 4/25/2012 | $26,000.00 | Ted | 1439 |
| 4/26/2012 | $39,000.00 | Ted | 1439 |
| 4/26/2012 | $39,000.00 | Ted | 7163 |
| 4/27/2012 | $25,000.00 | Ted | 1439 |
| 4/27/2012 | $25,000.00 | Ted | 7163 |
| 5/2/2012 | $29,000.00 | Ted | 1439 |
| 5/2/2012 | $28,000.00 | Ted | 7163 |

| | | | |
|---|---|---|---|
| 5/3/2012 | $6,000.00 | Ted | 1439 |
| 5/7/2012 | $19,200.00 | Ted | 1439 |
| 5/9/2012 | $21,000.00 | Ted | 1439 |
| 5/18/2012 | $32,000.00 | Ted | 1439 |
| 5/18/2012 | $28,500.00 | Ted | 7163 |
| 5/22/2012 | $29,000.00 | Ted | 1439 |
| 5/22/2012 | $28,000.00 | Ted | 7163 |
| 5/23/2012 | $40,000.00 | Ted | 7163 |
| 5/24/2012 | $45,000.00 | Ted | 7163 |
| 5/24/2012 | $43,000.00 | Ted | 1439 |
| 5/25/2012 | $48,000.00 | Ted | 1439 |
| 5/25/2012 | $46,000.00 | Ted | 7163 |
| 5/29/2012 | $37,000.00 | Ted | 1439 |
| 5/29/2012 | $25,000.00 | Ted | 7163 |
| 5/30/2012 | $55,000.00 | Ted | 1439 |
| 5/30/2012 | $40,000.00 | Ted | 1439 |
| 5/31/2012 | $40,000.00 | Ted | 1439 |
| 5/31/2012 | $43,000.00 | Ted | 7163 |
| 6/1/2012 | $65,000.00 | Ted | 1439 |
| 6/1/2012 | $38,000.00 | Ted | 1439 |
| 6/1/2012 | $37,000.00 | Ted | 1439 |
| 6/1/2012 | $23,000.00 | Ted | 1439 |
| 8/15/2014 | $10,000.00 | Ted | 0515 |
| 8/29/2014 | $10,000.00 | Ted | 6370 |
| 9/12/2014 | $14,000.00 | Ted | 0515 |
| 9/15/2014 | $4,000.00 | Ted | 5659 |
| 9/26/2014 | $5,500.00 | Ted | 0515 |
| 9/29/2014 | $8,000.00 | Ted | 0515 |
| 10/3/2014 | $10,000.00 | Ted | 0515 |
| 10/10/2014 | $5,000.00 | Ted | 0515 |
| 10/14/2014 | $25,000.00 | Ted | 0515 |
| 10/17/2014 | $20,000.00 | Ted | 0515 |
| 10/20/2014 | $4,500.00 | Ted | 5667 |
| 10/24/2014 | $8,500.00 | Ted | 0515 |
| 10/31/2014 | $4,500.00 | Ted | 0515 |
| 11/7/2014 | $8,500.00 | Ted | 0515 |
| 11/10/2014 | $5,000.00 | Ted | 0515 |
| 11/28/2014 | $15,000.00 | Ted | 0515 |
| 12/5/2014 | $10,000.00 | Ted | 0515 |
| 12/8/2014 | $10,000.00 | Ted | 5659 |
| 12/8/2014 | $25,000.00 | Ted | 0515 |
| 12/17/2014 | $8,000.00 | Ted | 0515 |

| 12/22/2014 | $32,306.84 | Ted | 0515 |
|---|---|---|---|
| 1/16/2015 | $4,000.00 | Ted | 5659 |
| 1/23/2015 | $9.500.00 | Ted | 0515 |
| 1/26/2015 | $7,500.00 | Ted | 5659 |
| 2/17/2015 | $10,000.00 | Ted | 0515 |
| 2/20/2015 | $8,500.00 | Ted | 5659 |
| 2/20/2015 | $8,500.00 | Ted | 0515 |
| 3/6/2015 | $8,500.00 | Ted | 0515 |
| 3/9/2015 | $ 8,000.00 | Ted | 5659 |
| 3/13/2015 | $3,000.00 | Ted | 0515 |
| 3/16/2015 | $10,000.00 | Ted | 0515 |
| 3/30/2015 | $2,500.00 | Ted | 0515 |
| 4/6/2015 | $13,750.00 | Ted | 0515 |
| 4/17/2015 | $12,000.00 | Ted | 0515 |
| 4/24/2015 | $15,000.00 | Ted | 0515 |
| 5/4/2015 | $11,000.00 | Ted | 0515 |
| 5/7/2015 | $12,000.00 | Ted | 0515 |
| 5/15/2015 | $4,000.00 | Ted | 0515 |
| 5/26/2015 | $26,000.00 | Ted | 0515 |
| 9/25/2015 | $6,000.00 | Ted | 0515 |
| **TOTAL** | **$2,284,256.84** | | |

| Payments to Ted Kasemir from Concepts and HoldCos via Draft Town | | | |
|---|---|---|---|
| **Date** | **Amount** | **Recipient** | **Paying Entity** |
| 1/12/2016 | $6,919.37 | Draft Town | 5659 |
| 6/26/2015 | $7,896.96 | Draft Town | 5659 |
| 8/14/2015 | $6,748.98 | Draft Town | 5659 |
| 10/16/2015 | $7,488.36 | Draft Town | 5659 |
| 12/7/2015 | $18,500.00 | Draft Town | 5659 |
| 12/15/2015 | $7,364.40 | Draft Town | 5659 |
| 12/18/2015 | $7,013.79 | Draft Town | 5659 |
| 12/18/2015 | $6,477.41 | Draft Town | 5659 |
| 12/21/2015 | $8,556.39 | Draft Town | 5659 |
| **TOTAL** | **$79,965.66** | | |

All payments that Ted received from Consolidated Concepts (defined below) while Concepts and the Restaurant Group were insolvent, including the foregoing payments to the extent the associated checks cleared, whether received directly or indirectly, and including payments he

received via Draft Town (or were paid to and remain in Draft Town), which upon information and belief is a single purpose management entity 100% owned by Ted and Ted's *alter-ego*, shall be referred to herein as the "*Ted Kasemir Post-Insolvency Payments*").   Ted also at times withdrew money from Concepts in the form of salary.

| Payments to Lisa Kasemir from Concepts and HoldCos | | | |
|---|---|---|---|
| **Date** | **Amount** | **Recipient** | **Paying Entity** |
| 6/19/15 | $5,250.00 | Lisa | 5659 |
| 5/27/15 | $22,000.00 | Lisa | 0515 |
| 2/26/16 | $4,986.13 | Lisa | 0515 |
| 2/19/16 | $23,050.00 | Lisa | 0515 |
| 2/12/16 | $9,000.00 | Lisa | 0515 |
| 12/9/15 | $12,250.00 | Lisa | 0515 |
| 11/9/15 | $10,000.00 | Lisa | 0515 |
| 11/27/15 | $8,000.00 | Lisa | 0515 |
| 11/20/15 | $6,800.00 | Lisa | 0515 |
| 11/13/15 | $10,000.00 | Lisa | 0515 |
| 11/13/15 | $10,000.00 | Lisa | 5667 |
| 1/29/16 | $4,855.00 | Lisa | 0515 |
| **TOTAL** | **$126,191.13** | | |

All payments that Lisa received from Consolidated Concepts (defined below) while Concepts and the Restaurant Group were insolvent, including the foregoing payments to the extent the associated checks cleared, whether received directly or indirectly, shall be referred to herein as the "*Lisa Kasemir Post-Insolvency Payments*"; and together with the Greenfield Post-Insolvency Payments and the Ted Kasemir Post-Insolvency Payments, the "*Post-Insolvency Payments*").

275.    None of the Post-Insolvency Payments were documented, with the only evidence of the transactions typically being the related banking records.

276.    All of the Post-Insolvency Payments were made while Concepts, and the Restaurant Group generally, were insolvent.

277.    In sum, Roger, Ted, and Lisa put money into Concepts and the HoldCos when needed, and took money out when possible – all without documenting any of the dozens of transfers in or out.

(a)    **Post-Bankruptcy – Greenfield and Kasemir, Under Penalty of Perjury, Assert and Schedule Inconsistent and Unsupportable Claims to the Detriment of Creditors**

278.    Ted Kasemir signed a verification of the schedules of assets and liabilities and the statement of financial affairs, providing that he did so "…under penalty of perjury…" *See* Docket Nos. 18 & 20.

279.    The Schedules list claims of $658,000 for Roger and $658,000 for Ted.

280.    When examined under oath, Ted claimed that he was not involved in coming up with those figures, and that Rodd came up with them.  Kasemir 10.18.16 Transcript at 141:21 – 142:11.  Reminded that Rodd stopped working for Concepts well before the schedules were prepared, Ted claimed again that he did nothing to determine the amounts owed and did not know who did, briefly claimed he got the numbers from the "Great Plains" ledger, then backtracked and again claimed to have done nothing.  *Id* at 141:21 – 143:12.  He admitted that he did nothing to verify the amounts and when asked whether he actually knew if he was owed $658,000 he stated "I do not know."  *Id* at 143:11-16.

281.    Ted thus signed a verification under penalty of perjury for schedules that grant himself and Roger matching $658,000 claims despite not knowing if those amounts were owed and doing nothing to verify the amounts.

282.    On February 25, 2016, Ted submitted a proof of claim (the "*Initial Kasemir POC*") in the Concepts bankruptcy.  *See* Claim No. 10-1.

283.    Ted signed the Initial Kasemir POC under penalty of perjury.  *Id*.

284.    The face amount if the Initial Kasemir POC is $601,000, or $57,000 less than what Ted certified was owed in the Schedules.

285.    Moreover, the attachment to the Initial Kasemir POC, which purports to list the items underlying his claim, only lists items aggregating to $313,000.  And even of that $313,000, $163,000 relates to checks that Concepts allegedly issued to Ted that were returned for "non-sufficient funds" (*i.e.*, checks issued *to* Ted that did not clear, not evidence of an underlying debt).  Ted could not explain any of this when examined under oath.  *See* Kasemir 10.18.16 Transcript at 150:3 – 160:9.

286.    On November 4, 2016, less than three weeks after his October 18, 2016 deposition, Ted filed a second claim (not amending his prior claim), this time in the amount of $313,000.  *See* Claim No. 11-1.  While it appears this may have been an attempt to correct the arithmetic errors in his initial claim, by filing two claims, Ted actually increased his claimed amounts because he is now asserting two claims against the estate despite admitting to now knowing how much he is actually owed, and having scheduled a wholly different amount.

287.    When Roger was asked under oath about the matching $658,000 amounts for him and Ted in the schedules, he stated that he thought they were inaccurate, and that he was owed more and Ted less.

288.    As noted above, Roger filed the Greenfield POC for $1,592,000, more than twice as much as the scheduled amount.  At his deposition he said that he was owed $1.8 million, and as noted above, the $1,592,000 includes amounts paid to contractors for Insider-Owned HoldCos that Roger is trying to argue are separate from Concepts.

289.    The foregoing scheduling and assertion of unsupportable claims, in each case under penalty of perjury, and in each case having the effect of threatening to dilute the recoveries of innocent creditors and victims of the conduct described herein, shall be referred to as the "*Improper Scheduling and Assertion of Unsupportable Insider Claims*" for purposes of this Complaint.

## CAUSES OF ACTION

290.    For purposes of the following causes of action, the term "Consolidated Concepts" shall refer to Concepts, together with any HoldCo or other entity that is substantively consolidated with Concepts as requested herein.

### Count I
### Substantive Consolidation
**(Against Park Tavern Rosemont, Prime Bar Tampa, Prime Bar Chicago, Park Tavern Chicago, Prime Bar America and the Restaurants America Entities)**

291.    The Trustee re-alleges the preceding paragraphs 1-290, as if stated fully herein.

292.    Concepts' business dealings are intertwined with those of Park Tavern Rosemont, Prime Bar Tampa, Prime Bar Chicago, Park Tavern Chicago, Prime Bar America and the Restaurants America Entities (collectively, the "*Consolidation Entities*"). They are all in the business of owning and operating restaurants, are part of the Restaurant Group, and are owned and controlled by Roger and Ted.

293.    The financial affairs of Concepts and the Consolidation Entities are hopelessly entangled.  For example, Concepts provided Common Concepts Services to each of the Consolidation Entities, all without being paid or reimbursed for providing such services.  The Restaurants America Entities did not even have employees or separate bank accounts.  The value

of these services was not tracked, and it would be virtually impossible, if not actually impossible, as well as prohibitively costly, to attempt to re-create the accounting now.

294.   As discussed above, Concepts and the Consolidation Entities were rampantly comingling their assets, and also comingling with the rest of the entities within the Restaurant Group.  At all times prior to the De-Coupling, the credit card revenues from each Consolidation Entity flowed into one or more of the Comingled Credit Card Accounts, and as discussed above, there was then extensive and regular comingling between the Comingled Credit Card Accounts. And even when credit card revenue for the Consolidation Entities began to flow into accounts in their own names, they were still extensively comingling, including via frequent online transfers. *See* detailed discussion for each Consolidation Entity under its respective alter ego count below.

295.   TI Funds for the buildouts of the Consolidation Entities was often deposited into Comingled Concepts Accounts, and Concepts paid buildout and/or operational expenses for all of the Consolidation Entities.

296.   Concepts and the other entities within the Restaurant Group have inadequate and incomplete financial records.  For example, the alleged "to-from" spreadsheet that supposedly existed to track electronic funds transfers between entities within the Restaurant Group has not been produced to the Trustee.  Concepts' schedules do not reflect intercompany claims against other HoldCo entities, or intercompany debts owed to other HoldCos, strongly suggesting that such records do not exist, are not accurate, and/or were irrelevant to Roger and Ted given that the Restaurant Group was run as a consolidated whole by their own admission.  The Common Concepts Services were not tracked at all, and at this point it would be virtually impossible to re-

create the costs of those services and allocate them among the Restaurant Group entities, many of which are now defunct.

297.    Similarly evidencing the hopelessly comingled nature of the finances of Concepts and the Consolidation Entities, as discussed separately herein, Roger and Ted are asserting large "claims" against Concepts for funds that they allegedly advanced, but that were comingled and used to pay expenses of all the entities – including the Consolidation Entities.  Given that cash is fungible, it is truly impossible to determine what particular entity received or benefitted from such dollars.

298.    Ted and Roger, and all of the entities within the Restaurant Group, utterly failed to maintain corporate formalities, and the Trustee specifically incorporates and directs the Court to the Failure to Maintain Corporate Formalities Facts (discussed above), which apply equally to the Consolidation Entities.

299.    The Trustee also specifically incorporates and directs the Court to the Failure to Maintain Records and Document Inter-Company and Insider Transactions Facts (discussed above), which also apply equally to (and have a material impact on) the Consolidation Entities. Those facts, including the failure to maintain records of money Ted and Roger put in and took out over the years, as well as the fact that the computer server may be destroyed and has not been turned over at the time of the filing of the Complaint, are only further reasons why it would be impossible or nearly impossible, and prohibitively expensive, to truly untangle the financials of the Consolidation Entities, Concepts, and other Restaurant Group Entities.

300.    Such substantial time and expense would be required to even attempt to unscramble the financial comingling between Concepts and the Consolidation Entities that no

such identification or allocation would be possible.  In the alternative, such an undertaking would be so costly that it would threaten the realization of any net assets for creditors.

301.    Substantive consolidation of Concepts and the Consolidation Entities will benefit creditors.  Substantive consolidation of these entities is necessary to avoid inequitable diminution of the Debtor's estate and to protect creditors.  Substantive consolidation of Concepts and the Consolidation Entities will have the effect of rendering a number of the other counts set forth below moot (such as alter-ego claims with respect to the Consolidation Entities), and will benefit the estate in that the estate will not have to pursue separate post-judgment actions to collect on judgments entered against the Consolidation Entities.

302.    Pursuant to 11 U.S.C. § 105, this Court, as a court of equity, has the power to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  And given the identity of interest, disregard of corporate formalities, and the extensive degree to which the financial affairs of Concepts and the Consolidation Entities are intertwined, it is necessary and appropriate that the business affairs of the Consolidation Entities be administered and resolved in conjunction with the affairs of the Debtor in its bankruptcy estate.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order:

(a)    substantively consolidating each of the Consolidation Entities into the Debtor's bankruptcy estate, *nunc pro tunc* to the Petition Date;

(b)    awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(c)     granting the Trustee such other and further relief as the Court deems just

and proper.

## Count II
## Alter Ego/Piercing Corporate Veil
**(*Against Park Tavern Rosemont, Prime Bar Tampa, Prime Bar Chicago,
Park Tavern Chicago, 1840 Pickwick, Prime Bar America and the Restaurants America
Entities, and Seeking a Finding with respect to the Restaurant Group Generally*)**

*Interplay with other Counts:  if Count I (substantive consolidation) is granted
in full, this Count II will only be relevant to 1840 Pickwick*

303.    The Trustee re-alleges the preceding paragraphs 1 - 302, as if stated fully herein.

304.    In Illinois, courts will pierce the corporate veil when (a) there is such unity of
interest and ownership that the separate personalities of the corporations and/or individuals no
longer exist and (b) adherence to the fiction of corporate separateness would sanction fraud or
promote injustice.

305.    When considering whether the first factor – unity of interest – exists, Illinois
courts look to the totality of the circumstances, but consider the following non-exclusive factors:
(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate
formalities; (4) nonpayment of dividends; (5) insolvency of debtor corporation;
(6) nonfunctioning of other officers or directors; (7) absence of corporate records; (8) comingling
of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or
entity to the detriment of creditors; (10) failure to maintain arm's-length relationship among
related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of
the dominant stockholders (collectively, the "*Non-Exclusive Unity of Interest Factors*").

306.    In the present case, the Trustee asserts that to the extent they are applicable, all of
the Non-Exclusive Unity of Interest Factors, and certainly the totality of the circumstances,

demonstrate that there was such unity of interest between Concepts and all of the other entities within the Restaurant Group, that the separate corporate personalities of individual entities ceased to exist, and the entire Restaurant Group was operated as a single comingled company.

307.    For the avoidance of doubt, the Trustee also specifically asserts to the extent they are applicable, all of the Non-Exclusive Unity of Interest Factors, and certainly the totality of the circumstances, demonstrate that there was such unity of interest between Concepts and each of the Restaurant Group Entities that continue to have operations -- Park Tavern Rosemont, Park Tavern Chicago, Prime Bar Chicago, Prime Bar Tampa, and 1840 Pickwick (collectively, the "*Operational Restaurant Group Entities*"), as well as  Prime Bar America and the Restaurants America Entities – that the separate personalities of such entities ceased to exist.  Specifically:

308.    ***Inadequate Capitalization***:  The Restaurant Group has operated for years, and likely since it was formed, in a severely undercapitalized state.   As discussed herein, the Restaurant Group would frequently be unable to pay bills, and Roger and/or Ted would only put in money on a short-term basis, withdrawing it as soon as possible, and treating what would normally be equity infusions to provide an operating cushion as purported "loans."   Roger testified that he characterized all of the money he put into the Restaurant Group as loans, meaning that, absent recharacterization as requested herein, he will have never put cash equity into the Restaurant Group (and upon information and belief the same is true of Ted).  Even in 2012 when the Restaurant Group was certainly insolvent and bouncing over 100 checks, Roger and Ted continued the same pattern.

309.    Similarly, each of the Operational Restaurant Group Entities was also undercapitalized.    Rodd Goldman, the former CFO for Concepts and Rosemont, from

Rosemont's formation through the De-Coupling, testified that none of the individual HoldCos was ever really capitalized by Roger and Ted (as with the Restaurant Group generally, they put in the bare minimum to address short-term cash shortfalls, then withdrew it as soon as possible).

310.    To give just one example to support Mr. Goldman's testimony, when Park Tavern Rosemont was opened, it did not even have its own bank account, and thus by definition had no cash of its own, until months after it had started operating.

311.    Even when Park Tavern Rosemont opened the Rosemont FM 0515 Account on September 19, 2012 (two months after Park Tavern Rosemont opened), credit card receipts continued to be deposited into Concepts accounts, and the Rosemont-FM 0515 Account maintained a nominal, and often negative, balance until the Rosemont De-Coupling occurred on May 28, 2013.

312.    The following chart graphically compares the limited activity in the 0515 account to the amount of revenue from Park Tavern Rosemont that was being comingled into the Comingled Concepts 1439 Account in the same months:

| Month | *High* **Balance in Rosemont 0515 Account** | **Rosemont Deposits into Comingled Concepts FM 1439 Account** |
|---|---|---|
| Oct 2012 | $0 | *$266,382* |
| Nov 2012 | ($40) | *$257,947* |
| Dec 2012 | $0 | *$270,099* |
| Jan 2013 | $10 | *$247,748* |
| Feb 2013 | $47 | *$198,177* |
| Mar 2013 | $131 | *$245,982* |
| Apr 2013 | $7,889 | *$256,916* |
| May 2013[14] | $13,663 | *$292,893* |

---

[14]    Through May 28, 2013.

313.   The Restaurants America Entities never even had bank accounts, and were not capitalized at all, instead relying solely on Concepts and the Concepts Employees.

314.   ***Failure to Issue Stock.***   Although the LLCs and corporations did purport to issue membership and/or stock interests, as discussed below, Roger and Ted totally disregarded "legal" ownership of each entity, including each of the Remaining Restaurant Group Entities and the Restaurants America Entities, and treated the Restaurant Group as one consolidated company that they owned 50-50.  As discussed above, Rodd, the former CFO of all the entities, agreed that the entire Restaurant Group was run as a single unit, and the extensive comingling, provision of the Common Concepts Services, and many other facts discussed herein support this conclusion.

315.   ***Failure to Observe Corporate Formalities.***   Corporate formalities, to the extent applicable, were wholly disregarded by Roger and Ted and the entities within the Restaurant Group.  The Trustee incorporates the Failure to Observe Corporate Formalities Facts discussed above.

316.   ***Non-Payment of Dividends.***   Again, all of the entities within the Restaurant Group were comingling – shifting money between and among them without regard for ownership (*i.e.*, money was at least as likely to flow to a sister company as to ownership).

317.   Roger and Ted improperly treated money they put into the Restaurant Group as "loans" and money they took out as "loan re-payments" or, post-bankruptcy, "management fees."  Not as dividends or distributions.

318.   Moreover, Ted would often take money out of entities, such as Park Tavern Rosemont, in which he legally had no ownership interest.

319.    In doing the foregoing, not only were Roger and Ted wholly disregarding ownership and formalities (as discussed above), they were also in many cases violating provisions of the corporate documents.   For example, the Rosemont Operating Agreement specifically provides that available cash "…shall be distributed to the Members…."   In direct derogation of this, as discussed herein, until the Rosemont De-Coupling, all cash was comingled into Concepts, and payments have been made to Ted, Lisa, and many other entities and individuals who have no legal ownership and who are not employed by Park Tavern Rosemont.

320.    In sum, the entities within the Restaurant Group did not properly distribute excess cash up as dividends or member distributions – cash was comingled, and when Roger and Ted put in or took out money, as discussed above, they treated it as repayment of purported "loans" they had made to the Restaurant Group.

321.    ***Insolvency of Debtor Corporation.***   As discussed above, Concepts and the entire Restaurant Group was insolvent since at least the beginning of 2012.

322.    Moreover, for all of the reasons discussed herein, the insolvency of Concepts, or any of the other entities within the Restaurant Group, cannot be judged standing alone.   Most basically, the assets of all the entities have always been comingled, and treated as being part of the larger Restaurant Group, with the separate corporate form and legal ownership of the individual Restaurant Group entities totally disregarded.

323.    ***Nonfunctioning of Other Officers or Directors.***   *See* the Failure to Maintain Corporate Formalities Facts (discussed above), including the fact that there is substantial doubt concerning whether board or shareholder meetings even ever occurred.

324.    Roger did not think any of the corporate entities had boards of directors, and could not be sure about his positions and roles with most entities.  Ted did not know whether he was a director of any entity.

325.    In addition, all of the entities within the Restaurant Group had completely overlapping management and ownership.  At all times relevant hereto, Roger and Ted, directly or indirectly, owned 100% of Concepts and every other entity within the Restaurant Group (though again, they disregarded legal ownership and treated the entire Restaurant Group as a single company that they owned 50-50), and served as the sole directors (to the extent boards existed) and officers for every entity within the Restaurant Group.

326.    ***Absence of Corporate Records.***    As discussed above, the basic corporate documents that were prepared were prepared by Concepts employees without input or review from, and often without even a real signature from, Roger and Ted.   The Trustee again incorporates and directs the Court's attention to the Failure to Maintain Corporate Formalities Facts.

327.    Moreover, the Trustee also incorporates and directs the Court's attention to the Failure to Maintain Records and Document the Inter-Company Transfers and Insider Transactions Facts (discussed above).  As discussed in detail in the substantive consolidation count, which discussion is incorporated and equally applicable here, between the lack of documentation and the totally comingled and intertwined nature of the Restaurant Group's financials, it is now either impossible or virtually impossible, and would be prohibitively expensive, to re-create missing records (such as full records of insider transactions, and many other items).

328.   ***Comingling of Funds***.   *See* discussion above concerning the extensive comingling between and among the entities within the Restaurant Group both before and after the De-Coupling.   Moreover, discussed in connection with the substantive consolidation count, the financial comingling and entanglement is so extreme that unscrambling the financial comingling is likely not even possible, and even if it was possible, such an undertaking would be so costly that it would threaten the realization of any net assets for creditors.

329.   The Operational Restaurant Group Entities, like all the others, were regularly comingling with Concepts and all of the other the other entities within the Restaurant Group. For example:

### (a)     Park Tavern Rosemont

330.   Park Tavern Rosemont, like the other entities within the Restaurant Group, was extensively comingling.   Prior to the Rosemont De-Coupling, Park Tavern Rosemont was included under the Concepts CC Processing Account, and all credit card receipts for Park Tavern Rosemont were comingled into one or more Comingled Concepts Accounts, and substantially all of its expenses were paid from one or more of the Comingled Concepts Accounts.

331.   As discussed above, prior to the Rosemont De-Coupling, funds in the Comingled Concepts Accounts were also being used to pay expenses of other HoldCos and the Restaurants America Entities (either directly or via further transfers between entities), so effectively all revenues of Park Tavern Rosemont were hopelessly comingled with the revenues of the rest of the Restaurant Group.   Similarly, Park Tavern Rosemont's expenses were being paid primarily from Comingled Concepts Accounts.

332.    Even after the other HoldCo's became separated from Concepts via the mid-2013 De-Coupling, comingling between Park Tavern Rosemont and Concepts and the other HoldCos continued unabated, just now accomplished via electronic transfers between accounts.    For example, just between March, 2014 and March, 2015 – a sample one-year period after the De-Coupling occurred – the Trustee is currently aware of Park Tavern Rosemont engaging in over five hundred (500) transfers of cash to and from seventeen (17) other accounts held by either Concepts or other HoldCos, with an aggregate value exceeding $2,595,000.00.  *See* detailed breakdown of currently known intercompany transfers in and out of Park Tavern Rosemont accounts attached hereto as Exhibit G.

### (b)    Park Tavern Chicago

333.    Park Tavern Chicago, like the other entities within the Restaurant Group, was extensively comingling.  Park Tavern Chicago was included under the Concepts CC Processing Account, and initially all credit card receipts for Park Tavern Chicago were comingled into Prime Bar-FM 7163 Account.  Funds in the Prime Bar-FM 7163 Account were then being further comingled with the Concepts-FM 1439 Account and used to pay expenses of other HoldCos and the Restaurants America Entities, so effectively all revenues of Park Tavern Chicago were being hopelessly comingled with the revenues of the rest of the Restaurant Group.  Similarly, Park Tavern Chicago's expenses were often paid from comingled accounts or funds.

334.    On or about May 23, 2013 – *i.e.*, right in the middle of 2013 when Roger and Ted were causing the De-Coupling to occur – Park Tavern Chicago began to deposit its credit card receipts into its own account ending in 6388.

335.     Even after Park Tavern Chicago credit card receipts began to be deposited into the 6388 account, however, comingling between Park Tavern Chicago and Concepts and the other HoldCos continued unabated, just now accomplished via electronic transfers between accounts. For example, just between March, 2014 and March, 2015 – a sample one-year period after the De-Coupling occurred – the Trustee is currently aware of Park Tavern Chicago engaging in over three hundred (300) transfers of cash to and from fifteen (15) other accounts held by either Concepts or other HoldCos, with an aggregate value exceeding $950,000.00.   *See* detailed breakdown of currently known intercompany transfers to and from Park Tavern Chicago accounts attached hereto as Exhibit H.

### (c)      Prime Bar Chicago

336.     Prime Bar Chicago, like the other entities within the Restaurant Group, was extensively comingling.   Prime Bar Chicago was included under the Concepts CC Processing Account, and initially all credit card receipts for Prime Bar Chicago were comingled into the Prime Bar-FM 7163 Account.   Funds in the Prime Bar-FM 7163 Account were then being further comingled with the Concepts-FM 1439 Account and used to pay expenses of other HoldCos and the Restaurants America Entities, so effectively all revenues of Prime Bar Chicago were being hopelessly comingled with the revenues of the rest of the Restaurant Group. Similarly, Prime Bar Chicago's expenses were often paid from comingled accounts or funds.

337.     On or about August 22, 2011, Prime Bar Chicago began to deposit its credit card receipts into its own account ending in 5659.

338.     Even after Prime Bar Chicago began depositing into its own accounts, comingling between Prime Bar Chicago and Concepts and the other HoldCos continued unabated, just now

accomplished via electronic transfers between accounts.   For example, just between March, 2014 and March, 2015 – a sample one-year period after the De-Coupling occurred – the Trustee is currently aware of Prime Bar Chicago engaging in over seven hundred (700) transfers of cash to and from seventeen (17) other accounts held by either Concepts or other HoldCos, with an aggregate value of over $3,150,000.00.   *See* detailed breakdown of currently known intercompany transfers in and out of Prime Bar Chicago accounts attached hereto as <u>Exhibit I</u>.

### (d)     **Prime Bar Tampa**

339.     Prime Bar Tampa was formed on November 18, 2008, so earlier than many of the HoldCos discussed herein.  Perhaps as a result, it did not follow the same pattern as most of the other HoldCos – for example, it opened its own bank account well before the 2013 De-Coupling. Nonetheless, it was still comingling with Concepts and the other entities within the Restaurant Group on just as vast a scale.

340.     Specifically, when Prime Bar Tampa began using WorldPay to process its credit card receipts in April, 2011, all of Prime Bar Tampa's credit card receipts were deposited into the comingled Prime Bar-FM 7163 Account (one of the Comingled Credit Card Revenue Accounts).

341.     Starting on May 27, 2011, the Prime Bar Tampa credit card revenues began to be deposited into a separate account ending in 4577.   The Trustee needs pre-trial discovery to identify the holder of the 4577 account, and determine to what extent funds from that account were being comingled with funds from the other Restaurant Group entities and/or the Insider Defendants.

342.    In July, 2011, Prime Bar Tampa opened an account in its own name at First Midwest Bank ending in 5667 (the "*PBT-FM 5667 Account*"), and starting in August, 2011, Prime Bar Tampa credit card receipts began to be deposited into the PBT-FM 5667 Account.

343.    However, even after Prime Bar Tampa credit card revenues were being deposited into a Prime Bar Tampa account, Prime Bar Tampa was still comingling funds with other entities on a vast scale.

344.    For example, just between March, 2014 and March, 2015 – a sample one-year period after the De-Coupling occurred – the Trustee is currently aware of Prime Bar Tampa engaging in over four hundred (400) transfers of cash to and from at least eighteen (18) other accounts held by either Concepts or other HoldCos, with an aggregate value exceeding $1,650,000.00.  *See* detailed breakdown of currently known intercompany transfers to and from Prime Bar Tampa accounts attached hereto as Exhibit J.

345.    The Restaurants America entities did not even have bank accounts, so Concepts paid all associated expenses, and when checks came to "Restaurants America" – a fairly regular occurrence since Roger and Ted were holding all the entities out as part of the group – they would be deposited into Concepts accounts.

346.    In sum, more pervasive comingling would be hard to imagine.

347.    **Diversion of Assets from the Corporation by or to a Stockholder or other Person or Entity to the Detriment of Creditors.**  As discussed in detail above, Roger and Ted have taken millions of dollars out of the Restaurant Group, including numerous distributions after Concepts and the Restaurant Group generally were insolvent.  And given the massive commingling described herein, saying that distributions were taken from particular entities – *e.g.*,

"Concepts" or "Park Tavern Rosemont" – is somewhat meaningless, since cash is fungible and its was comingled throughout the Restaurant Group to such a great degree.

348.    In fact, Roger and Ted operated the Restaurant Group in a manner that required frequent infusions of cash, which they would then take out whenever possible.  As described herein, Roger and Ted were keeping the Restaurant Group habitually undercapitalized, putting in "loans" when needed to keep the Restaurant Group alive, and then sucking out cash when possible.  Roger described often getting re-payment checks upon making loans (or shortly thereafter) and then holding the checks until sufficient cash existed to negotiate them.

349.    As described above, entities within the Restaurant Group have also made numerous payments to Lisa (Ted's wife), and to Roger and Ted through Hopworks, Tapsmith, and Draft Town – their "management" entities.

350.    The Edgebrook Loans appear to have been an expensive way for Roger and Ted to suck money out of and encumber Concepts and its subsidiaries and alter-egos before creditors could obtain judgments.

351.    Concepts also paid personal expenses – such as Roger's MetLife life insurance premium.  Concepts is not a beneficiary of the MetLife policy.

352.    Concepts provided the Common Concepts Services to Insider-Owned HoldCos, again, benefitting Roger and Ted.

353.    Moreover, Concepts incurred very substantial expenses relating to the buildout of Insider-Owned HoldCos to the benefit of Roger and Ted, including having its employees provide the Development Services.

354.     For example, Concepts incurred hundreds of thousands of dollars in restaurant development expenses before Park Tavern Rosemont even opened, yet as discussed, ownership of Park Tavern Rosemont was legally vested 100% in Roger (and treated as 50-50 between Ted and Roger).

355.     Moreover, Concepts historically provided Park Tavern Rosemont with the Common Concepts Services without receiving compensation or reimbursement.   Every time Concepts incurred an expense relating to Park Tavern Rosemont, value was being transferred away from Concepts and its creditors and to Park Tavern Rosemont (and thus either Roger, on paper, or Roger and Ted, in practice, given that they disregarded actual ownership).

356.     Prior to the Rosemont De-Coupling, Concepts was at least also receiving some benefit due to credit card revenues being deposited into its accounts.  But it is almost impossible to measure the extent of such benefit to Concepts and its creditors, since the funds were being comingled and then used to pay costs on behalf of, among other things, other Insider-owned HoldCos.

357.     Roger also caused all of the HoldCos then in existence, including all of the Operational Restaurant Group Entities, to execute the Greenfield Note at a time when Concepts was insolvent.

358.     Roger and Ted personally owning 1840 Pickwick provided another opportunity to withdraw money from the Restaurant Group for their personal benefit.  This included not only monthly rent payments, but also proceeds of loans that 1840 Pickwick would take out.

359.     Finally, it is important to remember that many of the hundreds of electronic transfers Rosemont made to other HoldCos after the De-Coupling (*see* exhibits and associated

discussion, *supra*) could have funded insider withdrawals from the recipient entities.  Again, the extent of comingling makes it basically impossible to truly analyze any single entity within the Restaurant Group on a stand-alone basis.

360.   **Failure to maintain arm's-length relationship among related entities.**   As discussed above, given the common and complete control Roger and Ted exercised over all of the Restaurant Group entities, the fact that Roger and Ted disregarded legal ownership and entity separateness and ran the entire Restaurant Group as though it was one large company, the extensive comingling between all of the Restaurant Group entities, and the fact that Concepts was providing the Common Concepts Services for the group without being compensated or reimbursed, and with no management agreements in place, it is hard to imagine a situation where less of an arms-length relationship was maintained.

361.   Even in the case of 1840 Pickwick, while the Pickwick Lease did exist, Roger testified that (a) he had never seen the Pickwick Lease; (b) he did not sign the Pickwick Lease (rather, his signature was stamped on the document); and (c) he did not authorize anyone to prepare or affix his stamp to the Pickwick Lease.  Concepts was listed as the tenant on the Pickwick Lease, yet other entities supposedly made rent payments at times, and there was no accounting for the fact that Concepts was paying the rent for the management operations of the entire Restaurant Group.  And the rent amount appears to have been tied to the amount of 1840 Pickwick's mortgage (obviously Concepts did not have the ability to compare space options, since Roger and Ted controlled Concepts and were of course on both sides of the Pickwick Lease transaction).

362.    **Whether, in fact, the Corporation is a Mere Façade for the Operation of the Dominant Stockholders.** The Restaurant Group was run as a consolidated comingled whole, and the Restaurant Group is dominated by Roger and Ted.  Roger and Ted are 50-50 owners of Concepts, and either Concepts or Roger and/or Ted own all of the other entities within the Restaurant Group, including all of the Operating Restaurant Group Entities.

363.    Rodd, the CFO for all of the Restaurant Group entities, viewed himself ultimately as an employee of Roger and Ted – the legal structure was unimportant, as described above.

364.    Moreover, as discussed in detail above, Roger and Ted and the other Insider Defendants extensively comingled their own funds with those of the Restaurant Group, putting in money as needed to pay bills, and then withdrawing money whenever possible.  This continued even while the Restaurant Group was plainly insolvent.

365.    In sum, all of the foregoing factors strongly support a finding that a "unity of interest" existed between Concepts and Park Tavern Rosemont.  And in fact, many other facts set forth above do not fit neatly into one of the above categories, but also strongly support the conclusion that a unity of interest exists.  To give just a few examples of many:

(a)    Concepts often paid contractors directly for restaurant development work done for the HoldCos, including Insider-Owned HoldCos.  For example, Fox General, the general contractor for the buildout of Park Tavern Rosemont (among other locations), listed Concepts, not Park Tavern Rosemont, as the customer in lien waiver forms, and Concepts made substantial payments to Fox General for buildout services.

(b)    All of the HoldCos operated under the Concepts WorldPay Processing Account.

(c)    TI Funds from landlords for HoldCo buildouts would often be deposited in Concepts accounts, including funds received in connection with Insider-Owned HoldCos.

(d)     As noted above, even vendors would get confused, regularly writing checks to "Restaurant America," with these then deposited into Comingled Concepts Accounts.

366.    Finally, adherence to the fiction of corporate separateness with respect to the entities within the Restaurant Group, and in particular the Operating Restaurant Group Entities, would sanction fraud or promote injustice.

367.    Without repeating all of the allegations above, failure to disregard corporate separateness would leave Roger and Ted to continue to personally benefit from the revenues and assets of the Insider-Owned HoldCos, despite the fact that they were in large part created by Concepts' Employees and at Concepts' expense, they benefitted from the Common Concepts Services for years, and that the entire Restaurant Group has always operated and held itself out to the world as a consolidated whole (including via the Consolidated Financials).

368.    Moreover, maintaining the fiction of corporate separateness would allow Roger and Ted to get away with the conduct they engaged in from late 2012 to mid-2013 with Concepts insolvent and creditor claims mounting – including the issuance of the Greenfield Note, the De-Coupling, the transfer to Holding of the Transferred Subsidiaries, and the Encumbering of the Concepts Assets via the Edgebrook Loans (among other things).

369.    Meanwhile, innocent creditors – the direct victim of the conduct described herein – would continue to go unsatisfied.   Those creditors, largely landlords, relied on the Consolidated Financials in extending credit, and to now allow Roger and Ted to treat the Operating Restaurant Group Entities and the rest of the entities within the Restaurant Group as not liable for the debts of Concepts' creditors, would plainly both sanction fraud ***and*** promote injustice.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order:

(a)     finding that the entire Restaurant Group operated as a consolidated whole, and that such unity of ownership existed that the entire Restaurant Group was effectively the alter-ego of Concepts;

(b)     finding that equity requires that the corporate veil be pierced;

(c)     piercing the corporate veil for each of the Remaining Restaurant Group Entities, Prime Bar America and the Restaurants America Entities and deeming each such entity to be jointly and severally liable for all debts and obligations of consolidated Concepts;

(d)     entering judgment in favor of Plaintiff and against Roger and Ted (jointly and severally) in the amount of liabilities of Consolidated Concepts (plus interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals), which amount will be determined at trial, but is believed to exceed $9 million (as filed claims exceed 11 million, but the Trustee is seeking to disallow, subordinate, or recharacterize $1,905,000 in insider claims as set forth herein);

(e)     enjoining Roger and Ted from dissipating, wasting, or using for their personal benefit assets of the Remaining Restaurant Group Entities until creditors of Concepts have been fully satisfied;

(f)     awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(g)     granting the Trustee such other and further relief as the Court deems just and proper.

## Count III
## Alter Ego/Piercing Corporate Veil
### (*Against the Insider Defendants*)

370.    The Trustee re-alleges the preceding paragraphs 1 - 369, as if stated fully herein.

371.    At all times relevant hereto, Roger and Ted, through their ownership of Concepts, the HoldCos, and other affiliated entities, controlled and dominated Concepts and interfered with and supplanted Concepts' corporate governance.

372.    Roger and Ted's domination and control over Concepts resulted in reckless self-dealing transactions whereby Roger and Ted, and their wives, Jennifer and Lisa, extracted value from Concepts, and/or caused Concepts and/or the HoldCos that comprise Consolidated Concepts to incur obligations to them, all at the cost of Concepts' non-insider creditors.  And Roger, Ted, Jennifer and Lisa, either directly or indirectly, have taken millions of dollars out of Concepts or other entities within the Restaurant Group (again, all of which are indistinguishable due to the extensive comingling discussed herein), including while Concepts was insolvent.

373.    In late 2012, with Concepts insolvent, Roger caused the HoldCos to execute the Greenfield Note, purporting to saddle them with a $1,800,000 obligation at the expense of innocent trade creditors.

374.    Concepts employees provided services that were personal to Roger and Jennifer, such as Rodd, Concepts CFO, preparing personal income taxes for Roger and Jennifer each year without paying Rodd separately for those services.

375.    Concepts paid personal expenses, such as the MetLife invoices described above.

376.    None of the officers of Concepts acted independently in the interests of Concepts, but were under the control of Roger and Ted.

377.     At all relevant times, Concepts, the HoldCos, and the Restaurant Group generally were inadequately capitalized to operate their business.

378.     Roger and Ted failed to maintain and respect the separate corporate identities of Concepts and the HoldCos that comprise Consolidated Concepts.  Concepts employees, acting at the direction of Roger and Ted, regularly caused funds to be comingled between and among the HoldCos comprising Consolidated Concepts (as detailed herein).

379.     Concepts employees, acting at the direction of Roger and Ted, created Consolidated Financials that combined the income and assets and liabilities of Concepts and the HoldCos comprising Consolidated Concepts and provided the Consolidated Financials to prospective landlords for purposes of obtaining credit and favorable lease terms (including TI Funds).  In other words, Roger and Ted made representations to creditors and the outside world indicating that Concepts was a holding company for all of the HoldCos comprising Consolidated Concepts.

380.     Roger and Ted's domination and control over Concepts and the HoldCos comprising Consolidated Concepts resulted in fraud or inequity to Concepts' non-insider creditors, and resulted in damage to Concepts' non-insider creditors.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order:

(a)     finding that the Insider Defendants are the alter-egos of the Restaurant Group, and thus of Concepts and, to the extent additional entities are substantively consolidated with Concepts,  Consolidated Concepts

(b)     finding that equity requires that the corporate veil be pierced;

(c)      piercing the corporate veil for each of the Insider Defendants and deeming

each of the Insider Defendants to be jointly and severally liable for all debts and

obligations of Consolidated Concepts;

(d)      entering judgment in favor of Plaintiff and against Roger, Ted, Jennifer

and Lisa (jointly and severally) in the amount of liabilities of Concepts (plus interest,

costs, and attorneys' fees to the fullest extent permitted by law, through trial and any

subsequent appeals), which amount will be determined at trial, but is believed to exceed

$9 million (as filed claims exceed 11 million, but the Trustee is seeking to disallow,

subordinate, or recharacterize $1,905,000 in insider claims as set forth herein); and

(e)      Granting the Trustee such other and further equitable relief as the Court

deems just and proper.

### Count IV
### Breach of Fiduciary Duty
(*Against Roger and Ted*)

381.    The Trustee re-alleges the preceding paragraphs 1-380, as if stated fully herein.

382.    At all times relevant to this Complaint, including at all times after January 1, 2012

(the "Insolvency Period"), Roger and Ted were officers (President and Secretary/Treasurer

respectively), the sole directors (to the extent boards of directors existed), and controlling

shareholders of Concepts.

383.    Concepts was insolvent or in the zone of insolvency at all times during the

Insolvency Period. In the alternative, Concepts became insolvent and unable to pay its debts as

they came due as a result of the conduct of Roger and Ted as described herein.

384.    Roger and Ted owed a fiduciary obligation to act with due care and to deal honestly and fairly with Concepts' creditors.

385.    Roger and Ted each breached their fiduciary duties to Concepts and its creditors by causing or allowing Concepts to engage in conduct that wrongfully manipulated corporate property to avoid paying creditor claims, and/or to benefit themselves and related entities at the expense of creditors.  For example:

(a)    Failing to properly capitalize Concepts, the Restaurant Group generally, or any of the HoldCos within it.

(b)    Commingling the funds of Concepts and the Concepts-Owned HoldCos with the funds of often undercapitalized Insider-Owned HoldCos, utilizing Concepts' funds for the benefit of the Insider Defendants and often undercapitalized and unprofitable Insider-Owned HoldCos, and causing Concepts to become liable on debts for which it would not otherwise have been liable.

(c)    Causing Concepts to provide Development Services to help form Insider-Owned HoldCos and otherwise paying for buildout and other start-up expenses of the companies, yet causing ownership of the new HoldCos to be vested in one or more of the Insider Defendants.

(d)    Causing Concepts to provide the Common Concepts Services without payment or reimbursement, including to Insider-Owned HoldCos owned by Roger and/or Ted.

(e)    Utilizing Concepts' assets and good will as collateral in transactions benefitting themselves or their friends and family thereby keeping themselves from having to provide collateral for their transactions and dissipating Concepts' assets while preserving their own.

(f)    Creating, participating in or acquiescing to the creation of, inaccurate Consolidated Financials which were then provided to landlords and other creditors to obtain credit for use in enterprises that benefited Roger and Ted or their friends and family.  Moreover, having landlords accept Concepts as a guarantor – based on its apparent financial strength as reflected in the Consolidated Financials – benefited Ted and Roger by allowing them to avoid personally guaranteeing leases.

(g)     After Concepts and the Restaurant Group became insolvent, causing Concepts to take out the Concepts-Edgebrook Loan, thereby causing the Encumbering of the Concepts Assets (and thus subordinating the claims of existing creditors), while diverting the vast majority of the proceeds of the Concepts-Edgebrook Loan for the benefit of the Insider Defendants or entities legally owned by them, other than Concepts.

(h)     Directing Concepts' attorneys and accountants, employees and other professionals and agents to carry out tasks and activities to strip Concepts of assets and hinder and delay creditors, including the transfer of the Transferred Subsidiaries to Holding (and associated transactions).

(i)      Failing to maintain accurate records of transfers of Concepts' assets and loans of monies or other assets to the Insider-Owned HoldCos to benefit those companies and their owners to the detriment of Concepts and thereby furthering Concepts' insolvency.

(j)      Causing the De-Coupling to occur, and thereby depriving Concepts of all of its revenues.

(k)     Creating false loan obligations against Concepts in favor of insiders such as with respect to the Greenfield Note.

(l)      Engaging in the Improper Scheduling and Assertion of Unsupportable Insider Claims.

(m)    Post-bankruptcy, executing the Exercise of Rights documents and causing the Concepts-Owned HoldCos to engage in the Post-Petition Corporate Waste Transfers that dissipated Concepts' assets for the benefit of Roger and Ted and to the detriment of the Concepts' estate and creditors.

386.    As a direct result of the foregoing conduct, creditor claims against Concepts increased, and Concepts had less ability to satisfy, even partially, the claims of its creditors.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order:

(a)     finding that Roger and Ted breached their fiduciary duties to Concepts and, once Concepts was in the zone of insolvency and subsequently insolvent, to creditors;

(b)      entering judgment in favor of Plaintiff and against Roger and Ted (jointly and severally) in the amount of liabilities of Concepts (plus interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals), which amount will be determined at trial, but is believed to exceed $9 million (as filed claims exceed 11 million, but the Trustee is seeking to disallow, subordinate, or recharacterize $1,905,000 in insider claims as set forth herein); and

(c)      awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)      granting the Trustee such other and further relief as the Court deems just and proper.

### Count V
### Usurpation of Business Opportunity
**(*Against Roger, Ted, Jennifer, Hopworks, Draft Town, Dennis, Tapsmith and Consulting*)**

387.    The Trustee re-alleges the preceding paragraphs 1 - 386, as if stated fully herein.

388.    Roger and Ted, as the sole officers, directors, and shareholders of Concepts, each owe a fiduciary duty to Concepts, and have been fiduciaries of Concepts at all times since its formation.

389.    Dennis, who served as General Counsel for Concepts in 2012 and at least into 2013, similarly was a fiduciary of Concepts, and owed duties of care and loyalty, among other things.

390.    Concepts was at all times in the business of owning, developing, and managing and operating restaurants, with each individual restaurant typically owned by an associated HoldCo, as described herein.

391.     As described in greater detail above: (a) when new HoldCos and associated restaurants were developed and formed, Concepts Employees would provide the Development Services (which Concepts was not paid or reimbursed for), and typically Concepts would pay for some or all of the direct development costs; (b) once restaurants and HoldCos were formed, Concepts employees would provide the Common Concepts Services to such HoldCos, again without receiving payment or reimbursement for such services; and (c) Concepts was extensively comingling its funds with those of all the HoldCos and other entities comprising the Restaurant Group, including paying expenses on behalf of and transferring funds to and from such entities.

392.     Developing, owning, and managing and operating new restaurants was thus reasonably incident to, and in fact was at the very core of, the business Concepts was engaged in.

393.     Concepts had the capacity to develop, own, and operate new restaurants and associated HoldCos.  In fact, Concepts did own HoldCos and associated restaurants, and through the Concepts Employees did develop and/or operate most or all of the restaurants within the Restaurant Group, including, among other things, by providing the Common Concepts Services.

394.     Concepts was the *only entity within the Restaurant Group* that: (a) had management level employees that provided the Common Concepts Services; (b) acted as a holding company for HoldCos and associated restaurants (at least prior to Roger and Ted causing Concepts to engage in the Transfer of the Owned Subsidiaries); and (c) acted as a guarantor for leases signed by most of the HoldCos.

395.     In light of the foregoing, Concepts had an actual and/or an expectancy interest in owning and benefitting from the revenue and value of new HoldCos and restaurants that its employees and principals formed and developed as part of the Restaurant Group.

396.     In fact, given that Concepts was incurring substantial costs in connection with the development of new HoldCos and restaurants – whether directly (such as via payments to contractors) or indirectly (such as via the cost of providing the Common Concepts Services), and taking substantial risk (for example by guaranteeing leases), Concepts has a material and actual pecuniary interest in owning and benefitting from the revenue and value of new HoldCos and associated restaurants.

397.     Roger, Ted, and Dennis, as fiduciaries of Concepts, knew or should have known that Concepts had an actual and/or expectancy interest in owning and benefitting from the revenue and value of new HoldCos and restaurants that were developed.

398.     These duties were breached in several ways, with Roger, Ted, and Dennis all taking personal advantage of opportunities that should have been routed through Concepts. Specifically:

**(a)     Roger and Ted Taking Ownership of Insider-Owned HoldCos**

399.     As discussed above, ownership of certain of the HoldCos – the Insider-Owned HoldCos – was vested in Roger and/or Ted and not Concepts.

400.     The only Insider-Owned HoldCos that remain operational today are:  (a) Park Tavern Rosemont; (b) Park Tavern Chicago; (c) Prime Bar Chicago; and (d) Prime Bar Tampa (collectively, the "*Remaining Insider-Owned HoldCos*").

401.     As Concepts incurred expenses in connection with the development and/or operation of each of the Insider-Owned HoldCos, provided the Common Concepts Services, and otherwise was instrumental in forming and operating the Insider-Owned HoldCos, it had an

interest and expectation that it would receive ownership and benefit from the revenues and value of such entities.

402.    Under the circumstances, including in light of the other conduct of Roger and Ted as described herein, by causing or allowing ownership of the Insider-Owned HoldCos, including the Remaining Insider-Owned HoldCos, to be placed in their personal names, Roger and Ted usurped a business opportunity of Concepts (the "*Usurpation of Ownership*").

403.    As a result of the Usurpation of Ownership, Concepts was deprived of assets and revenue, with the Insider-Owned HoldCos making numerous payments for the benefit of Roger and Ted, and was ultimately rendered insolvent, including as a result of guarantees and expenses relating to the Insider-Owned HoldCos it did not legally own.

404.     All creditors of Concepts suffered general harm as a result of the Usurpation of Ownership, and the corresponding harm to Concepts and its ability to re-pay creditor claims.

405.    Roger and Ted have personally benefitted from the Usurpation of Ownership through their ownership of the Insider-Owned HoldCos and by, among other things, causing the Insider-Owned HoldCos to make: (a) direct payments to them and/or their spouses; (b) payments to Hopworks that benefitted Roger as the sole shareholder of Hopworks and its alter-ego; and (c) payments to Draft Town that benefitted Ted as the sole shareholder of Draft Town and its alter-ego.

**(b)    The New Greenfield-Dennis Restaurant Ventures**

406.    As described above, starting in at least 2012, Roger, Jennifer, and Dennis began to engage in New Greenfield-Dennis Restaurant Ventures.  The Trustee specifically incorporates,

and directs the Court to, the New Greenfield-Dennis Restaurant Ventures Facts (discussed above).

407.    Upon information and belief, Roger and Dennis not only did not present the New Greenfield-Dennis Restaurant Ventures opportunities to Concepts, and in fact tried to distance the New Greenfield-Dennis Restaurant Ventures from Concepts, including, in Roger's case, placing ownership of the Greenfield portion of the New Greenfield-Dennis Restaurant Ventures in Jennifer's name.

408.    Under the circumstances, including in light of the other conduct described herein, by placing ownership of the New Greenfield-Dennis Restaurant Ventures outside of Concepts and the Restaurant Group generally, Roger and Dennis usurped a business opportunity of Concepts (the "*Usurpation of Opportunity*").

409.    Upon information and belief, Jennifer's ownership interest in Smith & Wells and any other New Greenfield-Dennis Restaurant Ventures is a means of disguising Roger's true interest in these ventures, including to delay and hinder creditors of Concepts and Roger by preventing them from seeking to collect against the New Greenfield-Dennis Restaurant Ventures.

410.    As a result of the Usurpation of Opportunity, Concepts was deprived of assets and revenue.

411.    All creditors of Concepts suffered general harm as a result of the Usurpation of Opportunity.

Roger, Jennifer, and Dennis have personally benefitted from the Usurpation of Opportunity by, among other things: (a) management fees paid to Tapsmith and Consulting for

the benefit of Roger and Dennis, respectively and (b) receipt of ownership and net profits in the New Greenfield-Dennis Restaurant Ventures.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order:

(a)     finding that Roger and Ted improperly usurped a business opportunity of Concepts via the Usurpation of Ownership;

(b)     finding that Roger breached his fiduciary duties to Concepts as a result of the Usurpation of Ownership, and entering judgment against him in an amount to be determined at trial, but to include, at a minimum, the aggregate amount of all payments made to him, Jennifer, or Hopworks by Insider-Owned HoldCos;

(c)     finding that Ted breached his fiduciary duties to Concepts as a result of the Usurpation of Ownership, and entering judgment against him in an amount to be determined at trial, but to include, at a minimum, the aggregate amount of all payments made to him, Lisa, or Draft Town by Insider-Owned HoldCos;

(d)     entering judgment against Hopworks and Draft Town, as the alter-egos of Roger and Ted, respectively, in the aggregate amount of payments received by each of them;

(e)     only to the extent that the Remaining Insider-Owned HoldCos have not been substantively consolidated with Concepts as separately requested herein, imposing a constructive trust on, and transferring ownership of, the Remaining Insider-Owned HoldCos to Concepts;

(f)     finding that Roger and Dennis improperly usurped a business opportunity of Concepts via the Usurpation of Opportunity;

(g)    finding that Roger breached his fiduciary duties to Concepts as a result of the Usurpation of Opportunity, and entering judgment against him in an amount to be determined at trial, but to include, at a minimum, the aggregate amount of all payments made to him or Tapsmith by New Greenfield-Dennis Restaurant Ventures;

(h)    finding that Dennis breached her fiduciary duties to Concepts as a result of the Usurpation of Opportunity, and entering judgment against her in an amount to be determined at trial, but to include, at a minimum, the aggregate amount of all payments made to her or Consulting by New Greenfield-Dennis Restaurant Ventures;

(i)    entering judgment against Tapsmith and Consulting, as the alter-egos of Roger and Dennis, respectively, in the aggregate amount of payments received by each of them;

(j)    entering judgment against Jennifer, as a knowing participant in the foregoing, and as a recipient of equity interests that should have been placed in Roger's name, in an amount to be determined at trial, but to include, at a minimum, the aggregate amount of all payments made to her or Consulting by New Greenfield-Dennis Restaurant Ventures;

(k)    imposing a constructive trust on, and transferring ownership of, the New Greenfield-Dennis Restaurant Ventures to Concepts; and

(l)    granting the Trustee such other and further relief as the Court deems just and proper.

**Count VI**
**Recharacterization of "Claims"**
(*Against the Insider Defendants*)

412.     The Trustee re-alleges the preceding paragraphs 1 - 411, as if stated fully herein.

413.     Where a debt instrument carries certain indicia of an equity contribution, this Court may recharacterize such debt as equity.

414.     Authority to recharacterize debts as equity is derived from section 502(b)(1) of the Bankruptcy Code, which states, in pertinent part, that the Court shall allow a claim, "except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unliquidated." 11 U.S.C. § 502(b)(1).

415.     The transactions underlying the Greenfield POC are governed by Illinois law, which provides for the recharacterization of debt to equity under certain circumstances.

416.     In evaluating whether a debt instrument should be recharacterized as equity, courts utilizing Illinois law generally employ a multi-factor test, considering the following non-exclusive factors, and as discussed in connection with each, the factors strongly favor recharacterization in this instance:

417.     **The intent of the parties:**   While Roger and Ted may have intended to put every advance they made to Concepts and/or the HoldCos as a loan (which obviously benefits them vis-à-vis arms-length creditors): (a) this intent was not clearly delineated since no loan agreements were ever issued and the advanced funds bear none of the hallmarks of debt (as discussed below) and (b) Roger and Ted controlled Concepts and the HoldCos, so they were on both sides of every transaction.

418.   **The identity between creditors and shareholders:**  There is 100% identity in this case.  Roger and Ted, directly or indirectly, together own 100% of Concepts and all of the HoldCos.  So again, they were on both sides of every transaction.

419.   **The extent of participation in management by the holder of the instrument:** Again, Roger and Ted were the owners, officers, and directors of each entity within the Restaurant Group.  They controlled whether advances were called "loans" (benefitting them) or equity, and as discussed below, they did not even issue "instruments" (*e.g.*, notes) to document the advances.

420.   **The ability of the corporation to obtain funds from outside sources:**  Concepts and the entire Restaurant Group were insolvent from at least the beginning of 2012 on, with checks regularly bouncing, and more and more restaurants defaulting and closing in 2012 and 2013 – all resulting in mounting guaranty debt for closed locations (all as described in detail above).  Under the circumstances, no reasonable third party lender would have advanced credit.

421.   Notably, although Concepts did obtain the Republic Loan in early 2013, as discussed above: (a) Roger had to purchase $200,000 in stock in Edgebrook and/or its holding to induce Edgebrook --- which was itself close to an FDIC takeover and desperate for capital – to make the loan (resulting in a hugely above market cost of funds); (b) the documents in Republic's loan opening memo include the Consolidated Financials (which showed no hint of distress) and other information (such as listing restaurants that were closed or about to close) as significant assets; and (c) Roger and Ted had to personally guaranty the loan and mortgage their personal residences as collateral.  In other words, it appears that: (a) the bank had a self-interested reason for making the loan; (b) the bank was not apprised of the true financial

condition of Concepts and the Restaurant Group; and (c) nonetheless the bank required very substantial non-debtor collateral.  Rodd Goldman, the CFO during 2012 and the beginning of 2013, thought the personal guarantees and the pledge of the homes was critical to securing the Edgebrook Loan.

422.   **The 'thinness' of the capital structure in relation to debt:**  As discussed in detail above, from at least the beginning of 2012, Concepts, which was paying the expenses of much of the rest of the Restaurant Group, was insolvent and bouncing checks – for example, well over one hundred (100) checks were returned as NSF in 2012 alone.  New HoldCos, of which there were many in 2011 and 2012, were not capitalized, with Roger and Ted trying to develop a host of new restaurants using TI Funds, existing cash flows from an insolvent and under-capitalized Restaurant Group, and "loans" from the Insider Defendants that they made (with the money then taken back out whenever possible).

423.   **The risk involved:**  Even established restaurants often struggle to find financing due to the limited liquidation value of their assets, and here the Restaurant Group was aggressively expanding and opening numerous new restaurants in multiple cities.  In fact, all but six of the dozens of restaurants that Roger and Ted started as part of the Restaurant Group are now closed.  Moreover, putting aside the normal risk associated with starting new restaurants, Concepts and the entire Restaurant Group were insolvent and unable to pay their bills as they came due from at least the beginning of 2012 on – and probably far sooner.  Obviously this undercapitalization, and the corresponding inability to absorb unexpected costs or losses, would further increase an already risky business.  This is why, as discussed, from at least the beginning

of 2012 on, no rational third party would have knowingly lent money if it was aware of the true financial situation of Concepts and the Restaurant Group generally.

424.   **The formal indicia of the arrangement:**   As discussed, none of the cash infusions the Insider Defendants made to Concepts and/or the HoldCos were documented.  The only "documentation" that exists is the banking records.  Although occasionally the word "loan" was scrawled in the "notes" section of a check, the fact that the purported loans were never documented as such strongly favors a finding that the advances were in fact equity infusions.

425.   Moreover, no interest was charged on the advances and there was never a formal re-payment schedule (and in fact the infusions were never paid back on a regular basis).  Rather, the Insider Defendants simply took money out of Concepts or other entities when cash allowed distributions to be made.  In sum, the transactions carry every indicia of equity infusions and ownership distributions, not debt.

426.   Finally, Roger's attempt to belatedly make his advances look more like "debt" by forcing the HoldCos to issue the Greenfield Note in December, 2012 should only reinforce the above conclusion.  Not only is the issuance of the Greenfield Note a fraudulent transfer (as discussed, it should be avoided once the HoldCos are consolidated with Concepts as requested herein), the fact that Roger made a clumsy and belated attempt to "document" prior advances at the end of 2012 with the Restaurant Group insolvent and getting steadily worse, should tell the Court that he was concerned about the nature of the advances he had made and was attempting to elevate his position at the expense of arms-length creditors.  The Court should also take into account what happened, or didn't happen, after the Greenfield Note was issued.  Although the

HoldCos failed to make payments, Roger did not call a default or attempt to foreclose – obviously not the actions of a real "lender."

427.    **The relative position of the obligees as to other creditors regarding the payment of interest and principal:**  The Insider Defendants preferred themselves over third party creditors in myriad ways, as discussed herein, including taking out millions of dollars in distributions from the Restaurant Group while landlords, who had been defrauded into advancing credit in the first place on the basis of the Consolidated Financials, went unpaid.  So while in this case there was no "interest and principal" that the Insider Defendants could prefer themselves with respect to – since the advances bore no indicia of debt – plainly they preferred themselves in other ways (and in fact actively worked to impede and delay creditor collections).

428.    **The voting power of the holder of the instrument:**  Roger and Ted, directly or indirectly, were the 100% shareholders and the directors and officers of every entity within the Restaurant Group, including Concepts.

429.    **The provision of a fixed rate of interest:**  None existed, as discussed above, at least until long after Concepts was insolvent and Roger belatedly attempted to "paper" his advances by causing the HoldCos to issue the Greenfield Note.

430.    **A contingency on the obligation to repay:**  There does not appear to have been any fixed obligation to repay.  Again, there was no documentation that would have set a maturity date, the Insider Defendants never called a "default" in connection with money they had advanced, and the only way they were "repaid" was as a result of future distributions to them from Concepts or the other HoldCos – distributions that in many or most cases do not appear to have tied to specific advances.

431.   **The source of the interest payments:**  Again, no interest payments were ever made (or even contemplated), strongly suggesting that none of the advances were truly "loans."

432.   **The presence or absence of a fixed maturity date:**  As noted above, no fixed maturity date existed.   In fact, all of the Insider Defendants continued to extend substantial additional "loans" to the Debtor long after earlier advances had not been repaid – strongly indicating that they were investing in businesses they owned, not making "loans" and expecting regular repayment.

433.   **A provision for redemption by the corporation:**  The advances were not documented, so there were no provisions of any nature.

434.   **A provision for redemption at the option of the holder:**  The advances were not documented, so there were no provisions of any nature.

435.   **The timing of the advance with reference to the organization of the corporation:**  One of the primary reasons the Restaurant Group was frequently in need of cash was buildout expenses for new restaurants which, as discussed above, can be risky.  TI Funds and Restaurant Group cash flows were often insufficient on their own to cover buildout expenses, especially given the separate drag of unprofitable locations on cash flow generally.

436.   As discussed above, Roger and Ted were failing to capitalize the HoldCos when created, leaving the HoldCos reliant on comingled TI Funds and Restaurant Group revenues. Obviously there would be shortfalls, and rather than Roger and Ted properly capitalizing their businesses, they would cause the Insider Defendants to make "loans" to the Restaurant Group, usually via Concepts, in amounts just sufficient to keep the group afloat.  The Insider Defendants would then take money out when possible.

437.   In sum, at a time they were trying to start numerous risky new restaurants around the country, Roger and Ted were putting almost no equity in the HoldCos and/or the Restaurant Group, and instead were advancing every dollar as a "loan" – improving their position vis-à-vis innocent (and in fact defrauded) third party creditors.

438.   Not only do all of the above factors strongly support a conclusion that all advances made by the Insider Defendants to entities within the Restaurant Group were advanced as equity and not as debt, each of the Insider Defendants is an "insider" of the Debtor, and thus their claims should be scrutinized more heavily than those of non-insiders.

439.   The Court should also remember that Roger and Ted were at all times fiduciaries of each of the entities within the Restaurant Group, and that the other two Insider Defendants are their spouses.  At all times Roger and Ted were acting under an inherent conflict of interest, in that they were on both sides of the purported "loan" transactions, and had the ability to structure the advances in a way that benefited them and their spouses at the expense of the Debtor and its creditors.

440.   Finally, the Court should consider Roger and Ted's claim with respect to the nature of the advances in light of the other conduct alleged herein, and their general willingness to take actions that would advance their personal interests (and those of their spouses) over the interests of innocent third party creditors.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order:

(a)   declaring that all monies advanced by each of the Insider Defendants to Consolidated Concepts shall be deemed to be, and to the extent necessary recharacterized to be, equity infusions;

(b)      disallowing any and all proofs of claim submitted by the Insider

Defendants on account of monies allegedly advanced by the Insider Defendants,

including the Greenfield POC and the Kasemir POC;

(c)      awarding the Trustee pre- and post-judgment interest, costs, and attorneys'

fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)      granting the Trustee such other and further relief as the Court deems just

and proper.

### Count VII
### Avoidance and Recovery of Constructively Fraudulent Transfers
### Pursuant to, Without Limitation, 740 ILCS §160/1, *et seq.* and
### 11 U.S.C. §§544(b)(1) and 550(a).
### (*Against Roger, Ted, and Lisa – Post-Insolvency Payments*)

441.    The Trustee re-alleges the preceding paragraphs 1 - 440, as if stated fully herein.

442.    Multiple creditors of Consolidated Concepts had claims that preceded the Insider

Post-Insolvency Payments.

443.    Each Post-Insolvency Payment constituted a transfer of an interest in property of

Consolidated Concepts.

444.    Each of the Post-Insolvency Payments was made to or for the benefit of the

Insider Defendant who was the recipient of such Post-Insolvency Payment.

445.    Consolidated Concepts received no consideration, or less than reasonably

equivalent value, in exchange for the Post-Insolvency Payment.

446.    The Restaurant Group was insolvent at the time of each Post-Insolvency Payment,

and for the reasons discussed herein, notably the extensive comingling between entities, it is

impossible and inappropriate to judge insolvency on less than a Restaurant Group basis.

447.    Consolidated Concepts  intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due at the time of, or as a result of, the Post-Insolvency Payments.

448.    Roger, Ted, and Lisa were either: (a) transferees of the Post-Insolvency Payments or (b) subsequent transferees of the initial transferees of the Post-Insolvency Payments.

449.    Accordingly, the Post-Insolvency Payments constitute avoidable fraudulent transfers pursuant to 740 ILCS §160/5(a)(2), as incorporated by 11 U.S.C. §544(b)(1).

450.    To the extent that the Post-Insolvency Payments are avoided pursuant to 740 ILCS §160/5(a)(2), the Post-Insolvency Payments and/or their value may be recovered by the Trustee from the Insider Defendants who received the Post-Insolvency Payments pursuant to, without limitation, 740 ILCS §160/9(b) and 11 U.S.C. §550(a).

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)     avoiding the Post-Insolvency Payments and entering judgment against each of Roger, Ted, and Lisa, in each case in the aggregate amount of the Post-Insolvency Payments received by such Insider Defendant from Consolidated Concepts (as determined by the Court), plus interest from the date of the transfer, pursuant to, without limitation, 740 ILCS §160/9 and 11 U.S.C. §550(a);

(b)     awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(c)     granting the Trustee such other and further relief as the Court deems just and proper.

## COUNT VIII
### Avoidance and Recovery of Actually Fraudulent Transfers
### Pursuant to, Without Limitation, 740 ILCS §160/1, *et seq.* and
### 11 U.S.C. §§544(b)(1) and 550(a).
**(*Against Roger, Ted, and Lisa – Post-Insolvency Distributions*)**

451.    The Trustee re-alleges the preceding paragraphs 1 - 450, as if stated fully herein.

452.    By at least the beginning of 2012, Roger, Ted, and Lisa were aware that Concepts and the Restaurant Group generally were insolvent and unable to pay their debts as they came due.   They were also aware that a number of the Restaurant Group's locations were not profitable.

453.    Throughout 2012, Roger, Ted, and Lisa were aware that entities within the Restaurant Group had defaulted on leases, closed associated restaurants, and that Concepts was liable on guaranty obligations relating to these shuttered locations.

454.    In 2012 and early 2013, Roger, Ted, and Lisa were aware that multiple other restaurants were not profitable and would need to close shortly.   Roger and Ted were also aware that these additional closings and associated breaches would result in claims against Concepts for leases it had guaranteed.

455.    Concepts and the Restaurant Group as a whole became more insolvent as additional locations closed in 2012, 2013 and 2014, guaranty debt mounted, and it continued to be impossible to pay debts as they came due.

456.    The Restaurant Group was insolvent at the time of each Post-Insolvency Payment, and for the reasons discussed herein, notably the extensive comingling between entities, it is impossible and inappropriate to judge insolvency on less than a Restaurant Group basis.

457.    The Post-Insolvency Payments were made with actual intent to hinder, delay, or defraud creditors.

458.    Among other things, the Post-Insolvency Payments were made to insiders, either Roger or Ted – who owned and controlled all of the entities within the Restaurant Group – or to Lisa, Ted's wife.

459.    All or most of the Post-Insolvency Payments were made after Concepts and/or other entities within the Restaurant Group had been sued and threatened with suits regarding unpaid debts, including lease defaults.

460.    The Post-Insolvency Payments continued to be made even as more and more defaults occurred, restaurants closed, guaranty debt mounted, and Concepts and the Restaurant Group became insolvent to an ever greater degree.

461.    Consolidated Concepts did not receive reasonably equivalent value for the Post-Insolvency Payments.

462.    Upon information and belief, the Post-Insolvency Payments occurred in Illinois.

463.    Roger, Ted, and Lisa were either: (a) transferees of the Post-Insolvency Payments was made; or (b) subsequent transferees of the initial transferees of the Post-Insolvency Payments.

464.    Accordingly, the Post-Insolvency Payments constitute avoidable fraudulent transfers pursuant to 740 ILCS §160/5(a)(1), as incorporated by 11 U.S.C. §544(b)(1).

465.    Therefore, to the extent that the Post-Insolvency Payments are avoided pursuant to 740 ILCS §160/5(a)(1), the Post-Insolvency Payments and/or their value may be recovered by the Trustee pursuant to, without limitation, 740 ILCS §160/9(b) and 11 U.S.C. §550(a).

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)    declaring that Roger, Ted, and Lisa are liable on account of their hindering, delaying, or defrauding creditors as described herein;

(b)    avoiding the Post-Insolvency Payments and entering judgment against each of Roger, Ted, and Lisa in the amount of the aggregate value of the Post-Insolvency Payment received by such party from Consolidated Concepts (as determined by the Court), plus interest from the date of the transfer, pursuant to, without limitation, 740 ILCS §160/9 and 11 U.S.C. §550(a);

(c)    awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)    granting the Trustee such other and further relief as the Court deems just and proper.

## COUNT IX
## Avoidance of Illegal Distributions
### (*Against Roger and Ted*)

466.    The Trustee re-alleges the preceding paragraphs 1 - 465, as if stated fully herein.

467.    On information and belief, Roger and Ted, as the sole members on Concepts' Board of Directors, to the extent that it had one, never formally authorized any of the Post-Insolvency Payments in violation of 805 ILCS 5/9.10(a).

468.    All of the Post-Insolvency Payments were made on and after the point that Concepts and the Restaurant Group, and thus Consolidated Concepts, were insolvent, or caused Concepts and the Restaurant Group, and thus Consolidated Concepts, to become insolvent.

469.    During all relevant times, Concepts was a corporation organized under Illinois Law.

470.    The Restaurant Group was insolvent at the time of each Post-Insolvency Payment, and for the reasons discussed herein, notably the extensive comingling between entities, it is impossible and inappropriate to judge insolvency on less than a Restaurant Group basis.

471.    As a result of the Post-Insolvency Payments, the net assets of Concepts were less than the "maximum amount payable at the time of distribution to shareholders having preferential rights in liquidation if the corporation were then to be liquidated." As such, the Post-Insolvency Payments were made in violation of 805 ILCS 5/9.10(c).

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)     declaring that the Post-Insolvency Payments were made as illegal distributions;

(b)     avoiding the Post-Insolvency Payments and entering judgment against Roger and Ted in the amount of the aggregate value of the Post-Insolvency Payments received by each of them (as determined by the Court), plus interest from the date of the transfer;

(c)     awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)     granting the Trustee such other and further relief as the Court deems just and proper.

## COUNT X
## Equitable Subordination of Greenfield and Kasemir Claims
## Pursuant to 11 U.S.C. § 510(c)
### (Against Roger and Ted)

*(Alternative count – only necessary to the extent that Insider Defendant proofs of claim have not been fully disallowed on account of the recharacterization count set forth above)*

472.     The Trustee re-alleges the preceding paragraphs 1 - 471, as if stated fully herein.

473.     Section 510(c) of the Bankruptcy Code states that the Court may: "(1) under principals of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."  11 U.S.C. § 510(c).

474.     Courts analyzing requests for equitable subordination have generally adopted the following three-part test, each of the conditions of which must be satisfied in order for a claim to be equitably subordinated: "(i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]." *Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).

475.     Each of the elements of the *Mobile Steel* test are met, such that equitable subordination of the claims of the Insider Defendants, including the Greenfield POC and the Kasemir POC, to the claims of general unsecured creditors is appropriate pursuant to section 510(c) of the Bankruptcy Code.

476.    First, Greenfield and Kasemir, both directly and through entities under their ownership and control, engaged in substantial inequitable conduct during the relevant periods prior to the Petition Date, including, without limitation:

(a)    Failing to properly capitalize Concepts, the Restaurant Group generally, or any of the HoldCos within it.

(b)    Commingling the funds of Concepts and the Concepts-Owned HoldCos with the funds of often undercapitalized Insider-Owned HoldCos, utilizing Concepts' funds for the benefit of the Insider Defendants and often undercapitalized and unprofitable Insider-Owned HoldCos, and causing Concepts to become liable on debts for which it would not otherwise have been liable.

(c)    Causing Concepts to provide Development Services to help form Insider-Owned HoldCos and otherwise paying for buildout and other start-up expenses of the companies, yet causing ownership of the new HoldCos to be vested in one or more of the Insider Defendants.

(d)    Causing Concepts to provide the Common Concepts Services without payment or reimbursement, including to Insider-Owned HoldCos owned by Roger and/or Ted.

(e)    Utilizing Concepts' assets and good will as collateral in transactions benefitting themselves or their friends and family thereby keeping themselves from having to provide collateral for their transactions and dissipating Concepts' assets while preserving their own.

(f)    Creating, participating in or acquiescing to the creation of, inaccurate Consolidated Financials which were then provided to landlords and other creditors to obtain credit for use in enterprises that benefited Roger and Ted or their friends and family.  Moreover, having landlords accept Concepts as a guarantor – based on its apparent financial strength as reflected in the Consolidated Financials – benefited Ted and Roger by allowing them to avoid personally guaranteeing leases.

(g)    After Concepts and the Restaurant Group became insolvent, causing Concepts to take out the Concepts-Edgebrook Loan, thereby causing the Encumbering of the Concepts Assets (and thus subordinating the claims of existing creditors), while diverting the vast majority of the proceeds of the Concepts-Edgebrook Loan for the benefit of the Insider Defendants or entities legally owned by them, other than Concepts.

(h)     Directing Concepts' attorneys and accountants, employees and other professionals and agents to carry out tasks and activities to strip Concepts of assets and hinder and delay creditors, including the transfer of the Transferred Subsidiaries to Holding (and associated transactions).

(i)     Failing to maintain accurate records of transfers of Concepts' assets and loans of monies or other assets to the Insider-Owned HoldCos to benefit those companies and their owners to the detriment of Concepts and thereby furthering Concepts' insolvency.

(j)     Causing the De-Coupling to occur, and thereby depriving Concepts of all of its revenues.

(k)     Creating false loan obligations against Concepts in favor of insiders such as with respect to the Greenfield Note.

(l)     Engaging in the Improper Scheduling and Assertion of Unsupportable Insider Claims.

(m)     Post-bankruptcy, executing the Exercise of Rights documents and causing the Concepts-Owned HoldCos to engage in the Post-Petition Corporate Waste Transfers that dissipated Concepts' assets for the benefit of Roger and Ted and to the detriment of the Concepts' estate and creditors

477.    The inequitable conduct of the Roger and Ted and their wives (who benefitted from all of the inequitable conduct described above, and participated in it by comingling their funds with those of the Restaurant Group and continuing to take out money post-insolvency) conferred a significant unfair advantage on the Insider Defendants, and caused substantial harm to the Debtor's legitimate unsecured creditors.

478.    In light of the foregoing circumstances, equitable subordination of Roger and Ted's claims will do justice to the Debtor's legitimate unsecured creditors, and is consistent with the provisions of the Bankruptcy Code.

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)      subordinating any and all claims of the Insider Defendants, including the claims reflected in the Greenfield POC and the Kasemir POC, to the claims of general unsecured creditors of Concepts pursuant to section 510(c) of the Bankruptcy Code;

(b)      awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(c)      granting the Trustee such other and further relief as the Court deems just and proper.

<u>**COUNT XI**</u>
<u>**Equitable Subordination and Disallowance of the Republic Bank Claims, and**</u>
<u>**Disgorgement of Amounts Paid by Consolidated Concepts Thereunder**</u>
<u>**Pursuant to 11 U.S.C. § 510(c)**</u>
(***Against Republic Bank***)

479.    The Trustee re-alleges the preceding paragraphs 1 - 478, as if stated fully herein.

480.    Section 510(c) of the Bankruptcy Code states that the Court may: "(1) under principals of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."  11 U.S.C. § 510(c).

481.    Courts analyzing requests for equitable subordination have generally adopted the following three-part test, each of the conditions of which must be satisfied in order for a claim to be equitably subordinated: "(i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or

conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must

not be inconsistent with the provisions of the Bankruptcy [Code]." *Matter of Mobile Steel Co.*,

563 F.2d 692, 700 (5th Cir. 1977).

482.    Each of the elements of the *Mobile Steel* test are met, such that it is appropriate

for all claims that Republic Bank may assert against Consolidated Concepts to be equitably

subordinated pursuant to section 510(c) of the Bankruptcy Code, and the liens securing such

Republic Bank claims should be transferred to the bankruptcy estate.

483.    Republic Bank's predecessor in interest, Edgebrook Bank, engaged in substantial

inequitable conduct prior to the Petition Date.

484.    Among other things, and without limitation, Edgebrook Bank required the

Edgebrook Investment to be made in order for Edgebrook Bank to make the Edgebrook Loans.

485.    Roger testified that, among other things:  (a) he had never invested in a bank

before; (b) he understood the investment to be a necessary pre-requisite for Edgebrook making

the Edgebrook Loans; and (c) he did no due diligence with respect to the Edgebrook Investment.

486.    Given that, among other things, Concepts and the Restaurant Group were

insolvent at the time the Edgebrook Loans closed, and had been for at least over a year, Concepts

had not filed a federal income tax return since its 2008 return was filed (*i.e.*, Concepts was

delinquent on its 2009, 2010, 2011, and 2012 tax returns at the time the Edgebrook Loans

closed), and multiple entities within the Restaurant Group has just defaulted on leases resulting

in Concepts becoming liable for more and more guaranty debt relating to closed locations, no

reasonable third party lender that conducted customary and reasonable due diligence would have

extended credit to Concepts or entities within the Restaurant Group at the time the Edgebrook Loans issued.

487.    Edgebrook Bank, however, which at the time was in its own financial difficulty, was in need of additional capital, and in fact was taken over by the Federal Deposit Insurance Corporation in 2015.

488.    Due to Roger's willingness to make the Edgebrook Investment, Edgebrook Bank either failed to conduct appropriate and customary due diligence, or disregarded information that would have resulted in a reasonable lender refusing to extend credit.  Either way, Edgebrook Bank acted recklessly and improperly in issuing the Edgebrook Loans, and did so in furtherance of its own self-interest.

489.    Edgebrook's reckless behavior resulted in general harm being suffered by all of Concepts' creditors.  As discussed in greater detail above, Roger and Ted quickly used all or a large percentage of the Edgebrook Loan Proceeds for their own direct or indirect benefit.

490.    Even the stock certificates from the Edgebrook Investment benefitted Roger personally despite the fact that Concepts effectively made the Edgebrook Investment.

491.    The result of all of this for Concepts was that its two most valuable subsidiaries, and other entities that for years had operated as *alter-egos* of Concepts (as discussed above) became encumbered by liens, yet had received little or no benefit, all at a time when Concepts and the Restaurant Group were insolvent, Concepts was facing mounting litigation, and at around the same time Roger and Ted caused the Transferred Subsidiaries to be transferred to Holding and engineered the De-Coupling.

492.    Upon information and belief, all of this was part of a deliberate strategy to hinder and delay creditors, while sucking out money for the benefit of Roger and Ted.  It would not have been possible but for Edgebrook recklessly and negligently overlooking obvious warning signs, and without Roger purchasing $200,000 in Edgebrook stock to induce it to extend credit.

493.    Meanwhile, Edgebrook, and Republic as Edgebrook's successor and the recipient of continued payments under the Edgebrook Loans, benefitted substantially.  The $200,000 "investment" was effectively a financing charge – since it was required for the loan to be made. Even if you allocate half of the finance charge to each Edgebrook Loan, the effective rate of interest being charged on the Concepts-Edgebrook Loan was over 24% (a minimum of 6.25%, plus over 15% for the finance charge ($8,333 per month for the 12 month term of the loan, or $100,000 / 12).  Similarly, the Pickwick-Edgebrook Loan only resulted in $394,839.80 in new money, so a $100,000 finance charge allocated over the five year life of such a loan is akin to a 5% bump to the underlying rate.

494.    Republic Bank, as the successor in interest to Edgebrook Bank, is responsible for, and subject to all defenses that could be asserted against, Edgebrook Bank, with respect to the Edgebrook Loans and Edgebrook Liens

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)    subordinating any and all claims that Republic Bank may have or assert against Consolidated Concepts to the claims of general unsecured creditors of Concepts pursuant to section 510(c) of the Bankruptcy Code;

(b)      Transferring any liens securing any and all claims that Republic Bank may have or assert against Consolidated Concepts to the bankruptcy estate pursuant to section 510(c) of the Bankruptcy Code;

(c)      Ordering Republic to disgorge all amounts previously paid to it and/or to Edgebrook on account of the Edgebrook Loans by Consolidated Concepts;

(d)      awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(e)      granting the Trustee such other and further relief as the Court deems just and proper.

### Count XII
### Avoidance and Recovery of Constructively Fraudulent Transfers
### Pursuant to, Without Limitation, 740 ILCS §160/1, *et seq.*
### and 11 U.S.C. §§544(b)(1) and 550(a).
**(*Against Holding, Rodd and One North – Transfer of One North*)**

495.   The Trustee re-alleges the preceding paragraphs 1 - 494, as if stated fully herein.

496.   Prior to March 4, 2013, Concepts owned 100% of the capital stock and/or membership interests in the Transferred Subsidiaries (the "*Ownership Interests*"), including the One North Stock.

497.   On March 4, 2013, Roger, Ted, and the Law Firm Partner caused Concepts to engage in the Subsidiary Transfer, thereby transferring Concepts' entire ownership interest in each of the Transferred Subsidiaries, including the One North Stock, to Holding. The Trustee specifically incorporates, and directs the Court's attention to, the Subsidiary Transfer Facts set forth above.

498.     The Transfer of each of the Ownership Interests to Holding, including the transfer of the One North Stock, each constituted a transfer of an interest in property of Concepts.

499.     In fact, at the time Concepts transferred the Ownership Interests to Holding, the Ownership Interests were, legally and on paper, Concepts' principal assets.

500.     The Transfer of the One North Stock was made to or for the benefit of the Holding as the recipient of the One North Stock.

501.     The transfer by Concepts of the One North Stock was made for less than reasonably equivalent value, and upon information and belief, for no consideration.

502.     Concepts and the Restaurant Group were insolvent at the time the One North Stock was transferred to Holding along with the other Ownership Interests, or was rendered insolvent as a result of the transfer.

503.     Concepts  intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due at the time of, or as a result of, the Transfer of the One North Stock.

504.     At the time Concepts transferred the Ownership Interests to Holding, Rodd was the CFO for both Concepts and each of the Transferred Subsidiaries.

505.     On July 26, 2013, less than four months after the Transfer of the Owned Subsidiaries, Rodd, Roger, and Ted executed a "Stock Purchase Agreement" (the "*SPA*") between Rodd and One North (one of the Transferred Subsidiaries) whereby Roger and Ted purported to cause One North to transfer 100% of its own capital stock (*i.e.*, the One North Stock owned by Holding) to Rodd.

506.    Pursuant to the SPA, the consideration for the One North Stock was: "payment of all liabilities [of One North] including, but not limited to, past due rent, past due taxes, all payables totaling approximately ONE HUNDRED THOUSAND ($100,000.00) DOLLARS."

507.    The consideration Rodd purported to give for the purchase was illusory since One North was already liable for its own debts, and in any event was not reasonably equivalent to the value of One North.

508.    Roger and Ted did not market One North to other purchasers or conduct any sort of valuation of One North prior to the purported transfer of its stock to Rodd.

509.    The Trustee needs post-filing discovery to determine whether Roger or Ted may have personally benefited from the transfer of the One North, but the Trustee is aware of One North making at least one $7,149.00 payment to Roger (Check No. 11507 from the One North 9021 account) on 10/1/13, or months after the transfer.

510.    More fundamentally, however, *One North did not own any of the One North Stock* because as set forth above, 100% of the One North Stock was (and still is) owned by Holding.

511.    Despite the foregoing, upon execution of the SPA, Roger and Ted allowed Rodd to take possession of One North, and Rodd has operated One North for his own benefit since that point, without distributing the net profits of the business to Holding, or otherwise acknowledging that Holding remains the 100% owner of the One North Stock (any and all net proceeds of the business that have been retained by Rodd, but that should have been distributed to Holding on account of its 100% ownership interest in One North, shall be referred to herein as the "*One North Net Proceeds*").

512.     To the extent the Court finds that as a result of the SPA or otherwise, Rodd took ownership of the One North Stock, Rodd is a subsequent transferee of One North.

513.     Upon information and belief, the transfer of the One North Stock occurred in Illinois.

514.     The transfer of One North Stock to Holding constituted an avoidable fraudulent transfers pursuant to 740 ILCS §160/5(a)(2), as incorporated by 11 U.S.C. §544(b)(1).

515.     To the extent that the transfer of One North Stock to Holding is avoided pursuant to 740 ILCS §160/5(a)(2), the One North Stock and/or its value may be recovered by the Trustee from Rodd, as a subsequent transferee pursuant to 740 ILCS §160/9(b) and 11 U.S.C. §550(a).

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment either:

(a)     declaring that Holding remains the owner of One North and the One North Stock and that Rodd has no ownership interest in One North or the One North Stock;

(b)     only if the Court finds that the One North Stock was somehow transferred to Rodd, or the Court is unable to make such a determination, avoiding the transfer of One North and the One North Stock to Holding and the subsequent transfer of One North and the One North Stock to Rodd, ordering Rodd to promptly transfer ownership of One North and the One North Stock to the Trustee, and entering judgment against Rodd in the amount of the One North Net Profits through the date the One North Stock is returned to the Trustee (in an amount to be determined by the Court), plus interest from the date of the transfer, pursuant to, without limitation, 740 ILCS §160/9 and 11 U.S.C. §550(a);

(c)     awarding the Trustee pre- and post-judgment interest, costs, and attorneys'

fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)     granting the Trustee such other and further relief as the Court deems just

and proper.

**COUNT XIII**
**Avoidance and Recovery of Actually Fraudulent Transfers**
**Pursuant to, Without Limitation, 740 ILCS §160/1, *et seq.* and**
**11 U.S.C. §§544(b)(1) and 550(a).**
(*Against Holding, Rodd, and One North – Transfer of One North*)

516.    The Trustee re-alleges the preceding paragraphs 1 - 515, as if stated fully herein.

517.    On March 4, 2014, Roger, Ted, and the Law Firm Partner caused Concepts to

engage in the Subsidiary Transfer, thereby transferring Concepts' entire ownership interest in

each of the Transferred Subsidiaries, including the One North Stock, to Holding.  The Trustee

specifically incorporates, and directs the Court's attention to, the Subsidiary Transfer Facts set

forth above.

518.    The Transfer of each of the Ownership Interests to Holding, including the transfer

of the One North Stock, each constituted a transfer of an interest in property of Concepts.

519.    The transfer by Concepts of One North and the other Transferred Subsidiaries to

Holding was made with actual intent to hinder, delay, or defraud creditors.

520.    Holding, the Transferee and beneficiary of the transfer of the One North Stock,

was an insider of Concepts.

521.    The Debtor retained control of the Transferred Subsidiaries whose stock was

transferred after the transfer as a result of its ownership interest in Holding, but more

importantly, as discussed in detail above, the Law Firm Partner structured the Holding

Transaction so as to give Roger and Ted a way to try to remain in control of the Transferred Subsidiaries in the event a trustee or receiver was appointed for Concepts (by arguing that Concepts was dissociated, and having Concepts RM, controlled via Roger and Ted, purchase a 1% interest).

522.    The transfer was not disclosed.  Creditors were unaware of the transfer, and Roger testified that they did not even notify Edgebrook Bank, Republic Bank's predecessor, despite the fact that the Edgebrook Loan closed on March 18, 2013, less than three weeks after the Subsidiary Transfer occurred on March 4, 2013.   And Concepts was the borrower on the Edgebrook Loan, and the two valuable Transferred Subsidiaries – Grillroom and Townhouse – were guarantors.

523.    At the time of the transfer by Concepts of One North and the other Transferred Subsidiaries to Holding, Concepts had been sued and threatened with suits regarding unpaid debts, including lease defaults.

524.    At the time Concepts transferred the Ownership Interests to Holding, the Ownership Interests were, legally and on paper, Concepts' principal assets.

525.    The result of the transfer was concealing assets from judgment creditors.  By the time judgment creditors obtained judgments, they found that as a result of the transfer, Concepts was an empty shell, allowing Roger and Ted to remain in control of the Transferred Restaurants far longer than they otherwise would have.

526.    The transfer by Concepts of One North and the One North Stock was made for less than reasonably equivalent value, and upon information and belief, for no consideration.

527.     Concepts was insolvent at the time One North and the One North Stock were transferred to Holding along with the other Ownership Interests, or became insolvent as a result of the transfer.

528.     The transfer took place in early 2013, at a time when Roger, Ted, Rodd, and the Law Firm Partner were all aware that (a) Concepts was insolvent and unable to pay its debts as they came due and (b) multiple HoldCos within the Restaurant Group had defaulted on leases and closed associated restaurants, more were likely to default, and that Concepts was liable on guaranty obligations relating to many or all of these closed and/or soon to be closed locations.

529.     The Trustee adopts all allegations relating to Rodd, and his status as a subsequent transferee of Holding with respect to One North and the One North Stock, included in Count XII, as though set forth fully herein.

530.     Upon information and belief, the transfer of One North and the One North Stock occurred in Illinois.

531.     Accordingly, the transfer of One North and the One North Stock to Holdings constitutes an avoidable fraudulent transfer pursuant to 740 ILCS §160/5(a)(1), as incorporated by 11 U.S.C. §544(b)(1).

532.     To the extent that the transfer of One North and the One North Stock to Holding is avoided pursuant to 740 ILCS §160/5(a)(1), the Trustee may recover One North and the One North Stock and/or its value from Rodd as a subsequent transferee pursuant to, without limitation, 740 ILCS §160/9(b) and 11 U.S.C. §550(a).

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)      Declaring that Holding remains the owner of One North and the One North Stock and that Rodd has no ownership interest in One North or the One North Stock;

(b)      Only if the Court finds that One North or the One North Stock was somehow transferred to Rodd, or the Court is unable to make such a determination, avoiding the transfer of One North or the One North Stock to Holding and the subsequent transfer of One North or the One North Stock to Rodd, ordering Rodd to promptly transfer ownership of One North and the One North Stock to the Trustee, and entering judgment against Rodd in the amount of the aggregate net profits of One North from July 26, 2013 through the date of turnover of the One North Stock (as determined by the Court), plus interest from the date of the transfer, pursuant to, without limitation, 740 ILCS §160/9 and 11 U.S.C. §550(a);

(c)      awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)      granting the Trustee such other and further relief as the Court deems just and proper.

### Count XIV
### Civil Conspiracy to Commit Actual Fraud
### (*Against Roger, Ted, and Rodd*)

533.    The Trustee re-alleges the preceding paragraphs 1 - 532, as if stated fully herein.

534.    Defendants Roger, Ted, and Rodd, acting through the Law firm Partner (collectively, the "*Conspirators*"), knew that the purpose of the transfer of the Ownership

Interests in the Transferred Subsidiaries to Holdings, was to deprive Concepts of its assets to the detriment of Concepts and its creditors.

535.    Each of the Conspirators entered into a conspiracy to engage in a series of transactions related to the transfer of the of the Ownership Interests in the Transferred Subsidiaries to Holdings, including the subsequent purported transfer of the One North stock, the post-bankruptcy exercise of the "Exercise of Rights" document, all of which hindered and delayed creditors and allowed Roger and Ted to enrich themselves by making the Post-Petition Corporate Waste Transfers.

536.    As a result of the conspiracy described above and more generally described herein, Concepts was deprived of its assets and rendered insolvent (or further insolvent) and unable to pay its debts as they came due.

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)    finding that the Conspirators engaged in a civil conspiracy as described herein;

(b)    entering judgment against each of the Conspirators, jointly and severally, in the amount of the liabilities of Concepts (plus interest, costs, and attorneys' fees), which amount will be determined at trial, but is currently believed to exceed $12 million, plus punitive damages;

(c)    awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)     granting the Trustee such other and further relief as the Court deems just and proper.

**Count XV**
**Aiding and Abetting Actual Fraudulent Transfers**
(*Against Roger, Ted, and Rodd*)

537.     The Trustee re-alleges the preceding paragraphs 1 - 536, as if stated fully herein.

538.     Defendants Roger, Ted, and Rodd, acting through the Law Firm Partner (defined above as the "*Conspirators*"), knowingly induced, participated, and assisted Concepts in actively defrauding its creditors by and through transactions related to the transfer of the of the Ownership Interests in the Transferred Subsidiaries to Holdings.

539.     As a result of each of the Conspirators aiding and abetting this fraud, Concepts has creditors that remain unpaid, and all of its creditors were hindered and delayed, even though Concepts had sufficient assets notwithstanding the fraud to satisfy all or part of the liability.

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)     finding that each of the Conspirators aided and abetted a deliberate fraud perpetrated on Concepts' creditors;

(b)     entering judgment against each of the Conspirators, jointly and severally, in the amount of the liabilities of Concepts (plus interest, costs, and attorneys' fees), which amount will be determined at trial, but is currently believed to exceed $12 million, plus punitive damages;

(c)     awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)      granting the Trustee such other and further relief as the Court deems just

and proper.

## Count XVI
## Avoidance of Improper Post-Petition Transfer
### (*Against Concepts RM, Roger, and Ted*)

540.    The Trustee re-alleges the preceding paragraphs 1 - 539, as if stated fully herein.

541.    As discussed above, upon information and belief, Concepts RM engaged in the

Post-Petition Transfer on or about March 26, 2015.

542.    The order for relief in the bankruptcy was entered on November 18, 2014.

Accordingly, the Post-Petition Transfer occurred after the entry of the Order for Relief.

543.    The Post-Petition Transfer resulted in 1% of Concepts' ownership interest in

Holdings being transferred to Concepts RM.

544.    Concepts' ownership interest in Holdings was property of its bankruptcy estate.

545.    The Post-Petition Transfer was not authorized by the Court or otherwise.

546.    Accordingly, the Post-Petition Transfer constitutes an improper post-petition

transfer as contemplated by, and may be avoided pursuant to, 11 U.S.C. § 549.

547.    As discussed separately herein, counsel invented and structured the Post-Petition

Transfer, and advised Roger and Ted to engage in same.

548.    Roger and Ted executed the Exercise of Rights Document and otherwise caused

the Post-Petition Transfer to occur.

549.    Upon information and belief, Roger, Ted, and counsel all knew or should have

known that the Post-Petition Transfer was an illegal post-petition transfer at the time the transfer

was made.

550.    Concepts' bankruptcy estate was substantially harmed by the foregoing conduct, because the Post-Petition Transfer allowed Roger and Ted to remain in control of Concepts' subsidiaries for months and engage in the Corporate Waste Transfers for their benefit and for that of counsel.  The Trustee and estate then had to incur substantial attorneys' fees to prosecute a motion, with Roger and Ted, including as represented by the Law Firm, opposed, to obtain control of the subsidiaries.

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)    finding that the Post-Petition Transfer was an improper post-petition transfer and is avoidable pursuant to 11 U.S.C. § 549;

(b)    avoiding the Post-Petition Transfer pursuant to 11 U.S.C. § 549;

(c)    entering judgment against each of Concepts RM, Roger, and Ted, jointly and severally, in the amount of damages incurred by the estate as a result of the Post-Petition Transfer, including, without limitation, the amount of the Post-Petition Waste Transfers, and all attorneys' fees and expenses incurred by the estate in connection with obtaining control of the Concepts' subsidiaries owned by Holdings, all in an amount to be determined at trial;

(d)    awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(e)    granting the Trustee such other and further relief as the Court deems just and proper.

## Count XVII
## Quantum Meruit
**(*Against Park Tavern Rosemont, Prime Bar Tampa, Prime Bar Chicago,
Park Tavern Chicago, 1840 Pickwick, and the Restaurants America Entities*)**

*Interplay with other Counts:  if Count I (substantive consolidation) is granted
in full, this Count II will only be relevant to 1840 Pickwick*

551.    The Trustee re-alleges the preceding paragraphs 1 - 550, as if stated fully herein.

552.    As discussed above, Concepts has always performed the Common Concepts Services for the benefit of the other entities within the Restaurant Group without receiving compensation or reimbursement for doing so.

553.    The Operational Restaurant Group Entities and the Restaurants America Entities (collectively, the "*Quantum Meruit Defendants*") all benefitted from the Common Concepts Services.

554.    Concepts, legally, has no ownership interest in the Quantum Meruit Defendants.

555.    It would be inequitable for the Quantum Meruit Defendants to have received the value of the Common Concepts Services but not pay for them.

**WHEREFORE**, for the reasons stated herein, Plaintiff respectfully requests that the Court enter judgment:

(a)    entering judgment against each of the Quantum Meruit Defendants in an amount equal to the value of the Common Concepts Services that each such entity received or benefited from, as determined at trial;

(b)    awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(c)      granting the Trustee such other and further relief as the Court deems just

and proper.

Respectfully submitted,

BRIAN AUDETTE,
CHAPTER 7 TRUSTEE

By:___/s/ Matthew E. McClintock___
One of His Attorneys

Matthew E. McClintock
Daniel C. Curth
GOLDSTEIN & MCCLINTOCK LLLP
208 South LaSalle Street
Suite 1750
Chicago, Illinois 60604
P: 312-337-7700
F: 312-277-2305
e-mail: mattm@goldmclaw.com